# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

---

|  |  |
|---|---|
| CHANGJI ESQUEL TEXTILE CO. LTD., | : |
| 12 Lvzhou South Road | : |
| Changji, Xinjiang, China | : |
|  | : |
| ESQUEL ENTERPRISES LIMITED, | : |
| 13/F., Harbour Centre | : |
| 25 Harbour Road | : |
| Wanchai, Hong Kong | : |
|  | : |
| ESQUEL APPAREL INC., | : |
| 14 East 33rd Street | : |
| New York, NY 10016 | : |
|  | : |
| Plaintiffs, | : |
|  | : |
| v. | : Civ. Action No. _____ |
|  | : |
| GINA M. RAIMONDO, SECRETARY OF COMMERCE, | : |
| 1401 Constitution Avenue, N.W., Washington, D.C. 20230 | : |
|  | : |
| U.S. DEPARTMENT OF COMMERCE, | : |
| 1401 Constitution Avenue, N.W., Washington, D.C. 20230 | : |
|  | : |
| JEREMY PELTER, ACTING UNDER SECRETARY, | : |
| BUREAU OF INDUSTRY AND SECURITY, | : |
| U.S. DEPARTMENT OF COMMERCE, | : |
| 1401 Constitution Avenue, N.W., Washington, D.C. 20230 | : |
|  | : |
| BUREAU OF INDUSTRY AND SECURITY, | : |
| U.S. DEPARTMENT OF COMMERCE, | : |
| 1401 Constitution Avenue, N.W., Washington, D.C. 20230 | : |
|  | : |
| MATTHEW S. BORMAN, DEPUTY ASSISTANT | : |
| SECRETARY FOR EXPORT ADMINISTRATION, | : |
| BUREAU OF INDUSTRY AND SECURITY, | : |
| U.S. DEPARTMENT OF COMMERCE | : |
| 1401 Constitution Avenue, N.W., Washington, D.C. 20230 | : |
|  | : |
| JOSEPH CRISTOFARO, END-USER REVIEW | : |
| COMMITTEE CHAIR, | : |
| BUREAU OF INDUSTRY AND SECURITY, | : |

U.S. DEPARTMENT OF COMMERCE          :
1401 Constitution Avenue, N.W., Washington, D.C. 20230  :
                                                        :
                        Defendants.                     :
                                                        :
_____          :

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Changji Esquel Textile Co. Ltd. ("CJE"), Esquel Enterprises Limited, and Esquel Apparel Inc., by and through their attorneys, allege and state as follows:

1.      This lawsuit seeks relief from devastating economic and reputational harms that Defendants have inflicted on Plaintiffs in violation of U.S. law and the U.S. Constitution.

2.      Plaintiffs are part of the Esquel group of companies ("Esquel"), an independent, family-owned textile and apparel manufacturing business based in Hong Kong with operations around the world, including in the United States.  Esquel has U.S.-educated leadership, a demonstrated and independently audited commitment to fair labor and socially responsible business practices (informed by the personal experience and commitment of its leadership to these values), and a major U.S. and European customer base that includes clothing name brands that are among the largest in the world.  Esquel is not owned or controlled (in whole or in part) by the Chinese government.

3.      Towards the end of the Trump Administration, the Department of Commerce's Bureau of Industry and Security ("BIS") and other Defendants summarily placed CJE on the U.S. "Entity List," which imposes U.S. trade restrictions on exports, reexports, and transfers of items subject to the Export Administration Regulations ("EAR").  Defendants did so based on a wholly false and unsubstantiated allegation:  that CJE was supposedly engaging in "the practice of forced labor involving members of Muslim minority groups in" Xinjiang, China.  85 Fed. Reg. 44,159, 44,159 (July 22, 2020).

4.     The appalling assertion that CJE would use, or has ever used, forced labor is antithetical to everything Esquel stands for.  Neither CJE nor any other company within Esquel has ever engaged in the practice of forced labor in Xinjiang or anywhere else in the world.  Esquel released a public statement unequivocally rejecting the allegation the day the Trump Administration added CJE to the Entity List,[1] and also sent a letter making the same point to then-Secretary of Commerce Wilbur Ross.

5.     Yet the Trump Administration added CJE to the Entity List without prior notice, without evidence, and without any opportunity for CJE to defend itself against Defendants' odious label—just as the Trump Administration was found to have done in several recent matters involving other entities improperly singled out without legal or factual justification.  *See, e.g.*, *Xiaomi Corp. v. Department of Def.*, No. CV 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021); *Luokung Tech. Corp. v. Department of Def.*, No. CV 21-583 (RC), 2021 WL 1820265 (D.D.C. May 5, 2021).

6.     In actuality, Esquel has a thoroughly documented, independently audited, and longstanding track record of adherence to ethical labor practices that absolutely bar any use of forced labor, including in CJE's operations in Xinjiang.  Neither Esquel nor its major U.S. and European customers would ever countenance forced labor practices in any of their operations or supply chains.

7.     CJE's facility—like all of Esquel's state-of-the-art, highly automated spinning mills in Xinjiang—complies with the leading Global Organic Textiles Standard ("GOTS"), as

---

[1] *See Response to Changji Esquel Textile Co. Ltd. (CJE) being named by U.S. Department of Commerce on the Entity List*, ESQUEL GRP. (July 21, 2020) ("July 2020 Press Release"), https://www.esquel.com/news/response-changji-esquel-textile-co-ltd-cje-being-named-us-department-commerce-entity-list.

certified following annual independent audits by Dutch-headquartered Control Union Certifications B.V. ("Control Union").  GOTS certification mandates adherence to standards that completely bar the use of forced labor practices, which must be verified through annual onsite inspection by an independent, accredited third party such as Control Union.  CJE has held GOTS certification continuously since 2008; CJE's most recent GOTS certification was renewed on January 16, 2021.

