**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| CHANGJI ESQUEL TEXTILE CO. LTD., *et al.*, | : | |
| | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. Action No.1:21-cv-01798-RBW |
| | : | |
| GINA M. RAIMONDO, SECRETARY OF COMMERCE, *et al.*, | : | |
| Defendants. | : | |
| | : | |

**PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**

Plaintiffs Changji Esquel Textile Co. Ltd. ("CJE"), Esquel Enterprises Limited, and Esquel Apparel Inc. hereby move for a preliminary injunction against Defendants' implementation or enforcement of CJE's Entity List designation. In support of this motion, Plaintiffs submit the accompanying Memorandum of Points and Authorities and Declaration of Marjorie Yang, Chairman and Chief Executive Officer of the Esquel group of companies. A proposed order is attached.

In accordance with LCvR 7.1(m), undersigned counsel have conferred with counsel for Defendants. To date, the parties have been unable to resolve the underlying dispute that forms the basis for this motion, and Defendants oppose this motion.

Further, under LCvR 65.1(d), Plaintiffs request a hearing on this motion within 21 days of its filing—*i.e.*, by Monday, August 9, 2021. The government has informed Plaintiffs that there will likely be a development regarding CJE's continued Entity List designation by August 1. But as explained in the accompanying Memorandum of Points and Authorities and Declaration of Marjorie Yang, Plaintiffs are suffering ongoing irreparable harm as the result of Defendants' inclusion of CJE on the U.S. Entity List. Accordingly, Esquel requests that the Court hold a hearing

on this motion by August 9, 2021.  To the extent the government takes action to remove CJE from

the Entity List before August 9, Plaintiffs will immediately inform the court and request to remove

this hearing from the calendar.

Respectfully submitted,

Dated:  July 19, 2021

 s/ James E. Tysse
James E. Tysse
  D.C. Bar No. 978722
Caroline Wolverton
  D.C. Bar No. 496433
Margaret O. Rusconi (*admission pending*)
  D.C. Bar No. 1719371

Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
jtysse@akingump.com

*Counsel to Plaintiffs Changji Esquel Textile Co. Ltd.,*
*Esquel Enterprises Limited, and Esquel Apparel Inc.*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| CHANGJI ESQUEL TEXTILE CO. LTD., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | Civ. Action No. 1:21-cv-01798-RBW |
| | : | |
| GINA M. RAIMONDO, SECRETARY OF COMMERCE, *et al.*, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR MOTION FOR <u>PRELIMINARY INJUNCTION</u>

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2
   A.     Statutory and Regulatory Background...................................................................2
   B.     Esquel's Strict And Audited Commitment To Ethical Employment
          Practices .................................................................................................................5
          1.     Esquel's Operations And Employment Practices .......................................5
          2.     Independent Audits Of Esquel Facilities Reveal No Forced Labor............8
   C.     Defendants Add CJE To The Entity List Without Authority Or Basis In
          Fact.......................................................................................................................10
   D.     The Entity List Designation Causes Plaintiffs Immediate Irreparable Harm ........11

ARGUMENT .......................................................................................................................13

I.      ESQUEL IS LIKELY TO SUCCEED ON THE MERITS ...........................................13
   A.     Defendants Acted Contrary To, And In Excess Of, The Delegated
          Authority In ECRA...............................................................................................14
   B.     Defendants Acted Beyond The Authority Of The Governing Regulations ...........18

II.     ESQUEL WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT
       INJUNCTIVE RELIEF.................................................................................................20

III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY
       FAVOR A PRELIMINARY INJUNCTION.................................................................27
   A.     Enjoining Defendants' Unlawful Action Will Not Harm the Government............28
   B.     A Preliminary Injunction Will Further Several Significant Public Interests.........29

CONCLUSION....................................................................................................................31

# TABLE OF AUTHORITIES

## CASES:

*Air Transp. Ass'n of Am., Inc. v. Export-Import Bank*,
  840 F. Supp. 2d 327 (D.D.C. 2012) ........................................................................................27

*Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*,
  No. 20-CV-3377 (DLF), 2021 WL 1946376 (D.D.C. May 14, 2021) ....................................13

*Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*,
  897 F.3d 314 (D.C. Cir. 2018) ..............................................................................................13

*Armour & Co. v. Freeman*,
  304 F.2d 404 (D.C. Cir. 1962) ..............................................................................................21

*AstraZeneca LP v. Apotex, Inc.*,
  633 F.3d 1042 (Fed. Cir. 2010) ............................................................................................26

*Atlas Air, Inc. v. International Bhd. of Teamsters*,
  280 F. Supp. 3d 59 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019) ...........................23

*Bayer HealthCare, LLC v. United States Food & Drug Admin.*,
  942 F. Supp. 2d 17 (D.D.C. 2013) ........................................................................................25

*Beacon Assocs., Inc. v. Apprio, Inc.*,
  308 F. Supp. 3d 277 (D.D.C. 2018) ......................................................................................24

*Brook Beverage, Inc. v. Pepsi-Cola Bottling Co. of N.Y., Inc.*,
  No. 20-CV-9275 (VSB), 2021 WL 568266 (S.D.N.Y. Feb. 16, 2021) .................................26

*California Ass'n of Priv. Postsecondary Schs. v. DeVos*,
  344 F. Supp. 3d 158 (D.D.C. 2018) ......................................................................................27

*Chevron U.S.A. Inc. v. Echazabal*,
  536 U.S. 73 (2002) ................................................................................................................16

*Cigar Ass'n of Am. v. FDA*,
  317 F. Supp. 3d 555 (D.D.C. 2018) ......................................................................................13

*Curtis 1000, Inc. v. Youngblade*,
  878 F. Supp. 1224 (N.D. Iowa 1995) ....................................................................................26

*Dart v. United States*,
  848 F.2d 217 (D.C. Cir. 1988) ..............................................................................................14

*Federal Express Corp. v. United States Dep't of Commerce*,
  486 F. Supp. 3d 69 (D.D.C. 2020) ..........................................................................................3

*Ferrero v. Associated Materials Inc.*,
   923 F.2d 1441 (11th Cir. 1991) ............................................26

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997) ............................................16

*Her Majesty the Queen in Right of Ontario v. EPA*,
   912 F.2d 1525 (D.C. Cir. 1990) ............................................14

*Jones v. District of Columbia*,
   177 F. Supp. 3d 542 (D.D.C. 2016) ............................................24

*League of Women Voters v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ............................................28, 29

*Luokung Tech. Corp. v. Department of Def.*,
   No. CV 21-583 (RC), 2021 WL 1820265 (D.D.C. May 5, 2021) ...................22, 25, 27, 28

*Lyng v. Payne*,
   476 U.S. 926 (1986) ............................................14

*Mercy Hosp., Inc. v. Azar*,
   891 F.3d 1062 (D.C. Cir. 2018) ............................................16

*Morgan Stanley DW Inc. v. Rothe*,
   150 F. Supp. 2d 67 (D.D.C. 2001) ............................................24

*NAACP v. Trump*,
   321 F. Supp. 3d 143 (D.D.C. 2018) ............................................13

*Nken v. Holder*,
   556 U.S. 418 (2009) ............................................27, 28

*Patriot, Inc. v. United States Dep't of Hous. & Urb. Dev.*,
   963 F. Supp. 1 (D.D.C. 1997) ............................................24

*Price v. Medicaid Dir.*,
   838 F.3d 739 (6th Cir. 2016) ............................................15

*Pursuing Am.'s Greatness v. FEC*,
   831 F.3d 500 (D.C. Cir. 2016) ............................................28

*R.I.L-R v. Johnson*,
   80 F. Supp. 3d 164 (D.D.C. 2015) ............................................28

*Railway Lab. Execs.' Ass'n v. National Mediation Bd.*,
   29 F.3d 655, *amended*, 38 F.3d 1224 (D.C. Cir. 1994) ...................14, 15

*Sanofi-Synthelabo v. Apotex, Inc.*,
  488 F. Supp. 2d 317 (S.D.N.Y.), *aff'd*, 470 F.3d 1368 (Fed. Cir. 2006) ...............................26

*Sherley v. Sebelius*,
  644 F.3d 388 (D.C. Cir. 2011) ...............................................................................................13

*TikTok Inc. v. Trump*,
  No. 1:20-CV-02658 (CJN), 2020 WL 5763634 (D.D.C. Sept. 27, 2020) .............................26

*Winter v. Natural Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ...................................................................................................................13

*Xiaomi Corp. v. Department of Def.*,
  No. CV 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ................................. *passim*

## STATUTES AND REGULATIONS:

46 U.S.C.A.
  § 2104(a) (West Supp. 1997) ..................................................................................................16