8.      Recent independent third-party audits of Esquel's facilities in Xinjiang (some of which were requested by customers who share the same commitment to socially responsible business practices) have confirmed Esquel's adherence to ethical labor standards barring forced labor.  For example, in May 2019—more than a year *before* Defendants placed CJE on the Entity List—ELEVATE Hong Kong Holdings Limited ("ELEVATE"), a leading business risk solutions provider headquartered in Hong Kong that is majority owned by a European private equity firm and led by an American CEO, was commissioned by a U.S. customer to conduct an audit of CJE. ELEVATE's methodology included extensive observation in an on-site visit and confidential interviews with randomly selected workers, including Uyghur and other ethnic-minority employees.  ELEVATE concluded that "[t]here was no evidence of forced, bonded or prison labor and no evidence of coercion or exploitation."

9.      As ELEVATE's audit indicates, and as many other voluntary and customer-commissioned audits confirm, Esquel's customers rightfully insist on workplaces free of unethical practices, including forced labor.  For Esquel, adherence to these practices is not only an absolute moral imperative, but a business imperative as well.  Indeed, given the highly sophisticated spinning equipment used by CJE, cheap or forced labor would have no place in the CJE mill.

10.     Thus, the outrageous assertion that CJE used forced labor is completely contrary to fact, and Defendants have never provided any substantiation for their false accusation.

11.     Defendants also acted beyond their authority in placing CJE on the Entity List.  The only statutory basis for placing an entity on the Entity List is to prevent certain enumerated harms to U.S. national security and foreign policy, including "the proliferation of weapons of mass destruction or of conventional weapons," "the acquisition of destabilizing numbers or types of conventional weapons," and even "acts of terrorism."  50 U.S.C. §§ 4811(2)(A), 4813(a)(2).  The "illustrative list of activities" that might warrant placement on the list, set forth in the governing regulations, similarly includes "[s]upporting persons engaged in acts of terror" and taking "[a]ctions that could enhance the military capability of, or the ability to support terrorism of governments that have been designated by the Secretary of State as having repeatedly provided support for acts of international terrorism."  15 C.F.R. § 744.11(b).

12.     But Defendants failed to determine that CJE—which operates a highly automated cotton spinning mill—deals in or poses a risk of dealing in items for use in the types of national security threats described in 50 U.S.C. § 4811(2)(A).  In fact, Defendants added CJE to the list based on an entirely separate interest—specifically, alleged "human rights violations and abuses." 85 Fed. Reg. at 44,159.  Even then, and contrary to the governing regulations, Defendants failed to offer any "specific and articulable facts" regarding CJE's listing.  15 C.F.R. § 744.11(b).

13.     CJE's placement on the Entity List has been deeply stigmatizing and has led to devastating economic consequences for Plaintiffs.  The day the Trump Administration announced CJE would be added to the Entity List, published articles characterized Esquel as having been

"sanction[ed] . . . over human rights."[2]  Those articles—which not only repeated Defendants' false findings about CJE, but also named many of Esquel's major customers[3]—unsurprisingly led several customers to notify Esquel that they would either pause or terminate business with Esquel as a whole, including Michael Kors, Nike, Gap Inc. (for the brand Banana Republic), and PVH (for the brands Calvin Klein and Tommy Hilfiger).  Esquel also has lost U.S. and other suppliers, and a major bank revoked a previously approved loan facility for Esquel shortly after CJE's placement on the Entity List.

14.     As a result of the Entity List designation, Esquel has been forced to close its factories in Mauritius and to severely reduce operations in Sri Lanka and China, putting thousands of employees out of work, with harmful consequences for those individuals, their families, and their local economies.  Esquel has been forced to consider making further reductions in its global operations and work force.  The consequences are dire for the tens of thousands of workers employed at Esquel factories, and particularly for employees working outside of China.  This harm to Esquel and its employees increases with each passing day CJE remains on the Entity List.

15.     Beyond direct economic effects, the severe stigma associated with placement on the Entity List has caused immediate and incalculable reputational damage to Esquel, both in the United States and worldwide.  Esquel's reputation as a global leader in sustainable textile

---

[2] Ana Swanson, *U.S. Imposes Sanctions on 11 Chinese Companies Over Human Rights*, N.Y. TIMES (July 20, 2020), https://www.nytimes.com/2020/07/20/business/economy/china-sanctions-uighurs-labor.html; *see also* Jeanne Whalen, *U.S. sanctions additional Chinese companies, alleging human rights violations in Xinjiang region*, WASH. POST (July 20, 2020), https://www.washingtonpost.com/business/2020/07/20/china-sanctions-uighurs-xinjiang/.

[3] Swanson, *supra* note 2, ("Changji Esquel Textile Co. Ltd, also appears to have ties to major international brands, working with Ralph Lauren, Tommy Hilfiger, Hugo Boss and Muji[.]"); Emma Graham-Harrison & Stephanie Kirchgaessner, *Apple imported clothes from Xinjiang firm facing US forced labour sanctions*, GUARDIAN (Aug. 10, 2020), https://www.theguardian.com/technology/2020/aug/10/apple-imported-clothes-from-xinjiang-firm-facing-us-forced-labour-sanctions.

manufacturing, built up over many years, has been deeply tarnished by the Trump Administration's reckless labeling of Esquel as a company that belongs on a list targeting "acts of terrorism" and other threats to national security.  50 U.S.C. §§ 4811(2)(A), 4813(a)(2).

16.     Esquel sought to avoid these dire consequences, to no avail.  In an earnest effort to cooperate in good faith with the U.S. government and avoid litigation, Esquel has repeatedly reached out to Defendants to seek the basis for CJE's addition to the Entity List and the evidence on which Defendants relied, and to refute the baseless allegation that CJE has engaged in the use of forced labor.  Esquel has also made clear from the outset that it will gladly take action to assure the U.S. government that it is not engaging in any activity targeted by the Entity List.  For example, it has offered to submit to further independent audits and unannounced site visits by U.S. government officials to interview Uyghur and other ethnic minority employees privately.

17.     To date, however, Esquel has yet to receive any evidence supporting Defendants' decision to single out CJE for designation on the Entity List.  Further, despite seeking clarification from BIS since September 2020, Esquel has no idea when (or if) Defendants will ever remove CJE from the Entity List.  Meanwhile, Esquel's business, global workforce, and reputation suffer increasing harm by the day.

18.     Accordingly, Esquel has been left with no choice but to seek a judicial order vacating and setting aside Defendants' actions as *ultra vires*, in violation of the U.S. Constitution, and otherwise contrary to law, as well as enjoining the Department of Commerce from implementing or enforcing CJE's Entity List designation.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 (federal question jurisdiction) and 28 U.S.C. § 2201 (the Declaratory Judgment Act).