49 U.S.C.
  § 322(b) ...................................................................................................................................16

50 U.S.C.
  § 4811(2)(A) ...................................................................................................................... *passim*
  § 4811(2)(D) .............................................................................................................................17
  § 4813(a)(1)-(16) ........................................................................................................................3

John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub.
  L. No. 115-232 § 1754(a)(2), 132 Stat. 1636, 2213 (codified at 50 U.S.C. §
  4813(a)(2)) ........................................................................................................................ *passim*

15 C.F.R.
  § 734.3(a) ...................................................................................................................................3
  § 744.11 ......................................................................................................................................4
  § 744.11(b) ......................................................................................................................... *passim*

## OTHER AUTHORITIES:

85 Fed. Reg. 44,159 (July 22, 2020) ................................................................................. *passim*

86 Fed. Reg. 4,872 (Jan. 15, 2021) .............................................................................................4

Al-Arshani, Sarah, *US says it will blacklist 11 Chinese companies accused of
  human rights abuses against Uighurs — including subsidiaries of a company
  that ships coronavirus tests worldwide*, BUS. INSIDER (July 21, 2020) .............................12, 22

Allen-Ebrahimian, Bethany, *Subsidiary of world's largest shirtmaker put on U.S. blacklist over Xinjiang ties*, Axios (July 21, 2020)............................................................12, 21

Ap, Tiffany, *Esquel Denies Forced Uighur Labor Claims*, Yahoo! (July 21, 2020) ........................................................................................................................12

Black's Law Dictionary (11th ed. 2019) .......................................................................15

Charles Alan Wright & Miller, Federal Practice and Procedure: Civil § 2948.1 .........................................................................................................................2

*Entity List FAQs*, Bureau of Indus. & Sec. (2020) .......................................................3

*Esquel Workplace Code of Conduct*, Esquel Grp. (Sept. 2020) .................................7

Exec. Order No. 13959, 85 Fed. Reg. 73,185 (Nov. 12, 2020) ....................................29

Graham-Harrison, Emma & Kirchgaessner, Stephanie, *Apple imported clothes from Xinjiang firm facing US forced labour sanctions*, Guardian (Aug. 10, 2020) ........................................................................................................................23

*Lists of Parties of Concern*, Bureau of Indus. & Sec. (2020) .......................................2

*Marjorie Yang*, Esquel Grp. (Aug. 2020) ....................................................................7

*Marjorie Yang received Lifetime Achievement Award at AmCham HK Women of Influence Awards 2018*, Esquel Grp. (Nov. 16, 2018) .................................................6

*Response to Changji Esquel Textile Co. Ltd. (CJE) being named by U.S. Department of Commerce on the Entity List*, Esquel Grp. (July 21, 2020) .........................11

Rieter Reference Mill Video Changji Esquel, YouTube (July 13, 2017) ....................19

Shepardson, Daniel & Bartz, Diane, *U.S. adds 11 firms to economic blacklist over China's treatment of Uighurs,* Reuters (July 20, 2020) ....................................12, 21

Swanson, Ana, *U.S. Imposes Sanctions on 11 Chinese Companies Over Human Rights*, N.Y Times (July 13, 2017) ...............................................................................11, 22

U.S. Agency for International Development, *What We Do, Economic Growth and Trade, Employment Framework* .....................................................................................30, 31

United Nations Development Programme, *What are the Sustainable Development Goals?*.......................................................................................................................30

Whalen, Jeanne, *U.S. sanctions additional Chinese companies; alleging human rights violations in Xinjiang region*, Wash. Post (July 20, 2020)....................................12, 22

## INTRODUCTION

This motion seeks an injunction that will remedy irreparable and ongoing harm to Plaintiffs Changji Esquel Textile Co. Ltd. ("CJE"), Esquel Enterprises Limited ("Esquel Enterprises"), and Esquel Apparel Inc. ("Esquel New York").  Plaintiffs are part of the Esquel group of companies ("Esquel"), an independent, family-owned textile and apparel manufacturing business based in Hong Kong with operations around the world, including in the United States.  Esquel has long demonstrated an independently audited commitment to fair labor and socially responsible practices, all of which are informed by the personal experience and dedication of its U.S.-educated leadership to these values.  Before the events at issue in this lawsuit, most of Esquel's customers were based in the United States and Europe, and included name brands that are among the largest in the world.  Esquel is not owned or controlled (in whole or in part) by the Chinese government.

In July 2020, the Trump administration added CJE—which operates a highly automated spinning mill in Xinjiang, China—to the U.S. Entity List.  In doing so, Defendants provided only a single sentence to justify their decision: CJE was supposedly engaging in "the practice of forced labor involving members of Muslim minority groups."  85 Fed. Reg. 44,159, 44,159 (July 22, 2020) ("July 2020 Notice").  Defendants articulated no specific facts to support that determination. They offered nothing beyond that conclusory statement.  In fact, no such facts or evidence exists. As multiple independent audits confirmed both before and after CJE's listing, CJE has not, does not, and will not use forced labor.  To do so would be contrary to everything Plaintiffs, and the broader Esquel group of companies, believe in.

The Trump administration's actions were not only unfounded, but unlawful.   The governing statute does not allow Defendants to add companies to the Entity List for the reasons given.  Forced labor and other human rights abuses are odious practices that the United States, and the global community, must condemn and fight.  But Congress limited the types of foreign policy

concerns that Defendants could address through the Entity List.  The governing statute does not give Defendants carte blanche to list entities for any reason.  Instead, it restricts Defendants' listing authority to five specific national security and foreign policy goals related to terrorism, weapons proliferation, military programs, disruption of critical infrastructure, and weapons of mass destruction.  Human rights abuses are not among them.  Placing CJE on the Entity List based on such alleged conduct was thus not only completely detached from reality, but beyond Defendants' statutory authority.

As a result of Defendants' placement of CJE on the Entity List, Esquel has suffered severe and debilitating harms to its business.  It has lost numerous clients and hundreds of millions of dollars in revenue.  Due to those losses, two factories that served U.S. customers have closed, several others are operating at half capacity, and the possibility of more closures looms.  Unless and until CJE is removed from the Entity List, Esquel's harm will only continue to grow.  In contrast, Defendants lack *any* interest in mistakenly keeping CJE on a list where it never belonged—or in violating Congress's clear commands.

This Court should thus grant Esquel's motion and issue a preliminary injunction against the inclusion of CJE on the Entity List on the grounds that Defendants acted *ultra vires* and in excess of their statutory and regulatory authority.

## BACKGROUND

### A.    Statutory and Regulatory Background

The U.S. Entity List identifies foreign parties who are restricted in terms of the items and technology they may receive from U.S. companies (and some non-U.S. companies).  *Lists of Parties of Concern*, BUREAU OF INDUS. & SEC. (2020).[1]  Specifically, listed entities are "prohibited

---

[1] https://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern.

from receiving some or all items subject to the EAR [Export Administration Regulations] unless the exporter secures a license." *Id*. Items "subject to the EAR" include commodities, software, and technology (i) of U.S.-origin, (ii) in or transiting through the United States, and (iii) that are not U.S.-origin but either incorporate more than a *de minimis* amount of certain U.S.-origin controlled content or are the direct product of certain U.S.-origin controlled items. 15 C.F.R. § 734.3(a). Put another way, parties on the Entity List face restrictions in terms of the items and technology (whether sensitive or non-sensitive) they may receive from U.S. companies, as well as non-U.S. companies whose goods are subject to the EAR. The U.S. government "considers that transactions of *any* nature with listed entities carry a 'red flag' and recommends that U.S. companies proceed with caution with respect to such transactions." *Entity List FAQs*, BUREAU OF INDUS. & SEC. (2020) (emphasis added).[2]

The Bureau of Industry and Security ("BIS"), an agency within the Department of Commerce, publishes the Entity List. The current authority of the Entity List is the Export Control Reform Act ("ECRA"), which was passed as part of the 2019 National Defense Authorization Act ("2019 NDAA"). After years of the EAR "remain[ing] in force" only "through a series of Executive Orders issued under the International Emergency Economic Powers Act ('IEEPA')," ECRA gave "the President, Secretary of Commerce, and various other officials" permanent statutory authority "to promulgate and administer the nation's export controls." *Federal Express Corp. v. United States Dep't of Commerce*, 486 F. Supp. 3d 69, 73 (D.D.C. 2020). Among other things, ECRA authorizes the creation and maintenance of a list of controlled items, the establishment of a licensing regime for the export of controlled items, and the establishment and maintenance of the list at issue here—the Entity List. *See generally* 50 U.S.C. § 4813(a)(1)-(16).

---

[2] https://www.bis.doc.gov/index.php/policy-guidance/faqs#faq_118.