20.     This Court has the authority to grant declaratory and injunctive relief under 28 U.S.C. §§ 2201-2202 (the Declaratory Judgment Act), 5 U.S.C. § 702 (the Administrative Procedure Act), and the Court's inherent equitable powers.

21.     Venue is proper under 28 U.S.C. § 1391(b) and (e) because (i) this is a civil action in which Defendants are federal agencies and federal officers acting in their official capacities, (ii) a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia, and (iii) Defendants reside in this district.

## PARTIES

22.     Plaintiff Esquel Enterprises Limited ("Esquel Enterprises"), headquartered in Hong Kong, is the operating arm of Esquel, a textile and apparel manufacturer that produces knit and woven garments.   Founded in 1978 in Hong Kong and headquartered there, Esquel is an independent, family-owned business with about 36,000 employees across its global operations as of May 31, 2021.  It has never been subject to any ownership, control, or direction by the Chinese government in any of its operations in China or elsewhere, and in fact is treated as a foreign investor in mainland China.

23.     Plaintiff Esquel Apparel Inc. ("Esquel New York"), headquartered in New York, is a wholly owned subsidiary of Esquel Enterprises.  Esquel New York is registered to do business in New York and Seattle, and it owns two investment properties in New York.  It provides primarily merchandising services to Esquel Enterprises, specifically in connection with Esquel Enterprises's U.S. customers.

24.     Plaintiff Changji Esquel Textile Co. Ltd. ("CJE"), established in 2009, operates a single Esquel spinning mill facility in Changji, Xinjiang.  CJE's state-of-the-art, highly automated mill relies on a relatively small number of specially trained employees to operate its automatic

spinning machines, as shown in a video produced by CJE's equipment supplier.[4]  CJE was added to the Entity List on July 22, 2020.

25.     Defendant Gina M. Raimondo is the Secretary of Commerce.  She is sued in her official capacity.  Section 1754 of the John S. McCain National Defense Authorization Act for Fiscal Year 2019 ("2019 NDAA"), Pub. L. No. 115-232, 132 Stat. 1686 (as amended, codified at 50 U.S.C. § 4813(a)(2)), requires the Secretary of Commerce, in consultation with other U.S. government officials, to "establish and maintain" the Entity List.  Raimondo's predecessor in the Trump Administration oversaw BIS's listing of CJE on the Entity List.

26.     Defendant Department of Commerce is an executive agency of the United States that, among other functions, creates and enforces export regulations, including the EAR.  It publishes and maintains the Entity List.

27.     Defendant Jeremy Pelter is the Acting Under Secretary of the Bureau of Industry and Security, an agency within the Department of Commerce.  He is sued in his official capacity.  Pelter's predecessor in the Trump Administration oversaw BIS's listing of CJE on the Entity List, which is the action at issue in this lawsuit.

28.     Defendant Bureau of Industry and Security is an agency within the Department of Commerce that is responsible for maintaining the Entity List.

29.     Defendant Matthew S. Borman is the Deputy Assistant Secretary for Export Administration within the Bureau of Industry and Security, an agency within the Department of Commerce.  He is sued in his official capacity.  Borman oversaw BIS's listing of CJE on the Entity List, which is the action at issue in this lawsuit.

---

[4]  Rieter Reference Mill Video Changji Esquel, YOUTUBE (July 13, 2017), https://www.youtube.com/watch?v=rxbsPKq5_oM.

30.     Defendant Joseph Cristofaro is the End-User Review Committee Chair within the Bureau of Industry and Security, an agency within the Department of Commerce.  He is sued in his official capacity.  The Committee is responsible for BIS's continued listing of CJE on the Entity List.

## FACTS

## I.    Statutory and Regulatory Background

31.     Since 1997, BIS has maintained the "Entity List," which "identifies foreign parties that are prohibited from receiving some or all items subject to the EAR unless the exporter secures a license."[5]  The scope of items that are "subject to the EAR" is broad, encompassing all commodities, software, and technology (i) of U.S.-origin, (ii) in or transiting through the United States, and (iii) that are not U.S.-origin but either incorporate more than a *de minimis* amount of certain U.S.-origin controlled content or are the direct product of certain U.S.-origin controlled items.  15 C.F.R. § 734.3(a).  Parties on the Entity List therefore face restrictions in terms of the items and technology (whether sensitive or non-sensitive) they may receive from U.S. companies, as well as from non-U.S. companies to the extent the items at issue are subject to the EAR.

32.     "BIS considers that transactions of any nature with listed entities carry a 'red flag' and recommends that U.S. companies proceed with caution with respect to such transactions."[6]  The EAR provides that, when compliance red flags are identified, exporters are expected to inquire and conduct due diligence to resolve the red flags and ensure that the contemplated activity does

---

[5]     *See Entity List*, BUREAU OF INDUS. & SEC. (2020), https://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern/entity-list; *Lists of Parties of Concern*, BUREAU OF INDUS. & SEC. (2020), https://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern.

[6] *Entity List FAQs*, BUREAU OF INDUS. & SEC. (2020), https://www.bis.doc.gov/index.php/policy-guidance/faqs#faq_118.

not, in fact, violate the EAR.  15 C.F.R. Part 732, Supp. No. 3.  As a result, business activity involving any party identified on the Entity List is associated with heightened compliance risk and administrative burden.

33.     Numerous companies and financial institutions in the United States and elsewhere refuse to do business with companies designated on the Entity List or their affiliates.  In fact, some U.S. companies' compliance policies mandate cutting off business altogether with entities designated on the Entity List.

34.     The authority for the Entity List is found in the Export Control Reform Act of 2018, 50 U.S.C. §§ 4801-4852 ("ECRA"), which is part of the 2019 NDAA.  ECRA directs the Secretary of Commerce, "in consultation with the Secretary of State, the Secretary of Defense, the Secretary of Energy, and the heads of other Federal agencies as appropriate," to "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States *pursuant to the policy set forth in section 1752(2)(A)*."  2019 NDAA, Pub. L. No. 115-232 § 1754(a)(2), 132 Stat. 1636, 2213 (codified at 50 U.S.C. § 4813(a)(2)) (emphasis added).