BIS first published the Entity List "as part of its efforts to inform the public of entities who have engaged in activities that could result in an increased risk of the diversion of exported, reexported and transferred (in-country) items to weapons of mass destruction (WMD) programs." *Entity List,* BUREAU OF INDUS. & SEC. (2020).[3]  Although the "grounds for inclusion on the Entity List" have grown over the last two-plus decades, *see id.,* Congress placed new limits on BIS's authority with the enactment of ECRA.

Specifically, through ECRA, Congress directed the Secretary of Commerce, "in consultation with the Secretary of State, the Secretary of Defense, the Secretary of Energy, and the heads of other Federal agencies as appropriate," to "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States *pursuant to the policy set forth in section 1752(2)(A).*"  John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232 § 1754(a)(2), 132 Stat. 1636, 2213 (codified at 50 U.S.C. § 4813(a)(2)) (emphasis added).  The referenced "section 1752(2)(A)," in turn, explains that "[t]he national security and foreign policy of the United States require" controls on exports from the United States to prevent five specific harms:  "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure." 50 U.S.C. § 4811(2)(A).

---

[3] https://www.bis.doc.gov/index.php/policy-guidance/lists-of-parties-of-concern/entity-list.

The relevant portion of the EAR, which was last amended in January 2021, is in accord. *See* 15 C.F.R. § 744.11; *see also* 86 Fed. Reg. 4,872, 4865 (Jan. 15, 2021) (Interim Final Rule). Those regulations provide that an entity may be placed on the Entity List only if "there is reasonable cause to believe, based on specific and articulable facts, that the entity has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States."  15 C.F.R. § 744.11(b).  Although the regulation does not define what it means to act "contrary to the national security or foreign policy interests of the United States," the "illustrative list of activities that could be contrary to the national security or foreign policy interests of the United States" includes several of the same policies articulated in 50 U.S.C. § 4811(2)(A), including preventing activities related to terrorism (subsection (b)(1)), military capabilities (subsection (b)(2)), and weapons proliferation (subsection (b)(3)).  *Id.*

**B.** **Esquel's Strict And Audited Commitment To Ethical Employment Practices**

1.  Esquel's Operations And Employment Practices

Esquel is an independent, family-owned textile and apparel manufacturing business based in Hong Kong with operations around the world, including in the United States.  In 2019, before CJE's designation, Esquel supplied around 110 million pieces of garments to brands across the world, and its major customers were based in the U.S. and Europe.  *See* Declaration of Esquel Chairman and CEO Marjorie Yang ("Yang Decl.") ¶ 7.  Before CJE's designation, over 60% of Esquel's garments were shipped to the United States or to other countries under U.S. brands. Although based in Hong Kong, less than 25% of Esquel's exports to the United States were manufactured in China; instead, most exports were manufactured mainly in other countries, including Vietnam, Sri Lanka, and, until the factory closures prompted by CJE's listing, Mauritius.

Before the listing and the factory closures that followed it, the majority of employees of the Esquel group of companies worked outside China. *Id.* ¶ 5.

Esquel has never been subject to ownership, control, or direction by the Chinese government. Esquel is run by U.S.-educated executive leadership with close ties to the U.S. academic and trade communities. For example, Marjorie Yang, who has been the Chairman of Esquel since 1995, received an MBA from Harvard Business School and a Bachelor of Science from Massachusetts Institute of Technology ("MIT"). Yang Decl. ¶ 2. She remains very involved in both schools, serving on a number of boards and councils, and she has been actively involved in trade commissions, such as the U.S.-China Joint Commission on Commerce and Trade. In 2018, she received the Lifetime Achievement Award at the annual American Chamber of Commerce Women of Influence Awards. *See Marjorie Yang received Lifetime Achievement Award at AmCham HK Women of Influence Awards 2018*, ESQUEL GRP. (Nov. 16, 2018).[4] Dr. John Cheh, Esquel's Chief Executive Officer when CJE was listed, obtained a Bachelor's Degree in Economics and Political Science from McGill University and a Ph.D. in Economics from MIT. Dr. Cheh has served the Canadian Government from 1974 to 1993, including in economic and trade positions in Beijing, Seoul, and Tokyo.

Since its founding in 1978, Esquel has been a global leader in sustainable manufacturing and socially responsible business operations. Esquel is a founding member of the United Nations Global Compact, the world's largest corporate sustainability initiative promoting universal principles on human rights, labor, anti-corruption, and the environment. Esquel Chairman and CEO Marjorie Yang serves on the High Level Steering Committee of the Compact's "Platform on

---

[4] https://www.esquel.com/news/marjorie-yang-received-lifetime-achievement-award-amcham-hk-women-influence-awards-2018.

Sustainable Infrastructure for the Belt and Road Initiative to Accelerate [Sustainable Development Goals]." *Marjorie Yang*, ESQUEL GRP. (last updated Aug. 2020).[5]  An Esquel company is also a member of the Better Work program, a collaboration between the United Nations and the World Bank, whose goal is to improve working conditions and labor rights in the apparel industry.  Yang Decl. ¶ 14.  And Esquel has long operated under its own strict Workplace Code of Conduct, which mandates that all Esquel companies protect employee rights under national and international labor laws and pay "at least" the local minimum wage or the prevailing industry wage, "whichever is higher."  *See Esquel Workplace Code of Conduct*, ESQUEL GRP. (Sept. 2020).[6]  It strictly prohibits all forms of forced labor, child labor, harassment, abuse, and discrimination.  *Id.*

Esquel has maintained a presence in Xinjiang since 1995, after it founded spinning mills close to the supply of high-quality Xinjiang cotton.  Ever since it has operated in Xinjiang, Esquel has offered equal opportunity employment to members of Uyghur and other ethnic minority groups.  CJE specifically was created in 2009 and operates one of Esquel's spinning mills in Xinjiang.  The state-of-the-art and highly automated mill is operated by a small number of trained and skilled workers.  As of May 2021, CJE employed 370 people, including 27 Uyghurs and 44 employees who represent other ethnic minority groups.  Yang Decl. ¶ 18.

Esquel has always viewed itself as part of the communities in which it operates, and has therefore tried to give back and improve the Xinjiang community, as well as enhance the income stability of the people who live there.  In 2003, Esquel established the Esquel-Y.L. Education Foundation in Hong Kong.  The Foundation helps Xinjiang children find educational opportunities through efforts like building and refurbishing schools, donating supplies, and providing education

---

[5] https://www.esquel.com/leadership/marjorie-yang

[6] https://www.esquel.com/sites/default/files/CodeOfConduct.pdf.

subsidies for over 4,400 primary students, as well as over 800 scholarships for high school students, the majority of whom are Uyghur or represent other ethnic minority groups.  Yang Decl. ¶ 15.  The Foundation has been running a summer learning program and STEM training programs for over 1,600 local children since 2007.  In 2012, Esquel launched a vision screening program to help improve the eyesight of the region's youth in partnership with Hong Kong Polytechnic University and local hospitals, and to date has provided over 12,000 students in remote areas with free eye examinations, and medical treatment, and donated 2,700 pairs of eyeglasses.  From 2007-2014, Esquel partnered with Standard Chartered Bank to provide millions of dollars in micro-financing and training to almost 2,000 local farming households in Xinjiang, with 100% repayment.  Esquel continued to run the program itself, using its own capital, until 2017 when local farmers gained better access to financing options locally.  *Id.* ¶ 15.  Many third parties have recognized Esquel for these efforts and its commitment to social responsibility more broadly.

### 2.    Independent Audits Of Esquel Facilities Reveal No Forced Labor

Independent, third-party audits have consistently shown that Esquel's facilities—including CJE—do not use forced labor.  More than a year before Defendants added CJE to the Entity List, ELEVATE Hong Kong Holdings Limited ("ELEVATE"), a leading business risk solutions provider headquartered in Hong Kong and majority-owned by European private equity fund EQT, conducted an audit of CJE in May 2019 at the request of an Esquel customer who shares Esquel's values.  ELEVATE performed a standard, independent, third-party social and environmental audit. It visited the CJE facility, performed extensive observation, and conducted confidential interviews with randomly selected workers, including Uyghur and other ethnic-minority employees.  The audit concluded that "[t]here was no evidence of forced, bonded or prison labor and no evidence of coercion or exploitation"; "[a]ll employees appeared to be recruited through legitimate channels

8

that were not affiliated with any government agency linked to training, education and vocational centers"; the "[t]erms and conditions of employment were the same between majority and minority populations in the factories"; and "[e]mployment duration, turnover, promotions, roles, titles, salaries and benefits all appeared to be consistent between majority and minority populations." Yang Decl. ¶ 20.