35.     Section 1752(2)(A) of the NDAA, in turn, explains that "[t]he national security and foreign policy of the United States require" controls on exports from the United States for five specific purposes, *i.e.*, "[t]o control the release of items for use in—(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."  50 U.S.C. § 4811(2)(A).

36.     As described in more detail below, BIS's Federal Register notice of July 22, 2020 (85 Fed. Reg. 44,159) ("July 2020 Notice") determined that CJE (and ten unrelated entities) had allegedly "engag[ed] in activities contrary to the foreign policy interests of the United States through the practice of forced labor involving members of Muslim minority groups in the XUAR [Xinjiang Uyghur Autonomous Region]."  85 Fed. Reg. at 44,159.  The July 2020 Notice did not find that Esquel had engaged in acts of terrorism, weapons proliferation, or any other of the enumerated categories set forth in 50 U.S.C. § 4811(2)(A).

## II.     Esquel's Strict And Audited Commitment To Ethical Employment Practices Precludes Any Use Of Forced Labor In Xinjiang Or Elsewhere

### Esquel's Operations and Employment Practices

37.     Esquel is an independent, family-owned business headquartered in Hong Kong.  It has about 36,000 employees across its international operations as of May 31, 2021—down from over 54,000 employees as of December 31, 2019.  Most of those employees are located in China, Sri Lanka, and Vietnam (and, at the time of the Entity List designation, Mauritius).  A global company with facilities and management that reflect its international footprint, Esquel has key personnel in and from all over the world, and maintains a philosophy grounded in progressive values that include a commitment to fair labor practices.

38.     In 2019, Esquel supplied about 110 million pieces of garments to brands around the world.  It primarily supplies major U.S. and European customers, including—prior to its placement on the Entity List—Michael Kors, Ralph Lauren, Nike, Gap Inc. (for the brand Banana Republic), PVH (which includes the brands Tommy Hilfiger and Calvin Klein), Lacoste, and Patagonia.

39.     Esquel is not, and has never been, subject to ownership, control, or direction by the Chinese government in any of its operations, either in mainland China or across the world.

40.     On the contrary, Esquel is run by U.S.-educated executive leadership with close ties to the U.S. academic and trade communities.  CEO Marjorie Yang, Chairman of Esquel since 1995, holds an MBA from Harvard Business School and a Bachelor of Science from Massachusetts Institute of Technology ("MIT").  She serves on advisory boards at multiple U.S. academic institutions and has been actively involved in trade commissions, such as the U.S.-China Joint Commission on Commerce and Trade.  In 2018, Yang received a Women of Influence Lifetime Achievement Award from the American Chamber of Commerce in Hong Kong and was featured as one of 24 "Faces of the United States-Hong Kong Relationship" in a publication celebrating the 175th anniversary of the U.S. Consulate General in Hong Kong.

41.     Dr. John Cheh, Esquel's Chief Executive Officer at the time the company was listed, received a Bachelor's Degree in Economics and Political Science from McGill University and a Ph.D. in Economics from MIT.  A Canadian citizen, Dr. Cheh served the Canadian Government from 1974 to 1993.  He started his career at the Canadian Government Treasury Board and Privy Council Office in Ottawa and then served in economic and trade positions in Beijing, Seoul, and Tokyo with Canada's Department of External Affairs and International Trade, including a position as the Executive Director of the Canada-China Trade Council from 1986 to 1988.  From 1994 to 2003, Dr. Cheh served as President, Asia, of Bell Canada International and then as President of Bombardier China before joining Esquel in 2003.

42.     Esquel currently has manufacturing facilities in China, Sri Lanka, and Vietnam. Esquel had two factories in Mauritius, but they were closed in November 2020 as a result of CJE's Entity List designation.

43.     In 2019, prior to CJE's designation, over 60% of Esquel's garments were shipped to the United States or to other countries under U.S. brands.  Less than 25% of Esquel's exports to

the United States were manufactured in China. Rather, they were primarily manufactured in other countries that host over half of Esquel's workforce: Vietnam (over 13,200 workers as of December 2019), Sri Lanka (over 5,800 workers as of December 2019), and, until the factories were closed in November 2020, Mauritius (over 4,100 workers as of December 2019).

44.     Esquel has been a global leader in sustainable manufacturing and socially responsible business operations since its founding. Since 2000, Esquel has been a founding member and participant in the United Nations Global Compact ("UNGC"), the world's largest corporate sustainability initiative, which promotes universal human rights, labor, environment, and anti-corruption principles. Esquel's sustainability progress reports are accessible on the UNGC website. *Esquel Group of Companies*, UNGC.[7] Esquel Chairman and CEO Marjorie Yang is a member of the High Level Steering Committee of UNGC's "Platform on Sustainable Infrastructure for the Belt and Road Initiative to Accelerate [Sustainable Development Goals]."

45.     Esquel operates pursuant to the Esquel Workplace Code of Conduct, established in 2005 and last updated in September 2020, which mandates that all Esquel facilities safeguard employee rights under national and international labor laws; requires that all Esquel facilities pay "at least" the local minimum wage or the "prevailing industry wage, whichever is higher"; prohibits all forms of forced labor, child labor, harassment, abuse, and discrimination; and requires Esquel facilities to "comply with the legally mandated regular work hours or 48 hours per week, whichever is less."

46.     Esquel contributes to initiatives designed to further sustainable and ethical textile and apparel industry practices. For example, since 2010, Esquel Garment Manufacturing

---

[7]     https://www.unglobalcompact.org/what-is-gc/participants/3456-Esquel-Group-of-Companies (under "COP" tab).

(Vietnam) Co. Ltd. has been a member of the Better Work program, a collaboration between the United Nations' International Labor Organization and the World Bank Group's International Finance Corporation with a mission to improve working conditions, labor rights, and competitiveness in the apparel industry.

47.    Esquel established a presence in Xinjiang in 1995 to launch spinning mills close to the supply of high-quality Xinjiang cotton.  Since then, Esquel has offered equal opportunity employment to members of Uyghur and other ethnic minority groups on a non-discriminatory basis.  As of May 31, 2021, Esquel's Xinjiang operations included two ginning mills and three spinning mills employing approximately 1,000 employees (down from over 1,200 employees as of July 31, 2020).