In October 2019, Netherlands-headquartered Control Union Certifications B.V. ("Control Union") audited CJE and Esquel's other two spinning mills in Xinjiang to certify the mills' compliance with the Global Organic Textiles Standard ("GOTS"). The certification requires the absence of forced labor practices, safe and hygienic working conditions, the payment of living wages, and no discrimination or harsh treatment. Control Union's audit confirmed that CJE was in compliance with GOTS, as were the other two mills. Yang Decl. ¶ 21. And the December 2019 audit of Esquel's two ginning mills in Xinjiang (not CJE) tracked the first two audits: It found no evidence of forced labor or discrimination at the audited facilities. *Id.*

In October 2020, shortly after the July 2020 Entity List designation, Control Union conducted a customer-commissioned audit of CJE. Control Union conducted confidential interviews with 73 CJE employees, including all 68 ethnic-minority employees then working at CJE. The interviews were conducted in private, and the auditors identified no hint of coaching. Control Union found no forced, prison, bonded, or involuntary labor, as well as no evidence of discrimination or harsh treatment. At bottom, the audit showed that CJE "treat[s] every worker with respect and dignity." Yang Decl. ¶ 22.

Two other customer-commissioned audits, both completed in October 2020, echoed the same findings. In one, conducted by a customer's internal audit specialists, the auditors interviewed "almost all Uyghur[] employees and [a] majority of other minorities" and said they

were "convinced that there was NO SIGN of Forced Employment or any other forced labor issues" at CJE.  Yang Decl. ¶ 23.  The other audit, prepared by QIMA Limited ("QIMA"), found no evidence of forced labor either.  *Id.*

This past May, ELEVATE performed another audit of CJE and Esquel's other two Xinjiang spinning mills.  According to ELEVATE, CJE "had [an] established hiring policy and hiring procedures in place" that "prohibit[ed] using of forced, bonded or involuntary prison labour"; "[a]ll workers were directly employed by factory with no labour agent or broker used"; "[t]here was no unreasonable limitation on freedom of movement"; and "[t]he workers could resign upon a reasonable notice period which were in line with local law requirements."  Yang Decl. ¶ 24.

Finally, Esquel has conducted its own internal audits, which have confirmed these same findings.  Neither CJE nor any other Esquel company has used, is using, or will use forced labor.

### C.    Defendants Add CJE To The Entity List Without Authority Or Basis In Fact

On July 22, 2020, Defendants placed CJE (along with ten unrelated entities) on the Entity List.  *See* 85 Fed. Reg. at 44,159-44,160.  Defendants did so pursuant to ECRA.  *See id.* ("ECRA provides the legal basis for BIS's principal authorities and serves as the authority under which BIS issues this rule.").  But the July 2020 Notice did not include any finding that CJE's activities included any of the activities set forth in section 4811(2)(A), such as "acts of terror[]" or "weapons of mass destruction."  50 U.S.C. § 4811(2)(A).  Rather, Defendants gave a one-sentence explanation:  CJE (and the other unrelated companies) were allegedly "engaging in activities contrary to the foreign policy interests of the United States through the practice of forced labor involving members of Muslim minority groups in the [Xinjiang Uyghur Autonomous Region ("XUAR")]." 85 Fed. Reg. at 44,159.  According to Defendants, this conduct "raises sufficient concern that prior review of exports, reexports, or transfers (in-country) of all items subject to the

EAR involving these entities, and the possible imposition of license conditions or license denials on shipments to these entities, will enhance BIS's ability to prevent items subject to the EAR from being used in activities contrary to the foreign policy interests of the United States." *Id.* at 44, 160.

Defendants' justification included no "specific and articulable facts," 15 C.F.R. § 744.11(b), or any evidence whatsoever. Defendants provided no reason to believe that CJE actually had engaged in the practice of forced labor in Xinjiang. Despite repeated attempts at outreach to the government, the basis on which the Trump administration decided to add CJE to the Entity List remains unclear.

### D.   The Entity List Designation Causes Plaintiffs Immediate Irreparable Harm

As explained in further detail below and in the attached declaration of CEO and Chairman Marjorie Yang, Defendants' unexpected listing of CJE has irreparably harmed Plaintiffs, and that harm increases every day CJE remains on the list. Immediately following the designation, Esquel issued a public statement denouncing the action, denying any "evidence to support the allegations against us on the use of forced labor in CJE," and stating unequivocally that "[w]e absolutely have not, do not, and will never use forced labor." *Response to Changji Esquel Textile Co. Ltd. (CJE) being named by U.S. Department of Commerce on the Entity List*, ESQUEL GRP. (July 21, 2020).[7] Esquel also sent a letter to then-Secretary of Commerce Wilbur Ross protesting the listing decision and again unequivocally denying the allegations. *See* Yang Decl. ¶ 27.

Esquel's immediate, insistent denial of the allegations did little to stop the sweeping harms that would follow. News articles immediately trumpeted Defendants' announcement of the Entity List additions, with many articles describing the listing as "sanctions." *See, e.g.*, Ana Swanson,

---

[7] https://www.esquel.com/news/response-changji-esquel-textile-co-ltd-cje-being-named-us-department-commerce-entity-list.

*U.S. Imposes Sanctions on 11 Chinese Companies Over Human Rights*, N.Y. TIMES (July 20, 2020).[8]  Several named Esquel's major customers.  *See, e.g.*, *id.*; Jeanne Whalen, *U.S. sanctions additional Chinese companies; alleging human rights violations in Xinjiang region*, WASH. POST (July 20, 2020);[9] Daniel Shepardson & Diane Bartz, *U.S. adds 11 firms to economic blacklist over China's treatment of Uighurs,* REUTERS (July 20, 2020);[10] Bethany Allen-Ebrahimian, *Subsidiary of world's largest shirtmaker put on U.S. blacklist over Xinjiang ties,* AXIOS (July 21, 2020);[11] Sarah Al-Arshani, *US says it will blacklist 11 Chinese companies accused of human rights abuses against Uighurs — including subsidiaries of a company that ships coronavirus tests worldwide,* BUS. INSIDER (July 21, 2020);[12] Tiffany Ap, *Esquel Denies Forced Uighur Labor Claims,* YAHOO! (July 21, 2020).[13]  It was thus no surprise when many of those same customers—including major U.S. and international brands—cut off their business with Esquel.

Due to the prior administration's reckless listing of CJE, Esquel estimates that it has lost hundreds of millions of dollars—approximately one quarter of its annual revenue.  It has also lost customers, suppliers, and access to credit.  Esquel has been forced to close its factories in Mauritius as well as significantly reduce work (and, consequently, employee pay) at its factories in Sri Lanka, Vietnam, and China.  Those actions, in turn, have meant that Esquel has lost many thousands of

---

[8] https://www.nytimes.com/2020/07/20/business/economy/china-sanctions-uighurs-labor.html.

[9] https://www.washingtonpost.com/business/2020/07/20/china-sanctions-uighurs-xinjiang/.

[10] https://www.reuters.com/article/us-usa-china-human-rights/u-s-adds-11-firms-to-economic-blacklist-over-chinas-treatment-of-uighurs-idUSKCN24L1XT.

[11] https://www.axios.com/hong-kong-shirtmaker-esquel-xinjiang-blacklist-uighur-forced-labor-1c5c7226-6668-4a6b-88c1-c344a4f3dd8f.html.

[12] https://www.businessinsider.com/us-blacklist-chinese-companies-over-xinjiang-human-rights-abuses-2020-7.

[13] https://tinyurl.com/2dyma4av.

valuable employees (and those employees have lost their livelihoods). *See generally* Yang Decl. ¶¶ 25-45. As long as CJE remains on the list, it faces the possibility of additional pay cuts, layoffs, and facility closures.

**ARGUMENT**

This Court should enjoin Defendants from keeping CJE on the Entity List. The Court has discretion to grant a preliminary injunction if (1) Plaintiffs are "likely to succeed on the merits," (2) Plaintiffs are "likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in [Plaintiffs'] favor," and (4) the provision of interim relief "is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *see Sherley v. Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011). Courts in this Circuit continue to "consider[] these factors on a sliding scale, whereby a strong showing on one factor could make up for a weaker showing on another." *NAACP v. Trump*, 321 F. Supp. 3d 143, 146 (D.D.C. 2018) (internal quotation marks omitted) (quoting *Cigar Ass'n of Am. v. FDA*, 317 F. Supp. 3d 555, 560 (D.D.C. 2018)); *Alabama Ass'n of Realtors v. United States Dep't of Health & Hum. Servs.*, No. 20-CV-3377 (DLF), 2021 WL 1946376, at *1 (D.D.C. May 14, 2021) (under sliding scale approach, Plaintiff must show at least "a serious legal question on the merits"); *see also Archdiocese of Wash. v. Washington Metro. Area Transit Auth.*, 897 F.3d 314, 334 (D.C. Cir. 2018) (reserving question of "whether the 'sliding scale' approach remains valid after *Winter*"). Because Esquel has a strong likelihood of success, it is entitled to an injunction regardless of whether the sliding scale approach applies.