48.    CJE, the entity Defendants named to the Entity List, was established in 2009 and operates one of Esquel's spinning mills in Xinjiang.  CJE's spinning mill is a state-of-the-art, highly automated facility, operated by a relatively small group of highly skilled employees.  As of May 31, 2021, CJE employed 370 employees, of whom 27 are Uyghurs and 44 are other ethnic minorities, including Hui people and Kazakhs.

49.    Esquel has developed long-term, strategic partnerships with local Xinjiang farmers and organizations to improve community services and enhance income stability and predictability in the region.  For example, from 2007 to 2014, Esquel partnered with Standard Chartered Bank to provide millions of dollars in micro-financing as well as training on financial management and sustainable farming practices to nearly 2,000 local farming households in Xinjiang facing seasonal and uneven cash-flow challenges, with 100% repayment.  Esquel used its own capital to run the program until 2017.

50.     In 2003, Esquel established the Esquel-Y.L. Yang Education Foundation, which has helped Xinjiang children gain access to educational opportunities.  Specifically, the Foundation has refurbished schools, donated supplies, and provided education subsidies for over 4,400 primary students, as well as over 800 scholarships for high school students, a majority of whom are Uyghur or other ethnic minorities.  The Foundation's summer learning program and STEM training programs have helped to enhance the educational and career readiness of over 1,600 local children since 2007.  In 2012, Esquel launched a vision-screening program to help improve the eyesight of the region's youth in partnership with Hong Kong Polytechnic University and local hospitals, providing over 12,000 students in remote areas with free eye examinations, medical treatment, and over 2,700 pairs of eyeglasses to date.  From 2012 to 2015, the Foundation partnered with Novartis to provide resources and support to help over 200 schools in rural Xinjiang develop a health education curriculum, reaching a total of 300,000 students.

51.     Third parties have repeatedly recognized Esquel's commitment to social responsibility, including in Xinjiang.  For instance, a 2010 case study by a Harvard University professor and published by the Harvard Business School highlighted Esquel's partnerships with individual farmers and support of local communities in Xinjiang.

### Independent Audits of Esquel's Practices

52.     Independent, third-party audits have repeatedly confirmed the absence of forced labor in CJE's facility and Esquel's facilities more broadly.  In 2019, three sets of independent third-party audits were conducted, each on a subset of Esquel's facilities in Xinjiang, and each concluded that there was no forced labor in any of the facilities.  Four additional audits that took place in 2020 and 2021 came to the same conclusion.  All of these audits are described below.

53.     In May 2019—prior to Esquel's designation on the Entity List—Hong Kong-headquartered ELEVATE conducted an audit of CJE.  ELEVATE, which is led by an American CEO and is a global leader in corporate social responsibility compliance, was commissioned by one of Esquel's U.S. customers to perform a standard independent, third-party social and environmental audit.  ELEVATE's methodology included an on-site visit with extensive observation and confidential interviews with randomly selected workers, including Uyghur and other ethnic-minority employees.  ELEVATE's audit concluded that "[t]here was no evidence of forced, bonded or prison labor and no evidence of coercion or exploitation"; "[a]ll employees appeared to be recruited through legitimate channels that were not affiliated with any government agency linked to training, education and vocational centers"; the "[t]erms and conditions of employment were the same between majority and minority populations in the factories"; and "[e]mployment duration, turnover, promotions, roles, titles, salaries and benefits all appeared to be consistent between majority and minority populations."

54.     In October 2019, Esquel's three spinning mills in Xinjiang—including CJE—were independently audited by Netherlands-headquartered Control Union as part of the certification process required to validate these mills' compliance with the GOTS standard.  GOTS certification is contingent on satisfying environmental and social criteria, including adherence to International Labor Organization standards that bar the use of forced labor, require safe and hygienic working conditions and payment of living wages, and ban discrimination and harsh treatment.  GOTS certifications are renewed annually, subject to on-site inspection and certification by independent and accredited third parties.  Control Union's October 2019 audit findings validated ongoing compliance with GOTS standards at CJE and Esquel's other spinning mills in Xinjiang, and Esquel received the corresponding certificate of compliance in April 2020.  Control Union also produced

an audit report that does not identify any findings of non-compliance with the GOTS certification criteria at Esquel's spinning mills in Xinjiang, including at CJE.

55.     In December 2019, Esquel's two ginning mills in Xinjiang (not including CJE) were audited by Bureau Veritas CPS ("Bureau Veritas"), a European auditor.  Bureau Veritas's findings were consistent with the audit findings with respect to CJE in that the auditors identified no evidence of forced labor or discrimination at the audited facilities.

56.     In October 2020—after the Entity Listing—Control Union conducted a customer-commissioned audit of CJE.  During the audit, Control Union conducted confidential interviews with 73 CJE employees, including all 68 ethnic minority employees then working at CJE, either individually or in small groups of five to ten employees.  The auditors indicated that all interviews were conducted in private and that no hint of coaching was identified.  Control Union found no forced, prison, bonded, or involuntary labor; no evidence of discrimination in pay, working conditions, or any other aspect of CJE's operations; and no evidence of harsh or inhumane treatment of workers.  On the contrary, the audit report notes that CJE "treat[s] every worker with respect and dignity."

57.     Two other customer-commissioned CJE audits occurred in October 2020.  One was conducted by a customer's internal audit specialists.  According to their report, the auditors individually interviewed "almost all Uyghur[] employees and a majority of other minorities," and were "convinced that there was NO SIGN of Forced Employment or any other forced labor issues" at CJE.  The other audit report was prepared by an independent, third-party auditor, QIMA Limited ("QIMA"), at the direction of another Esquel customer.  QIMA interviewed 26 CJE workers, including four ethnic minority workers, all of whom "spoke freely of their views of the facility."

18

QIMA did not identify any forced labor, child labor, or discrimination related to wages, benefits, or working hours.