## I.    ESQUEL IS LIKELY TO SUCCEED ON THE MERITS

Although Esquel brings three claims for relief, it is entitled to injunctive relief based on the likelihood of success of its first count—specifically, that Defendants' actions in adding CJE to the Entity List on July 22, 2020 were *ultra vires* and in excess of Defendants' statutory and regulatory authority. That is so for two reasons: First, Defendants' reason for putting CJE on the Entity List

13

was not one of the limited bases approved by Congress.  Second, Defendants neither possessed nor offered any "specific and articulable facts" for CJE's listing, as required by the governing regulations.  And because Defendants' listing of CJE "is definitive" and "has a direct and immediate *** effect on the day-to-day business of the parties challenging the action," Esquel's *ultra vires* claim is ripe for immediate judicial review.  *Her Majesty the Queen in Right of Ontario v. EPA*, 912 F.2d 1525, 1531 (D.C. Cir. 1990) (ellipsis in original); *see Dart v. United States*, 848 F.2d 217, 222, 224 (D.C. Cir. 1988) ("Judicial review is favored when an agency is charged with acting beyond its authority.").

### A.      Defendants Acted Contrary To, And In Excess Of, The Delegated Authority In ECRA

"[I]t is beyond cavil that 'an agency's power is no greater than that delegated to it by Congress.'"  *Railway Lab. Execs.' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 670, *amended*, 38 F.3d 1224 (D.C. Cir. 1994) (quoting *Lyng v. Payne*, 476 U.S. 926, 937 (1986)).  That is because "[a]gencies owe their capacity to act to the delegation of authority, either express or implied, from the legislature."  *Id.*  Relevant here, Congress through ECRA authorized Defendants to add entities to the Entity List for specifically enumerated reasons, and ECRA was the "authority under which BIS" acted.  85 Fed. Reg. at 44,160.

In listing CJE for alleged human rights violations, Defendants acted outside Congress's clear statutory bounds in ECRA—and thus well beyond their delegated authority.  ECRA authorizes the creation and maintenance of the Entity List.  It directs the Secretary of Commerce, "in consultation with the Secretary of State, the Secretary of Defense, the Secretary of Energy, and the heads of other Federal agencies as appropriate," to "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States."  50 U.S.C. § 4813(a)(2).  But they must do so "*pursuant to the policy set*

14

*forth in section 4811(2)(A).*"  *Id.* (emphasis added).  Section 4811(2)(A), in turn, explains that "[t]he national security and foreign policy of the United States require" controls on exports from the United States for use in five specific areas: "(i) the proliferation of weapons of mass destruction or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure."  *Id.* § 4811(2)(A).  Under the plain text of the statute, to include an entity on the Entity List, Defendants must determine that the entity is involved in one of these five enumerated areas of concern.

It necessarily follows that Defendants *cannot* list an entity based on the entity's alleged involvement in some other, non-specified area.  To do so would flout the express limit Congress placed on Defendants' listing authority through ECRA:  that the list "shall" be "establish[ed] and maintain[ed] *** pursuant to the policy set forth in section 4811(2)(A)."  50 U.S.C. § 4813(a)(2). That delegation of authority does not give Defendants discretion to list entities for any national security or foreign policy goals Defendants choose.  *See Railway Lab.*, 29 F.3d at 671 ("The *duty* to act under certain carefully defined circumstances simply does not subsume the *discretion* to act under other, wholly different, circumstances, unless the statute bears such a reading.").  Rather, Defendants can list entities only in accordance with the policy detailed in section 4811(2)(A).  *See Pursuant to*, BLACK'S LAW DICTIONARY (11th ed. 2019) (defining "pursuant to" as "in accordance with" or "[a]s authorized *** under"); *see also Price v. Medicaid Dir.*, 838 F.3d 739, 749 (6th Cir. 2016) ("'Pursuant to' is a narrower term than 'consistent with.' *** [I]t means, in addition, that an action is directed or permitted by the authority by which the action is taken.").  Listing an entity because of its activity in some area other than "(i) the proliferation of weapons of mass destruction

or of conventional weapons; (ii) the acquisition of destabilizing numbers or types of conventional weapons; (iii) acts of terrorism; (iv) military programs that could pose a threat to the security of the United States or its allies; or (v) activities undertaken specifically to cause significant interference with or disruption of critical infrastructure," would not be "pursuant to" the section, and would thus fall outside Defendants' authority.  50 U.S.C. § 4811(2)(A).

The negative-implication canon confirms this reading.  "Sometimes called *expressio unius est exclusio alteriu*s, the canon suggests that 'expressing one item of [an] associated group or series excludes another left unmentioned.'"  *Mercy Hosp., Inc. v. Azar*, 891 F.3d 1062, 1069 (D.C. Cir. 2018) (alteration in original) (quoting *Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002)); *see also Halverson v. Slater*, 129 F.3d 180, 185 (D.C. Cir. 1997) (describing "the statutory construction principle, *expressio unius est exclusio alterius*, that is, 'the mention of one thing implies the exclusion of another thing'").  The application of that canon here mirrors its application in *Halverson*.  There, the D.C. Circuit considered "the authority of the Secretary of the Department of Transportation *** to delegate certain responsibilities under the Great Lakes Pilotage Act of 1960."  129 F.3d at 181.  That statute gave the Secretary the power to delegate responsibilities "to an officer or employee of the Department," but later said that "[t]he Secretary may delegate the duties and powers conferred by th[e] subtitle *** to any officer, employee, or member of the Coast Guard."  *Id.* at 183-184 (quoting 49 U.S.C. § 322(b) and 46 U.S.C.A. § 2104(a) (West Supp. 1997), respectively).  The Secretary argued that he also had the authority to delegate pilotage functions to non-Coast Guard officials, but the D.C. Circuit found that argument "irreconcilable" with the *expressio unius* canon:  "According to th[at] *** canon, the Congress, in drafting section 2104(a) this way, intended to exclude delegations to non-Coast Guard officials."  *Id.* at 185.  The same is

true here.  In drafting section 4811(2)(A) with five specified areas of concern in which participation

justifies export controls, Congress necessarily "intended to exclude" other potential justifications.

If Congress had wanted to give Defendants broad discretion to address national security

and foreign policy concerns without regulating *which* types of national security and foreign policy

concerns justify action, it easily could have done so.  For instance, a different subsection of

ECRA—subsection 4811(2)(D)—provides that one purpose of U.S. export control law is to carry

out "the foreign policy of the United States, including the protection of human rights and the

promotion of democracy."  50 U.S.C. § 4811(2)(D).  Thus, in subsection 4813(a)(2), Congress

could have chosen to cross-reference subsection 4811(2)(*D*), in addition to subsection 4811(2)(*A*).

But it did not.  Instead, Congress limited the permissible types of national security, foreign policy,

or economic threats to those involving "acts of terror[]," "weapons of mass destruction," and

similar concerns.  50 U.S.C. § 4811(2)(A).  Defendants are not free to disregard Congress's choice.

The governing regulations, which were last amended in 2021, are consistent with ECRA.

One subsection details the "[c]riteria" for adding an entity to the Entity List.  15 C.F.R. § 744.11(b).

It starts by noting that an entity may be added to the list if there is "reasonable cause to believe

*** that the entity has been involved, is involved, or poses a significant risk of being or becoming

involved in activities that are contrary to the national security or foreign policy interests of the

United States."  *Id.*  The subsection then goes on to "provide an illustrative list of activities that

could be contrary to the national security or foreign policy interests of the United States."  *Id*.

Those activities, in turn, track the areas of concern listed in the statute—*i.e.*, they relate to conduct

that threatens national security, such as "[s]upporting persons engaged in acts of terror" or taking

"[a]ctions that could enhance the military capability of, or the ability to support terrorism of

governments that have been designated by the Secretary of State as having repeatedly provided

support for acts of international terrorism." *Id.* Other activities (like human rights abuses), while important and concerning in their own right, are not included.

In short, Defendants could not add CJE to the Entity List for alleged human rights abuses because doing so would be *ultra vires* and outside the policy set forth in section 4811(2)(A), *i.e.*, the policy to which the "establish[ment] and maint[enance]" of the Entity List must comply.  50 U.S.C. § 4813(a)(2).