58.      In May 2021, ELEVATE conducted another audit at Esquel's three Xinjiang spinning mills, including at CJE.  The auditors spent a day onsite at CJE with a Uyghur language translator.  Twenty-six workers of different ethnicities were randomly selected from different departments, including eight Uyghurs.  ELEVATE's audit concluded, among other things, that "[t]he factory had established hiring policy and hiring procedures in place" that "prohibit[ed] using . . . forced, bonded or involuntary prison labour"; "[a]ll workers were directly employed by factory with no labour agent or broker used"; "[t]here was no unreasonable limitation on freedom of movement"; and "[t]he workers could resign upon a reasonable notice period which w[as] in line with local law requirements."

59.      In addition to external and customer audits, CJE is regularly audited through Esquel's Internal Audit and Corporate Social Responsibility departments.  These audits have identified no indicators of forced labor.

60.      Esquel's internal and external audits have been conducted with no local or Chinese national government involvement or any requirement for Esquel to make audit results available to the government.

61.      In short, independent, third-party audits confirm the total absence of a basis for CJE's placement on the Entity List.

**III.   Defendants Add CJE To The Entity List Without Any Basis In Fact And Fail To Respond To CJE's Good-Faith Efforts To Access The Evidence Underlying Its Designation**

62.      On July 22, 2020, without notice or warning, Defendants placed CJE on the Entity List with a single phrase of explanation:   CJE, along with other companies, was allegedly

"engaging in activities contrary to the foreign policy interests of the United States through the practice of forced labor involving members of Muslim minority groups in the XUAR [Xinjiang Uyghur Autonomous Region]."  85 Fed. Reg. at 44,159.

63.     According to Defendants, "the conduct of" CJE and the other identified companies "raises sufficient concern that prior review of exports, reexports or transfers (in-country) of all items subject to the EAR involving these entities, and the possible imposition of license conditions or license denials of shipments to these entities, will enhance BIS's ability to prevent items subject to the EAR from being used in activities contrary to the foreign policy interests of the United States."  85 Fed. Reg. at 44,160.  ECRA provided the "legal basis" and "authority under which" Defendants acted in placing CJE on the Entity List.  *Id.*

64.     This reed-thin justification for adding CJE to the Entity List was unaccompanied by a whit of support.  Defendants provided no evidence or reason to believe that CJE actually had engaged in the practice of forced labor in Xinjiang.

65.     Thus, Plaintiffs can only guess at potential sources for Defendants' false allegation that CJE is "engaging in . . . the practice of forced labor involving members of Muslim minority groups in" Xinjiang.

66.     One possible source is a 2019 *Wall Street Journal* article stating that Chinese officials had "offer[ed]" Uyghur employees in Xinjiang to Esquel.[8]  But the Chinese government has never made or coordinated Esquel hiring decisions.  The article may have been referring to a local Xinjiang government agency's referral of Uyghur and other ethnic minority candidates for job openings at a different Esquel factory, in Urumqi, Xinjiang.  Between 2017 and 2018,

---

[8] Eva Dou & Chao Deng, *Western Companies Get Tangled in China's Muslim Clampdown*, WALL ST. J. (May 16, 2019), https://www.wsj.com/articles/western-companies-get-tangled-in-chinas-muslim-clampdown-11558017472.

approximately 60 candidates were referred by the agency, and all were evaluated through Esquel's objective, merit-based recruiting protocol.  The successful candidates were hired and trained in the same way as other Esquel employees, and their compensation and benefits were the same.  Of the 34 ultimately hired, several have since resigned from the company for voluntary reasons—for instance, to take care of dependents—reflecting that all Esquel employees are free to choose to leave the company.

67.     Another possible source is a report from an Australian organization that cited the same *Wall Street Journal* article and also stated that CJE participated in a county job fair in Xinjiang.[9]  The report falsely implied that CJE participated in labor transfers within Xinjiang.  Participating in local job fairs—something Esquel does throughout the world—in no way amounts to engagement in labor transfers or a forced labor scheme.  At the fair identified in the report, Esquel followed its standard merit-based recruitment procedures to hire the most qualified candidates, and identified no indicia of forced participation by attendees.  Of the candidates at the fair to whom Esquel extended job offers, three were of Uyghur or Kazakh ethnicities, and Esquel offered each a salary comparable to what other employees at CJE, including Han employees, earned for similar positions.  All three candidates accepted.  Later, two Uyghur employees voluntarily resigned.

68.     Whatever the basis, Defendants made no attempt to solicit a factual response from Esquel or to give it an opportunity to rebut the accusations before placing CJE on the Entity List.  Ironically, in the name of deterring forced labor and protecting ethnic Uyghurs, the prior

---

[9] Vicky Xiuzhong Xu et al., *Uyghurs For Sale*, Australian Strategic Policy Inst. (Mar. 1, 2020), https://www.aspi.org.au/report/uyghurs-sale.

administration apparently chose to impose crippling penalties on Esquel *because* it employed ethnic Uyghurs.

69.     Immediately following CJE's designation on the Entity List, Esquel issued a public statement denouncing the action, flatly denying any "evidence to support the allegations against us on the use of forced labor in CJE," and stating unequivocally that "[w]e absolutely have not, do not, and will never use forced labor."  July 2020 Press Release, *supra* note 1.  Esquel echoed those statements in a letter to then-Secretary of Commerce Wilbur Ross.  To this day, those statements remain true:  CJE (and Esquel more broadly) has never used, and will never use, forced labor.

70.     Working with U.S. outside counsel, Esquel also immediately took steps to ensure continued compliance with U.S. laws and regulations, including communicating with suppliers and customers to clarify the scope of the Entity List restrictions.  These steps were consistent with Esquel's longstanding adherence to applicable law in the various jurisdictions where it operates, including U.S. law.

71.     Esquel further sought to engage with the U.S. government to ascertain the bases for Entity List designation and to clear up Defendants' misapprehension regarding Esquel's labor practices.  Esquel made clear that CJE would gladly submit to further independent audits and unannounced site visits by U.S. government officials, including confidential interviews with ethnic minority employees.

72.     But Esquel has received no meaningful response to its queries regarding the basis for its designation on the Entity List or any other substantive response from the U.S. government.  Meanwhile (as detailed below), Esquel's operations worldwide continue to shed revenue and incur reputational damage each day, to the severe detriment of its employees in several countries.