## B.    Defendants Acted Beyond The Authority Of The Governing Regulations

Even if Defendants had placed CJE on the Entity List based on grounds approved by Congress, federal law would still require them to have "specific and articulable facts" supporting their conclusion that the entity is involved, has been involved, or risks being involved in an activity that is "contrary to the national security or foreign policy interests of the United States."  15 C.F.R. § 744.11(b).  Defendants have provided none, nor can they.  All Defendants purported to find was that CJE (and ten unrelated companies) were "engaging in activities contrary to the foreign policy interests of the United States through the practice of forced labor involving members of Muslim minority groups in the XUAR [Xinjiang Uyghur Autonomous Region]."  85 Fed. Reg. at 44,159. Defendants provided no facts to support this finding, much less "specific" or "articulable" facts. Nor have Defendants provided Esquel with such facts despite repeated requests.

The lack of "specific and articulable facts" to support Defendants' allegation against CJE makes sense:  There are none.  Esquel does not and has not ever used forced labor.  The claim that CJE did so is antithetical to everything Esquel stands for.  CJE has participated in many independent audits—both before the listing and after—and all of them have come back clean.  In May 2019, ELEVATE's audit found no evidence of forced labor.  Neither did Control Union's audit in October 2019.  And those results are consistent with the results of four audits conducted

18

after the listing:  three October 2020 audits by Control Union, QIMA, and a customer's internal auditors, and a fourth by ELEVATE in May 2021.  Beyond those external and customer audits, CJE is regularly audited through Esquel's Internal Audit and Corporate Social Responsibility departments.  There is no evidence of forced labor at any Esquel facility.  Yang Decl. ¶¶ 20-24.

Indeed, cheap or forced labor would have no place in a mill like CJE, which relies on highly sophisticated spinning equipment operated by a relatively small number of specially trained employees.  A documentary-style video produced by one of Esquel's equipment suppliers showcases how CJE's technologically advanced facility in Xinjiang works.  A ginning machine first combs through the cotton to clean it and extract dust.  Rieter Reference Mill Video Changji Esquel at 0:35-0:38, YOUTUBE (July 13, 2017).[14]  A separate machine then blends the cotton for quality yarns.  *Id.* at 1:00.  Another series of machines spin the yarns.  *Id.* at 1:30-2:35.  A "[f]ully automated transport system" moves the cotton "from spinning preparation to end spinning."  *Id.* at 2:36.  In fact, almost the entire process is automated.  *Id.* at 3:46.  As the video reveals, these machines do not require cheap or forced labor to operate them; instead, employees are running production checks and quality checks, as well as ensuring that the "[i]ntelligent mill control system" is operating smoothly.  *Id.* at 4:09-4:21.  Those jobs require specific skills and training, and they pay almost three times the local minimum wage.  Yang Decl. ¶ 18.  Cheap or forced labor is incompatible with such a facility.

Put simply, Defendants have not met and cannot meet the requirement that there be "specific and articulable facts" providing a "bas[is]" for the conclusion that CJE is engaging in acts "contrary to the national security or foreign policy interests of the United States."  15 C.F.R.

---

[14] https://www.youtube.com/watch?v=rxbsPKq5_oM.

§ 744.11(b).  Placing CJE on the Entity List without such facts thus conflicted with federal law and was *ultra vires* for this reason as well.

## II.   ESQUEL WILL CONTINUE TO SUFFER IRREPARABLE HARM ABSENT INJUNCTIVE RELIEF

Defendants' listing of CJE has irreparably harmed, and will continue to irreparably harm, Plaintiffs—CJE (the listed entity), Esquel Enterprises (the headquarters and operating arm of Esquel), and Esquel New York (Esquel Enterprises' New York subsidiary).  The listing prompted many reports that Esquel was "sanctioned" for its (nonexistent) role in forced labor.  The ensuing loss of customers led to the closure of two factories in Mauritius and severely reduced operations in Sri Lanka, Vietnam, and China, putting thousands of employees out of work.  As long as CJE remains on the Entity List, Esquel faces continuing reputational harm, loss of business, and factory closures.

**CJE's inability to acquire items subject to EAR.**  As an initial matter, as a result of Defendants' actions, all exports, reexports, and transfers (in-country) to CJE of items subject to the EAR—whether sensitive or non-sensitive—require a license from BIS.  Thus, since July 2020, CJE has been unable to obtain any U.S. items subject to the EAR, unless the U.S. exporter first obtains a license.  But the necessary license applications are presumptively denied for most items, with very limited exceptions.  *See* 85 Fed. Reg. at 44,160 (describing "license review policy of presumption of denial").  Such restrictions have already created significant difficulties for CJE.  For example, CJE has been unable to purchase cotton from U.S. suppliers.  Yang Decl. ¶ 35.  A Swiss company that supplies CJE yarn and fiber-testing equipment produces some of its spare parts in the United States, so it cannot supply CJE with spare parts.  *Id.*  Hewlett-Packard stopped providing equipment to CJE.  *Id.*  Further, some chemical suppliers stopped supplying to CJE.  *Id.*  These harms to CJE's ability to obtain needed supplies cannot "be easily remediated."  *Xiaomi*

20

*Corp. v. Department of Def.*, No. CV 21-280 (RC), 2021 WL 950144, at *11 (D.D.C. Mar. 12, 2021). The quality and pricing of cotton is different now that CJE is required to source elsewhere. The sudden pause of replacement parts for machines has put machine operations at risk. Yang Decl. ¶ 35. And forcing CJE to use different chemicals can affect the product performance levels. *Id.*

**Harm to business reputation.** Of even greater concern to Plaintiffs, the placement of CJE on the Entity List has also had immediate, significant repercussions with respect to Esquel's business reputation and goodwill. Esquel is a global leader in sustainable manufacturing and socially responsible business operations, and many of its customers relied on that status and hold Esquel to that high standard. Yang Decl. ¶¶ 9-10, 20. CJE is frequently the subject of independent, third-party audits to ensure compliance with corporate social responsibility standards. *Id.* ¶¶ 19-24. Esquel holds itself to a high standard as well—operating under its own Workplace Code of Conduct, participating in global corporate sustainability initiatives like the United Nations Global Compact and the Better Work program, maintaining Global Organic Textiles Standard certifications through independent audits, and working hard to improve the lives of the people in the areas in which it operates. *Id.* ¶¶ 12, 14, 15, 21.

Placing CJE on the Entity List "could not fail to damage [Esquel's] good name" and the goodwill it had built over decades. *Armour & Co. v. Freeman*, 304 F.2d 404, 406 (D.C. Cir. 1962) (finding irreparable harm). CJE has been ignominiously branded a company that is "engaging in activities contrary to the foreign policy interests of the United States through the practice of forced labor." 85 Fed. Reg. at 44,159. What's more, the Entity List is synonymous with a national security "blacklist" of sorts. *See, e.g.*, Shepardson & Bartz, *U.S. adds 11 firms to economic blacklist*, *supra*; Allen-Ebrahimian, *Subsidiary of world's largest shirtmaker put on U.S. blacklist*,

*supra*; Al-Arshani, *US says it will blacklist 11 Chinese companies*, *supra*.  By its terms, the Entity

List is established and maintained to ensure U.S. exports are not used in "the proliferation of

weapons of mass destruction," "the acquisition of destabilizing numbers or types of conventional

weapons," "acts of terrorism," and the like.  50 U.S.C. § 4811(2)(A).  Just like the government's

labeling of Xiaomi and Luokung as companies that are "seeking to undermine the security of the

United States," Defendants' labeling of Esquel as a company that violates human rights and

belongs on a list targeting acts of terrorism and other threats to national security "is *** sufficiently

severe to constitute irreparable injury."  *Luokung Tech. Corp. v. Department of Def.*, No. CV 21-

583 (RC), 2021 WL 1820265, at *14 (D.D.C. May 5, 2021).  "[G]iven the gravity of what the

[Entity List] label implies," "the potential for long-term reputational harm is far more severe here"

than even other cases in this Circuit in which "[i]rreparable harm to a business's reputation [was]

found *** as a result of [a] government"-imposed label.  *Xiaomi Corp.*, 2021 WL 950144, at *10

(explaining that it "cannot fathom how the government's labeling of Xiaomi" on an analogous list

associated with Chinese military control "would not meet th[e] standard" for irreparable harm).

 Indeed, the evidence of the reputational harm Esquel has already suffered is overwhelming.