## IV. CJE's Addition To The Entity List Causes Immediate And Irreparable Harm

73.    Defendants' placement of CJE on the Entity List has worked severe irreparable harm on Plaintiffs.  These harms are ongoing and continually increasing.  Plaintiffs will continue to suffer from growing irreparable harm until Defendants remove CJE from the Entity List.

74.    CJE's placement on the Entity List had the immediate legal effect of imposing a license requirement for all exports, reexports, and transfers (in-country) to CJE of items subject to the EAR.  CJE is no longer able to receive any U.S. items (whether sensitive or not) subject to the EAR—from physical equipment and spare parts used in CJE's spinning mill, to over-the-counter consumer laptops and computers from Hewlett-Packard and other U.S. companies—unless the U.S. exporter procures a license from BIS.  Such license applications are subject to a "license review policy of presumption of denial" for most items subject to the EAR with very limited exceptions.  85 Fed. Reg. at 44,160.

75.    Plaintiffs have also suffered immediate and drastic reputational damage.  Following the Trump Administration's announcement of CJE's designation, news articles immediately reported that CJE had been "sanctioned" for human rights abuses.  Major U.S. and international outlets like, the *New York Times*, the *Washington Post*, *Reuters*, *Axios*, *Business Insider*, and *Yahoo News* all covered the announcement, while highlighting Esquel's major customers (like Ralph Lauren, Tommy Hilfiger, Hugo Boss, Muji, Calvin Klein, and Nike).[10]  The month after the

---

[10] Swanson, *supra* note 2; Whalen, *supra* note 2; David Shepardson & Diane Bartz, *U.S. adds 11 firms to economic blacklist over China's treatment of Uighurs*, Reuters (July 20, 2020), https://www.reuters.com/article/us-usa-china-human-rights/u-s-adds-11-firms-to-economic-blacklist-over-chinas-treatment-of-uighurs-idUSKCN24L1XT;  Bethany  Allen-Ebrahimian, *Subsidiary of world's largest shirtmaker put on U.S. blacklist over Xinjiang ties*, AXIOS (July 21, 2020),  https://www.axios.com/hong-kong-shirtmaker-esquel-xinjiang-blacklist-uighur-forced-labor-1c5c7226-6668-4a6b-88c1-c344a4f3dd8f.html; Sarah Al-Arshani, *US says it will blacklist 11 Chinese companies accused of human rights abuses against Uighurs — including subsidiaries of a company that ships coronavirus tests worldwide*, BUS. INSIDER (July 21, 2020),

designation, *The Guardian* published an article focused exclusively on the fact that Apple had purchased uniforms from Esquel, "a company facing US sanctions over forced labour at a subsidiary firm in China's western Xinjiang region."[11]

76.     Unsurprisingly, as a result of CJE's Entity List designation, numerous customers have cut off their business with Esquel.  For example, Michael Kors, Nike, Gap Inc. (Banana Republic), PVH (*i.e.*, Calvin Klein and Tommy Hilfiger), and other U.S. brands have discontinued, or stated that they will pause or discontinue, doing business with Esquel.  The French brand Lacoste likewise decided to cease business with Esquel because of the Entity List placement. Collectively, these customers represented hundreds of millions of dollars in revenue in 2019.

77.     Esquel has also suffered losses caused by disruptions in its supply chain, including the discontinuation of business with a U.S. cotton supplier, an Australian cotton supplier, a Japanese supplier of textile machines and spare parts, a Swiss supplier of testing equipment and spare parts, and two U.S. suppliers of computers and servers.

78.     Further, Esquel has faced hardships in securing financing.  For example, shortly after CJE's placement on the Entity List, a major bank revoked a previously approved loan facility for Esquel as a result of CJE's designation.

79.     As a consequence of these business losses, in November 2020, Esquel was forced to close its factories in Mauritius, costing thousands of employees their jobs (and costing Esquel over ten million dollars in severance payments).  The Mauritius factories had been making products primarily for the U.S. market.  In Sri Lanka, Esquel has had to take on subcontracting

---

https://www.businessinsider.com/us-blacklist-chinese-companies-over-xinjiang-human-rights-abuses-2020-7; Tiffany Ap, *Esquel Denies Forced Uighur Labor Claims*, YAHOO!  (July 21, 2020), https://tinyurl.com/2dyma4av.

[11] Graham-Harrison & Kirchgaessner, *supra* note 3.

work and operate at half capacity in order to survive, with the incomes of Esquel's Sri Lankan workers negatively impacted.  In China, the Entity List designation has reduced business at Esquel's spinning mills, left employees underutilized, resulted in a decrease in pay, and led to voluntary departures.

80.     Until CJE is removed from the Entity List, Esquel will be forced to consider further closures and terminations on an ongoing basis, which will have immediate and irreparable harmful effects on its employees and business operations.

81.     Esquel Enterprises's U.S. subsidiary, Esquel New York, has suffered substantial irreparable harms resulting from CJE's entity listing.  Esquel New York's work primarily supports Esquel Enterprises's U.S. customers.  Between 2019 and 2020, largely as a result of CJE's designation and the drastic termination of business with multiple U.S. customers, Esquel New York's agency fee from Esquel Enterprises dropped by 77%, and its net income dropped by over $1.2 million—the first time it has recorded a loss in at least six years.

82.     The severe stigma associated with CJE's placement on the Entity List has also caused incalculable reputational damage to Plaintiffs, both in the United States and worldwide. Among other severe impacts, American universities with which Esquel has a longstanding association have responded to the Entity List designation by scaling back ties.  In addition, a publisher pressured a professor to drop a chapter on Esquel in a book about best-of-kind companies, due to concerns over how the book would be perceived if Esquel were included in light of CJE's designation on the Entity List.

83.     These and other incalculable economic and reputational harms that Plaintiffs have incurred are ongoing and grow more damaging every day that CJE remains on the Entity List.

## STATEMENT OF CLAIMS FOR RELIEF

### COUNT I

### ULTRA VIRES AGENCY ACTION—ACTING IN EXCESS OF STATUTORY AND REGULATORY AUTHORITY

#### Against All Defendants

84.     Plaintiffs reallege and incorporate by reference the allegations contained in all the preceding paragraphs.

85.     Defendants acted *ultra vires* and in excess of their statutory and regulatory authority under the 2019 NDAA and associated regulations in issuing the July 2020 Notice that added CJE to the Entity List.