After the listing, news articles immediately reported that CJE had been "sanction[ed] *** over

human rights" abuses.  *See* Swanson, *U.S. Imposes Sanctions, supra*.  Many U.S. and international

news outlets covered the announcement, including the *New York Times*, the *Washington Post*,

*Reuters*, *Axios*, *Business Insider*, and *Yahoo News*.  *See id.*; *see also, e.g.*, Whalen, *U.S. sanctions*

*additional Chinese companies, supra*.  In reporting on Defendants' false determination regarding

CJE, articles highlighted Esquel's major customers.  *See, e.g.*, Swanson, *U.S. Imposes Sanctions,*

*supra*.  One article focused entirely on Esquel's relationship with a single client, declaring that the

client had bought uniforms from Esquel, "a company *facing US sanctions over forced labour* at a

subsidiary firm in China's western Xinjiang region."  Emma Graham-Harrison & Stephanie Kirchgaessner, *Apple imported clothes from Xinjiang firm facing US forced labour sanctions*, GUARDIAN (Aug. 10, 2020) (emphasis added).[15]

Unsurprisingly, due to Defendants' listing, many Esquel customers refused to continue working with Esquel.  Yang Decl. ¶ 29.  European customers have done the same.  *Id.*  Suppliers stopped their business with Esquel.  *Id.* ¶¶ 34-35.  Esquel has struggled to secure financing.  For example, one bank suspended $150 million in credit lines that Esquel had been using and asked for early repayment of a $30 million loan. *Id.* ¶ 36.  Another bank stopped processing a $30 million long-term loan to Esquel that the bank had approved internally.  *Id.*  And Esquel was not invited to events to which it was normally invited, such as the Sourcing USA Summit, and was disinvited from other events, such as the AW21 Yarn Expo. *Id.* ¶¶ 39-40.   For these reasons, like the plaintiffs in *Xiaomi*, "[i]t is almost unquestionable that [CJE's] designation has damaged [Esquel's] reputational standing with corporate customers and business partners."  *Xiaomi Corp.*, 2021 WL 950144, at *9.

This Court has recently made clear that such "injury to reputation can, at least at times, rise to the level necessary to support the issuance of an injunction."  *Xiaomi Corp.*, 2021 WL 950144, at *9 (quoting *Atlas Air, Inc. v. International Bhd. of Teamsters*, 280 F. Supp. 3d 59, 103 (D.D.C. 2017), *aff'd*, 928 F.3d 1102 (D.C. Cir. 2019)).  In fact, "because '[i]njury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'"  *Id.* (quoting CHARLES ALAN WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2948.1).  That is why this Court has frequently found irreparable harm when the plaintiff alleged reputational

---

[15] https://www.theguardian.com/technology/2020/aug/10/apple-imported-clothes-from-xinjiang-firm-facing-us-forced-labour-sanctions.

injury.  *See Patriot, Inc. v. United States Dep't of Hous. & Urb. Dev.*, 963 F. Supp. 1, 5 (D.D.C. 1997) ("plaintiffs have demonstrated irreparable harm in damage to their business reputation" where government "characteriz[ed] them in [a] letter as" engaging in suspicious business practices with senior citizens); *Beacon Assocs., Inc. v. Apprio, Inc.*, 308 F. Supp. 3d 277, 288 (D.D.C. 2018) (concluding that harm was "irreparable absent an injunction" because the improper contract termination for default "left a black mark on [plaintiff]'s reputation *** [and] will result in many lost contract opportunities"); *Morgan Stanley DW Inc. v. Rothe*, 150 F. Supp. 2d 67, 77 (D.D.C. 2001) (loss of "customer trust and goodwill" amounted to irreparable harm).

To be sure, "[a]s with all other forms of irreparable harm, *** the showing of reputational harm must be concrete and corroborated, not merely speculative." *Jones v. District of Columbia*, 177 F. Supp. 3d 542, 547 (D.D.C. 2016) (internal quotation marks omitted).  But, as shown above and in the Declaration of Esquel Chairman and CEO Marjorie Yang, Esquel's reputational harm is not based on "[c]onjecture" or "'vague and unsupported' assertions of harm." *Id.* at 548.  Esquel has shown that it already has "suffer[ed] *** great, concrete, corroborated and certain reputational injuries," and will continue to suffer such harm "absent the injunctive relief" sought here. *Id.*

**Loss of market share.**  As Esquel's customers pause their business with Esquel, with many cutting off their business entirely, competitors that have not been listed as "a threat to the national security and foreign policy of the United States," 50 U.S.C. § 4813(a)(2), have grown their market share at Esquel's expense.  Yang Decl. ¶ 33.  That is all the more true given that Esquel's capacity to take on work has plummeted.  As a result of CJE's designation and the ensuing loss of business, Esquel has had to close two factories in Mauritius; it lost numerous workers as a result of lower business volume; and it faces the significant risk that more closures will follow.  *Id.* ¶ 41. Unfortunately, the gap between Esquel and its competitors will continue to grow as long as CJE

24

remains on the list.  And the business opportunities Esquel lost are unlikely to crop up again.  That is especially true given the industry in which Esquel operates.  Fashion products like those produced by Esquel have a long development cycle—from conceptual design to order placement, placement to production, and production to shipment, the whole cycle can be as long as 12 months. *Id.* ¶ 33.  Once customers start that process with another company, it is near impossible for their business to return to Esquel.  *Id.*

This Court has recognized that this kind of "diminished market share" and loss of competitiveness "can constitute irreparable harm."  *Xiaomi Corp.*, 2021 WL 950144, at *11 (quoting *Bayer HealthCare, LLC v. United States Food & Drug Admin.*, 942 F. Supp. 2d 17, 26 (D.D.C. 2013)); *Bayer*, 942 F. Supp. 2d at 26 (citing cases).  Just last year, in *TikTok Inc. v. Trump*, this Court found that plaintiffs proved that they faced irreparable harm where the Secretary of Commerce's prohibition of certain transactions "ero[ded] *** Tiktok's attractiveness as a commercial partner."  No. 1:20-CV-02658 (CJN), 2020 WL 5763634, at *8 (D.D.C. Sept. 27, 2020).  That is precisely what has happened here:  Competitors not wrongly included on a list meant for national security threats will continue to edge out Esquel's share of the market.  *See Luokung*, 2021 WL 1820265, at *12 (including the "high likelihood that [Luokung's] overall market share will decline as it loses customers to its competitors that are not saddled with the CCMC designation" as evidence of irreparable harm).

**Forced layoffs.**  Because of the listing, Esquel had no choice but to lay off thousands of employees.  Esquel's Mauritius factories primarily made clothing for Esquel's U.S. customers. When Defendants placed CJE on the Entity List, and those customers cut off their business, Esquel was forced to close the Mauritius factories.  Yang Decl. ¶ 41.  Over 2,600 Esquel employees were let go as a result.  *Id.*  As long as CJE remains on the list, more closures and layoffs lurk on the

horizon.  *Id.* ¶ 45.  And "[w]hen a company is 'forced to lay off personnel,' that constitutes 'independent evidence of irreparable harm.'"  *Brook Beverage, Inc. v. Pepsi-Cola Bottling Co. of N.Y., Inc.*, No. 20-CV-9275 (VSB), 2021 WL 568266, at *7 (S.D.N.Y. Feb. 16, 2021) (quoting *Sanofi-Synthelabo v. Apotex, Inc.*, 488 F. Supp. 2d 317, 342 (S.D.N.Y.), *aff'd*, 470 F.3d 1368, 1382-1383 (Fed. Cir. 2006)); *see also AstraZeneca LP v. Apotex, Inc.*, 633 F.3d 1042, 1061 (Fed. Cir. 2010) (affirming finding that layoffs were a "type[] of irreparable harm"); *Ferrero v. Associated Materials Inc.*, 923 F.2d 1441, 1449 (11th Cir. 1991) (listing layoffs as reason for finding irreparable harm); *Curtis 1000, Inc. v. Youngblade*, 878 F. Supp. 1224, 1274 (N.D. Iowa 1995) (same).