86.     Defendants' decision to designate CJE on the Entity List was outside the agency's statutory authority under ECRA.  That Act directs the Secretary of Commerce to "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States pursuant to the policy set forth in section 1752(2)(A)."  2019 NDAA, Pub. L. No. 115-232 § 1754(a)(2), 132 Stat. 1636, 2213 (codified at 50 U.S.C. § 4813(a)(2)).  Section 1752(2)(A), in turn, explains that "[t]he national security and foreign policy of the United States require" controlling the release of items for use in five specific areas: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."  2019 NDAA, Pub. L. No. 115-232 § 1752(2)(A), 132 Stat. 1636, 2210 (codified at 50 U.S.C. § 4811(2)(A)).

87.     Defendants did not find, and have not alleged, that CJE or any other Plaintiff engaged in any of the activities specified in Section 1752(2)(A).  *See* 85 Fed. Reg. at 44,159.

88.     Moreover, BIS regulations require that entities be added to the Entity List only after the agency has found "specific and articulable facts" regarding the entities' activities.  15 CFR § 744.11(b).

89.     Defendants neither possessed nor offered any "specific and articulable facts" demonstrating that CJE was engaged in the practice of forced labor in Xinjiang.

90.     Accordingly, Defendants exceeded their statutory and regulatory authority, and violated both ECRA and 15 CFR § 744.11 by adding CJE to the Entity List.

91.     Plaintiffs are entitled to a judgment that the July 2020 Notice as it applies to CJE was *ultra vires*, in excess of authority, and contrary to law.

## COUNT II

## VIOLATION OF THE ADMINISTRATIVE PROCEDURE ACT—UNLAWFUL AGENCY ACTION

### Against All Defendants

92.     Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

93.     The July 2020 Notice constitutes final agency action subject to judicial review because it had immediate legal effects and consummated the agency's decision-making process with respect to CJE's placement on the Entity List.

94.     Defendants violated the APA by acting in excess of statutory and regulatory authority and otherwise contrary to law by placing CJE on the Entity List for supposed human-rights-related violations.  As explained in Count I, *supra*, Defendants never found that CJE (or any other Plaintiff) engaged in any of the activities specified in Section 1752(2)(A).

95.     Moreover, the sole basis Defendants gave for placing CJE on the Entity List—alleged human-rights abuses—is entirely without record basis.  Defendants failed to offer any "specific and articulable" facts or other evidence that CJE (or any other Plaintiff) is actually engaged in forced labor in Xinjiang, and failed to provide Plaintiffs with advance notice or a sufficient opportunity to be heard regarding the listing.

96.     Given that Defendants have not yet shared the basis of their decision to add CJE to the Entity List or the evidence Defendants relied on, Plaintiffs may have additional grounds for relief after review of the administrative record.

97.     Defendants' actions have caused, and will continue to cause, ongoing harm to Plaintiffs.

## COUNT III

## VIOLATION OF THE DUE PROCESS CLAUSE OF THE FIFTH AMENDMENT

### Against All Defendants

98.     Plaintiffs reallege and incorporate by reference the allegations contained in all of the preceding paragraphs.

99.     The Due Process Clause of the Fifth Amendment of the U.S. Constitution mandates that no person "be deprived of life, liberty, or property, without due process of law."

100.    Plaintiffs are entitled to the process due under the U.S. Constitution due to their significant U.S. presence and property interests, including U.S.-based Esquel New York.

101.    Plaintiffs have constitutionally protected property and liberty interests in the United States, including (i) a property interest in the economic viability of its subsidiary Esquel New York, which has offices in New York and Seattle; (ii) property and liberty interests in Plaintiffs' right to conduct their business in the United States and with United States companies, free of arbitrary and

unlawful government action; and (iii) a liberty interest in the reputation of Plaintiffs, including Esquel New York.

102.   Plaintiffs were entitled to constitutionally mandated due process prior to any deprivation of their constitutionally protected interests.  That process includes, at a minimum, the right to notice of the basis for Defendants' decisions and an opportunity to be heard, including an opportunity to rebut whatever evidence on which the government relied.

103.   Plaintiffs, however, were not afforded constitutionally sufficient process:  they were not provided with the evidentiary basis for CJE's designation on the Entity List, and they were not given an opportunity to rebut the determination reflected in the July 2020 Notice.

104.   Defendants' actions denied Plaintiffs their constitutional rights and caused Plaintiffs significant and ongoing harm.

## **PRAYER FOR RELIEF**

For those reasons, Plaintiffs respectfully request that this Court:

(1)   declare that Defendants' July 2020 Notice adding CJE to the Entity List is *ultra vires*, as well as unauthorized by, and contrary to, law;

(2)   declare that Defendants acted in excess of authority, in violation of the Due Process Clause of the Fifth Amendment to the U.S. Constitution, and otherwise contrary to law when they added CJE to the Entity List;

(3)   order Defendants immediately to produce the basis of the July 2020 Notice adding CJE to the Entity List, and whatever evidence upon which Defendants relied in making that determination, in the form of the administrative record;

(4)   vacate and set aside the designation of CJE as a listed entity on the Entity List;

(5)    preliminarily and permanently enjoin Defendants from implementing or enforcing

CJE's Entity List designation;

(6)    award Plaintiffs their costs and reasonable attorney fees; and

(7)    grant such other and further relief as may be just and proper.


                                  Respectfully submitted,


                                  ___/s James E. Tysse_____
Dated:  July 06, 2021             James E. Tysse
                                    D.C. Bar No. 978722
                                  Caroline L. Wolverton
                                    D.C. Bar No. 496433
                                  Margaret O. Rusconi (*admission pending*)
                                    D.C. Bar No. 1719371

                                  Akin Gump Strauss Hauer & Feld LLP
                                  2001 K Street, N.W.
                                  Washington, D.C. 20006
                                  Telephone: (202) 887-4000
                                  jtysse@akingump.com

                                  *Counsel to Plaintiffs Changji Esquel Textile Co. Ltd.,*
                                  *Esquel Enterprises Limited, and Esquel Apparel Inc.*