**Unrecoverable monetary losses.**  Defendants' placement of CJE on the Entity List has already caused Esquel to suffer significant economic losses—losses that will only grow if CJE remains on the list.  As explained, since the announcement that Defendants had placed CJE on the list, Esquel estimates that it has lost approximately one quarter of its total revenue over the last 12 months.  Yang Decl. ¶ 30.  Because of this drastic drop in business, Esquel has had to close its factories in Mauritius, resulting in the loss of thousands of jobs and costing Esquel over $10 million in severance payments.  *Id.* ¶ 41.  Esquel has also had to take on subcontracting work in its factories in Sri Lanka, as well as operate at half capacity, to survive.  *Id.* ¶ 42.  To make matters worse, Esquel is forced to consider further closures as the loss in revenue continues and grows.  *Id.* ¶¶ 45, 45. As for Esquel New York specifically, the company's agency fee from Esquel Enterprises dropped by 77% in 2020 because of the loss of business with many U.S. customers, and its net income dropped by over $1.2 million.  *Id.* ¶ 31.  That was the first time Esquel New York recorded a loss in at least six years.  *Id.*

Despite the general rule "that economic loss does not, in and of itself, constitute irreparable harm," *Luokung*, 2021 WL 1820265, at *12 (internal quotation marks omitted), "when a plaintiff's alleged damages are unrecoverable, such as here, due to the sovereign immunity enjoyed by Defendants, courts have recognized that unrecoverable economic loss can indeed constitute irreparable harm," *Xiaomi Corp.*, 2021 WL 950144, at *10 (collecting cases) (quoted by *Luokung*, 2021 WL 1820265, at *12). This does not mean that "*any* unrecoverable financial injury" will suffice. *Luokung*, 2021 WL 1820265, at *12. The "asserted 'economic harm' must 'be significant, even where it is irretrievable because a defendant has sovereign immunity.'" *California Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018) (quoting *Air Transp. Ass'n of Am., Inc. v. Export-Import Bank*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012)). But here, "the enormity of [Esquel]'s financial losses—which [Esquel has] substantiated with concrete evidence—meets every variation of the standard" for unrecoverable economic harm. *Xiaomi Corp.*, 2021 WL 950144, at *10. Esquel "has *** begun to see an exodus of lucrative contracts," with the listing being the obvious "reason they are ending their current business relationships." 2021 WL 950144, at *11. As explained, Esquel's suppliers have cut ties; it has trouble securing financing; it has been forced to close factories and lay off employees; and it has permanently lost an estimated one quarter of its revenue in the last year alone as a result of Defendants' placement of CJE on the Entity List. And the likelihood of continued loss makes the possibility of further facility closures and layoffs all the more certain.

## III.   THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR A PRELIMINARY INJUNCTION

When a preliminary injunction is sought against the government, harm to the opposing party and the public interest merge into a single inquiry. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *accord, e.g.*, *Xiaomi*, 2021 WL 950144, at *12. "[T]he [government's] harm and the public interest

are one and the same, because the government's interest *is* the public interest." *Pursuing Am.'s Greatness v. FEC,* 831 F.3d 500, 511 (D.C. Cir. 2016) (citing *Nken*, 556 U.S. at 435). The Court thus weighs the harm to the movants absent preliminary injunction against the impact of an injunction on the government and the public interest. *Id.* Here, Esquel is suffering devastating reputational as well as economic consequences as a result of CJE's listing, as discussed immediately above. In contrast, removing that listing will not harm the government and will instead further multiple important public interests.

### A. Enjoining Defendants' Unlawful Action Will Not Harm the Government

"[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'" *Xiaomi*, 2021 WL 950144 at *12 (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)); *see also League of Women Voters v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) ("There is generally no public interest in the perpetuation of unlawful agency action.") (collecting cases). As discussed, the placement of CJE on the Entity List is unlawful under the 2019 NDAA and Commerce regulations. *See* Section I, *supra*. Defendants "cannot suffer harm" from a preliminary injunction that merely ends the unlawful inclusion of CJE on the Entity List. *Xiaomi Corp.*, 2021 WL 950144 at *12.

Moreover, unlike in *Xiaomi* and *Luokung*, Defendants cannot make even a plausible argument that keeping CJE on the Entity List is necessary for "the security of the country's citizenry." *See Xiaomi Corp.*, 2021 WL 950144, at *12 (quoting government's brief). Defendants do not (and cannot) suggest that placing CJE on the list was necessary to prevent the use of U.S. exports in one of the NDAA's five enumerated areas of concern, such as weapons proliferation or acts of terrorism. *See* 50 U.S.C. § 4811(2)(A). Instead, the *only* reason Defendants gave for CJE's placement was that CJE was allegedly "engaging in activities contrary to the foreign policy

interests of the United States through the practice of forced labor involving members of Muslim minority groups in the XUAR." 85 Fed. Reg. 44,159.  Not only is that finding far different from the government's finding in *Xiaomi* that the company "directly threaten[s] the United States homeland and United States forces overseas," Exec. Order No. 13959, 85 Fed. Reg. 73,185 (Nov. 12, 2020); it is also wrong.  As detailed above, there is no evidence that CJE ever engaged in forced labor practices.  And that evidence will never exist because Esquel does not and will not ever use forced labor—so the United States has no interest *at all* in perpetuating the Trump administration's mistake of placing CJE on the list.  In short, removing CJE from the Entity List will not harm Defendants.

On the other side of the balance, enjoining CJE's designation will at least start the process of clearing Esquel's name and remedying Esquel's harm, repairing the damage caused by the last administration's actions and regaining the confidence of customers, employees, and policymakers around the globe.  Because the listing was entirely unfounded, there can be no serious question that the balance of the equities tips sharply in Esquel's favor.

### B.    A Preliminary Injunction Will Further Several Significant Public Interests

The public interests in lawful government action, corporate sustainability, and employment in developing parts of the world all will be furthered by a preliminary injunction directing Defendants to remove CJE from the Entity List.

"[T]here is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'"  *League of Women Voters*, 838 F.3d at 12.  Because CJE's inclusion on the Entity List is *ultra vires*, a preliminary injunction directing removal will further the "substantial public interest" in having Defendants abide by the statutory authority for use of the Entity List as well as other binding federal law.  *Id*.

A preliminary injunction removing CJE from the Entity List will also promote the important public interests in human rights, labor rights, the environment, and anti-corruption by restoring some of Esquel's ability to serve as a leader in corporate sustainability. As discussed, Esquel maintains sustainability at the core of its business strategy. Yang Decl. ¶ 9. Sustainability principles guide all of Esquel's operations, including its employment through the Esquel Workplace Code of Conduct, highly automated facilities like the CJE spinning mill, and partnerships with local Xinjiang famers and organizations to provide community services and enhance income stability and predictability. *Id.* ¶¶ 12-15. Removing the stigma of the CJE Entity List designation through a preliminary injunction will enable Esquel to recover at least some of its status as a model for corporate sustainability both in the textile industry and in the international business community, and thereby promote critical sustainability goals concerning human rights, labor rights, the environment, and anti-corruption principles.

In addition, removing CJE's designation through a preliminary injunction will enable it to both safeguard and boost employment (including non-discriminatory employment of Uyghurs and other ethnic minority groups) in the areas in which it operates—*i.e.*, rural parts of Sri Lanka, Vietnam, and China. The United States and the United Nations, among other countries and institutions, recognize the strong public interest in increasing high-quality employment in historically underdeveloped parts of the world. U.S. Agency for International Development, *What We Do, Economic Growth and Trade, Employment Framework* ("[T]he employment outcomes that USAID host countries want and that U.S. policy priorities are: (1) increasing employment for those who want to work, (2) higher earnings, and (3) better and more inclusive jobs.");[16] United Nations

---

[16] https://www.usaid.gov/what-we-do/economic-growth-and-trade/employment-framework.

Development Programme, *What are the Sustainable Development Goals?* (identifying decent work and economic growth among the Sustainable Developmental Goals).[17]  As of December 2019, before Esquel was forced to cut the number of available jobs because of the drop in business that followed CJE's Entity List designation, Esquel employed 13,200 workers in Vietnam, 5,800 workers in Sri Lanka, and 4,100 workers in Mauritius.  Yang Decl. ¶ 44.  In fact, Esquel is precisely the kind of private sector firm the U.S. government has observed generates high-quality employment in developing parts of the world consistent with U.S. policy.  *See* U.S. Agency for International Development, *What We Do, supra* ("Because modern, private sector firms tend to produce the most formal, highest-paying jobs, the most effective strategy is to focus on growing employment in this sector.").  But until CJE is removed from the Entity List, Esquel cannot employ as many employees as it did before and faces the possibility of laying off even more.

*****

A preliminary injunction removing CJE from the Entity List will prevent further substantial and irreparable harm to Esquel, while causing no harm to the government and instead advancing multiple significant public interests.  The balance of equities weighs heavily in favor of issuing the requested injunction.

## CONCLUSION

Plaintiffs respectfully urge this Court to grant this motion and to issue as soon as possible a preliminary injunction barring the inclusion of CJE on the Entity List.

---

[17] https://www.undp.org/sustainable-development-goals.

Respectfully submitted,

 s/ James E. Tysse

Dated:  July 19, 2021

James E. Tysse
  D.C. Bar No. 978722
Caroline L. Wolverton
  D.C. Bar No. 496433
Margaret O. Rusconi (*admission pending*)
  D.C. Bar No. 1719371
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
jtysse@akingump.com

*Counsel to Plaintiffs Changji Esquel Textile Co. Ltd.,*
*Esquel Enterprises Limited, and Esquel Apparel Inc.*