**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CHANGJI ESQUEL TEXTILE CO. LTD., *et al.,* | : | |
| Plaintiffs, | : | |
| v. | : | Case No. 1:21-cv-01798-RBW |
| GINA M. RAIMONDO, SECRETARY OF COMMERCE, *et al.,* | : | |
| Defendants. | : | |

**SUPPLEMENTAL DECLARATION OF MARJORIE YANG**

I, Mun Tak Marjorie YANG ("Marjorie Yang"), declare:

1.      I am the Chairman and Chief Executive Officer of the Esquel group of companies ("Esquel").

2.      This declaration is based on personal knowledge and information provided to me in my official capacity.

3.      My original declaration, filed July 19, 2021, outlines the ongoing irreparable harm Plaintiffs are facing due to the placement of Changji Esquel Textile Co. Ltd. ("CJE") on the U.S. Entity List.

4.      I submit this declaration to outline two additional concrete harms Plaintiffs are likely to suffer in the short term if CJE is not removed from the U.S. Entity List soon.

**CJE's Continued Designation Threatens To Disrupt Business With A Specific U.S. Customer, and Potentially Other Customers, For The Spring 2022 Season**

5.      Since CJE's placement on the Entity List in July 2020, we have lost a number of U.S. and European customers. But not all of them left immediately after CJE's placement; in fact, some have discontinued business with Esquel only in recent months. With CJE's continued

placement, we risk losing even more customers, and soon.

6.     As explained in my July 18, 2021 declaration (¶ 33), the development cycle of fashion products usually takes many months.  Orders for the Spring season, which are important in Esquel's industry, are typically made starting in August of the preceding year.

7.     I am aware of at least one major U.S. customer who is actively considering reducing or even terminating business with Esquel in light of CJE's continued Entity List designation.  We have communicated with this customer (as well as others) regarding our efforts to clear CJE's name, but the customer is growing increasingly impatient.

8.     I fear that, because of CJE's listing, other Esquel customers will choose not to place orders in August 2021 for the Spring 2022 season.  Each additional day of uncertainty related to CJE's Entity List designation means increasing risk of lost business for Spring 2022 (and potentially beyond)—business that would not be recoverable if CJE is removed from the Entity List later this Fall, due to the long development cycle for such orders.

9.     My concern that we will imminently lose additional customers in the coming weeks is particularly acute because, just one week after we filed our complaint in this case, the U.S. Government released its "Xinjiang Supply Chain Business Advisory," on July 13, 2021, titled "Risks and Considerations for Businesses and Individuals with Exposure to Entities Engaged in Forced Labor and other Human Rights Abuses linked to Xinjiang, China." *See* Ex. 1.  That advisory warns "[b]usinesses, individuals, and other persons" about the "significant reputational, economic, and legal risks of involvement with entities or individuals in or linked to Xinjiang that engage in human rights abuses." *Id.* at 2.  The advisory specifically highlights Entity List

2

placement as a risk factor, and even lists CJE (along with other companies on the Entity List) in an annex attached to the advisory. *Id.* at 21-22.

10. I worry that the advisory will put renewed pressure on the major U.S. customer, and other customers, to discontinue their business with Esquel in light of CJE's listing.

11. It is thus imperative that CJE is removed from the Entity List as soon as possible so that we can prevent the major U.S. customer, and potentially other customers, from placing orders with Esquel's competitors next month. With the Spring 2022 season ordering window fast approaching, I fear that continued delay will result in additional irreparable harm.

**CJE's Designation Will Soon Lead To Production Delays For A Particular Customer, Risking Customer Penalties And The Loss Of Future Orders**

12. Unless CJE is removed from the Entity List soon, Esquel will face order fulfilment issues in the very near future. Specifically, we need to shift orders from our Vietnam factories to other factories in China right away to meet the delivery of orders by mid-September, but one major U.S. customer will not move its orders back to any factories in China due to CJE's Entity List designation.

13. Vietnam has seen a major uptick in COVID-19 cases lately, and two of Esquel's Vietnam factories are located in the south of Vietnam, near the epicenter of the outbreak in Ho Chi Minh City. As a result, those factories' production capabilities have been negatively affected by region's lockdown, and are operating at less than one-third of their typical capacity.

14. Because these factories provide for a significant portion of our U.S. and European customers, we need to shift some of the orders to other factories, including China. However, one of our key U.S. customers refuses to move its order back to China garment factories, citing the risk associated with our China facilities due to CJE's inclusion on the Entity List. Our hope is that, if

3

CJE is removed from the Entity List, the customer would be willing to allow us to source its orders from China again.

15.     If we cannot move this customer's order to our factories in China, the completion of its order will be delayed.  It will also be more expensive—costing an estimated $130,000—to complete due to overtime required and potential airfreight charge.  This could lead to Esquel facing penalties from the customer and potentially losing future orders.  In fact, the customer has suggested that they will scrap their entire holiday season order if production delays escalate.

16.     Because damages from such monetary harms and loss of business may not be recovered from the U.S. government due to its sovereign immunity, time is of the essence in having CJE removed from the Entity List.

*****

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge.

Executed this 23rd day of July 2021, in Hong Kong, China.

_____
Mun Tak Marjorie YANG

4

# Exhibit 1



DEPARTMENT
OF
STATE

DEPARTMENT
OF
THE TREASURY

DEPARTMENT
OF
COMMERCE

DEPARTMENT
OF
HOMELAND SECURITY

OFFICE OF THE UNITED
STATES TRADE
REPRESENTATIVE

DEPARTMENT
OF
LABOR

**Xinjiang Supply Chain Business Advisory**

**Updated: July 13, 2021**

**Title: Risks and Considerations for Businesses and Individuals with Exposure to Entities Engaged in Forced Labor and other Human Rights Abuses linked to Xinjiang, China[1]**

## SUMMARY:

The People's Republic of China (PRC) government continues to carry out genocide and crimes against humanity against Uyghurs and members of other ethnic and religious minority groups in

---

[1] This advisory is explanatory only and does not have the force of law. It does not supplement or modify statutory authorities, executive orders, or regulations. It is not intended to be, nor should it be interpreted as, comprehensive or as imposing requirements under U.S. law, drawing any legal conclusions about specific fact scenarios regarding particular businesses or entities, or otherwise addressing any particular requirements under applicable law. Its sole intent is to provide information to businesses and individuals that they may consider in assessing their potential exposure to involvement with entities engaged in human rights abuses, as part of a risk-based approach to due diligence. Please see the legally binding provisions cited and other relevant legal authorities.

1

the Xinjiang Uyghur Autonomous Region (Xinjiang), China.[2]  The PRC's crimes against humanity include imprisonment, torture, rape, forced sterilization, and persecution, including through forced labor and the imposition of draconian restrictions on freedom of religion or belief, freedom of expression, and freedom of movement.

Businesses, individuals, and other persons, including but not limited to investors, consultants, labor brokers, academic institutions, and research service providers (hereafter "businesses and individuals") with potential exposure to or connection with operations, supply chains, or laborers from the Xinjiang-region, should be aware of the significant reputational, economic, and legal risks of involvement with entities or individuals in or linked to Xinjiang that engage in human rights abuses, including but not limited to forced labor and intrusive surveillance.

Given the severity and extent of these abuses, including widespread, state-sponsored forced labor and intrusive surveillance taking place amid ongoing genocide and crimes against humanity in Xinjiang, businesses and individuals that do not exit supply chains, ventures, and/or investments connected to Xinjiang could run a high risk of violating U.S. law.  Potential legal risks include: violation of statutes criminalizing forced labor including knowingly benefitting from participation in a venture, while knowing or in reckless disregard of the fact that the venture has engaged in forced labor; sanctions violations if dealing with designated persons; export control violations; and violation of the prohibition of importations of goods produced in whole or in part with forced labor or convict labor.

## I.  Introduction

The U.S. Department of State, the U.S. Department of the Treasury, the U.S. Department of Commerce, the U.S. Department of Homeland Security (DHS), the Office of the U.S. Trade Representative, and the U.S. Department of Labor are updating this advisory, originally published in July 2020, in light of growing evidence of the use of forced labor in Xinjiang and the Secretary of State's determinations that the PRC government has committed genocide and crimes against humanity in Xinjiang.

The U.S. government has taken action in response to human rights abuses in and in connection to Xinjiang.  Actions include the issuance of Withhold Release Orders by U.S. Customs and Border Protection (CBP), the addition of entities to the U.S. Department of Commerce Entity List, the imposition of economic sanctions by the U.S. Department of the Treasury, the imposition of visa restrictions by the U.S. Department of State, as well as the addition of multiple goods to the U.S. Department of Labor's *List of Goods Produced by Child Labor or Forced Labor*.  Raw and

---

[2] The U.S. government is also aware of reports documenting the expansion of internment camps to Tibet and Inner Mongolia to arbitrarily detain other ethnic and religious minorities and documenting the use of forced labor beyond Xinjiang such as in the fishing industry.  Businesses should similarly be aware of the potential reputational, economic, and legal risks of involvement with entities and individuals engaged in any human rights abuses in China or elsewhere.

refined materials, commodities, intermediate goods, byproducts, and recycled materials may all have connections to forced labor and human rights violations in Xinjiang, regardless of the final product and region of origin or export.  See Annex 1 for U.S. government actions.  This advisory outlines risks that businesses and individuals should consider when assessing business partnerships with, investing in, sourcing from, or providing other support to companies operating in Xinjiang, linked to Xinjiang, or with laborers from Xinjiang.

### a.  Human Rights Violations in Xinjiang

The PRC government in Xinjiang has, since at least March 2017, unjustly imprisoned  more than one million Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other ethnic and Muslim minority groups for indefinite periods in internment camps.  Detainees have described extreme overcrowding, sleep and food deprivation, medical neglect, physical and psychological abuse, torture, forced labor, forced ingestion of unidentified drugs, forced sterilizations and abortions, sexual abuse, forced renunciation of religion, denial of prayer and other religious practices (including pressure to consume pork or alcohol), denial of the use of their native languages, and being forced to study and recite Chinese Communist Party (CCP) propaganda.  There are reports that some detainees have died in the internment camps, or very shortly after release, as a result of abuse and neglect.  These abuses are believed to have spread outside the internment camps and beyond Xinjiang, with credible reports claiming that victims have been forcibly transferred to other provinces of China and subjected to forced labor and other abusive labor conditions.

Businesses and individuals should be aware of the atrocities against Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other ethnic and Muslim minority groups, including state-sponsored forced labor practices employed by the PRC government in Xinjiang, as well as situations of forced labor involving members of these groups outside Xinjiang.  There are credible reports indicating that labor transfers of ethnic minorities in Xinjiang to other regions and provinces of China are part of a state-sponsored coercive relocation and forced labor program aiming to force assimilation and reduce their population density.

### b.  Overview of Issues Addressed in Advisory

This advisory urges businesses and individuals to undertake heightened human rights due diligence to identify potential supply chain links to entities operating in Xinjiang, linked to Xinjiang (e.g., through the pairing program described in III. a or Xinjiang supply chain inputs) or utilizing Uyghur or other ethnic and Muslim minority laborers from Xinjiang.  Such heightened due diligence is in line with the [UN Guiding Principles on Business and Human Rights](#) (UN Guiding Principles), the [International Labor Organization's Combating Forced Labor: A Handbook for Employers and Business](#) (ILO Forced Labor Guidelines), and the [Organisation for Economic Co-Operation and Development (OECD) Guidelines for Multinational Enterprises](#) (OECD Guidelines), which also includes factors to be considered in determining appropriate action, such as whether and how to responsibly end relationships when a business lacks the ability to prevent or mitigate adverse impacts.

This advisory discusses four primary types of potential supply chain exposure to entities engaged in human rights abuses:

(1) Assisting or investing in the development of surveillance tools for the PRC government in Xinjiang, including tools related to genetic collection and analysis;

(2) Sourcing labor or goods from Xinjiang, or from entities elsewhere in China connected to the use of forced labor of individuals from Xinjiang, or from entities outside of China that source inputs from Xinjiang;

(3) Supplying U.S.-origin commodities, software, and technology to entities engaged in such surveillance and forced labor practices; and

(4) Aiding in the construction and operation of internment facilities used to detain Uyghurs and members of other Muslim minority groups, and/or in the construction and operation of manufacturing facilities that are in close proximity to camps and reportedly operated by businesses accepting subsidies from the PRC government to subject minority groups to forced labor.

## II. Heightened Risk for the Provision of Certain Goods, Services, and Surveillance Technology in Xinjiang

### a. Background on Surveillance

The PRC government has established an unprecedented, intrusive, high-technology surveillance system across Xinjiang, as part of a region-wide apparatus of oppression, aimed primarily against traditionally Muslim minority groups.  PRC authorities justify mass surveillance and various restrictions under the guise of combatting what the PRC government labels as "terrorism," "religious extremism," and "alleviating poverty" in Xinjiang.  However, the Xinjiang surveillance infrastructure is facilitating human rights abuses, including abuses of the right to be free from arbitrary or unlawful interference with privacy, freedom of religion or belief, freedom of movement, and freedom of expression, which are enshrined in the Universal Declaration of Human Rights (UDHR).

Surveillance systems, many of which are equipped with artificial intelligence, facial recognition, gait recognition, and infrared technology, are being used throughout Xinjiang to track movements, monitor behaviors, and identify individuals for detention.

The "Strike Hard against Violent Terrorism Campaign," launched by the PRC government in 2014, primarily in Xinjiang, has been used to justify the collection of biometric data from all Xinjiang residents ages 12 to 65.  Authorities have collected DNA samples, fingerprints, iris

4

scans and blood types, and are centralizing this information in cloud databases. Furthermore, during what Xinjiang officials advertised as free health checks, residents' faces were scanned, blood was drawn, and fingerprints were collected. Voice samples of individuals are also being collected when they apply for passports, raising further concerns about privacy. This involuntarily collected biometric data is linked to individuals' identification numbers and centralized in searchable databases used by police.

One of the main systems for mass surveillance in Xinjiang is a mobile app used by police. The app uses artificial intelligence to track movements, monitor behavior and identify individuals for detention. The app allows authorities to input personal data about residents, such as identifying information, physical data, and data about religious practices, among other identifiers, into a dataset. The app was used to identify roughly 20,000 individuals for detention in one week, according to leaked official government documents.

Chinese surveillance and technology companies earn billions of dollars in contracts from the PRC government, but there is evidence that these businesses also get support from foreign academics, scientists, and businesses, and are funded in part by international investors.

### b. Heightened Risk for the Provision of Goods, Services, and Technology with a Nexus to Xinjiang Surveillance

Businesses and individuals engaged in the following activities or otherwise linked, directly or indirectly, to those in Xinjiang engaged in these activities may face reputational risks and/or trigger U.S. criminal or civil enforcement or administrative and other actions, depending on the facts and circumstances of their involvement:

- **Investment in PRC Companies Directly and Indirectly Linked to Surveillance in Xinjiang:** Provision of financial support, including by venture capital and private equity firms, to Chinese companies that contribute to the PRC government's vast and growing surveillance network linked to human rights abuses in Xinjiang.

- **Certain Activities with Cameras, Tracking Technology, Biometric Devices, or Other Goods and Services:** Selling or providing biometrics devices; items intended for surveillance; items used for genetic collection and analysis; microchips and microprocessors; tracking technology, or equipment, software, and technology related to the aforementioned products; providing maintenance or other services in support of such products, including those that have been known to arbitrarily track and control the movements of Uyghurs or others in Xinjiang; or selling or providing any goods, software, or technology used as inputs, or to support the production of inputs, used in the manufacture of the aforementioned products.

- **Certain Technology Joint Ventures, and Research Partnerships:** Involvement in joint ventures with PRC government officials and departments, or Chinese companies

5

whose intellectual property has been known to aid the development or deployment of a surveillance system used arbitrarily against members of minority groups or others. This may include granting PRC government officials access to genetic databases or aiding the PRC government in involuntary collection of genetic data; participation in facial recognition research related to minority groups in Xinjiang; conducting research partnerships with Chinese technology facial recognition firms known to be involved with enabling China's surveillance activities or inviting such parties to conferences where technical issues on surveillance-related activities will be discussed; or attending conferences related to surveillance activities and facial recognition technology in which such entities play a leading role, such as through organizing or sponsoring these conferences.

ï **Certain Services Provided to Xinjiang's Internment Camps or Surveillance State:** Provision of services to internment camps or training of Xinjiang authorities, police, or PRC government officials that enable arbitrary detention, or arbitrary or unlawful surveillance on the basis of ethnic group, religion, or other protected class.

ï **Companies on the U.S. Department of Commerce Entity List**: The Department of Commerce's Entity List identifies entities reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States.  The Department of Commerce has added multiple PRC government entities and commercial companies to the Entity List that are implicated in human rights violations and abuses in the implementation of the PRC government's campaign of repression, mass arbitrary detention, and high-technology surveillance against Muslim minority groups from Xinjiang, including conducting genetic analyses.  Exports, reexports, or transfers (in-country) of items subject to the Export Administration Regulations (EAR) where such entities are a party to the transaction (e.g., end-user, purchaser, intermediate or ultimate consignee) require a license from the Department of Commerce's Bureau of Industry and Security (BIS).  The list is available here: Commerce Entity List.  For additional information about the Entity List, please see Annex 5 below.

ï **Entities on the U.S. Department of the Treasury's Non-SDN Chinese Military-Industrial Complex Companies List**: E.O. 13959, as amended, imposes certain investment-related prohibitions with respect to certain entities related to China's defense and related materiel sector or surveillance technology sector.  So far, 59 entities have been publicly listed and are subject to the E.O.'s investment prohibitions.  Entities subject to the prohibitions in E.O. 13959, as amended, are identified on the Department of the Treasury's Office of Foreign Assets Control's (OFAC) Non- Specially Designated Nationals (SDN) Chinese Military-Industrial Complex Companies List (NS-CMIC List).  The list is available here: NS-CMIC List. For additional information about the NS-CMIC, please see Annex 5 below.

6

**III. Heightened Risk for Forced Labor in Xinjiang**

    **a.  Background on Xinjiang Labor Abuses**

The PRC government has implemented programs with a stated objective of eradicating poverty across the country.  However, certain programs targeting predominantly members of Muslim minority groups are coupled with discriminatory social control, pervasive surveillance, and a large-scale internment program.  There is evidence of forced labor, under the guise of "vocational training" obtained using threats, force, detention, debt bondage, and other abusive practices occurring in the internment camps, large industrial parks, PRC companies outside Xinjiang, and among the non-detained rural residents of Southern Xinjiang where the majority of Uyghurs live.

Internment camps are often euphemistically referred to as Educational Training Centers or Vocational Training Centers.  There are reports of forced labor in the internment camps themselves, as well as reports of individuals "graduating" from the camps and then being required to work at nearby facilities or sent to satellite factories in their home region or other provinces.  There have been reports of Vocational Training Centers located within and adjacent to industrial parks.

- **Government Subsidies and Labor Abuse:** Xinjiang government documents indicate the existence of a large-scale PRC government plan, known as the "mutual pairing assistance" program, for companies from other parts of China to establish satellite factories in Xinjiang in conjunction with the internment camps.  Reports indicate that, through the PRC government's mutual pairing assistance program, 19 cities and developed provinces, generally in the eastern part of China, are spending billions of Chinese yuan to establish factories in Xinjiang.  Some factories directly involve the use of internment camp labor, while other factories are part of abusive labor programs that require parents to leave children as young as 18 months old, while the parents are forced or coerced to work full-time under constant surveillance.  The children are sent to state-controlled orphanages and other facilities.

  The pairing strategy relies generally on low-skilled labor industries that only require a limited amount of job training.  PRC government authorities incentivize Chinese companies to open factories near the internment camps, and local governments receive additional funds for each individual from the camps forced to work in these sites at a fraction of minimum wage or without any compensation.  In April 2019, Xinjiang authorities began rolling out a plan to attract textile and garment companies.  Under the plan, local governments receive funds to build production sites for these companies near the camps and companies receive a subsidy of approximately 260 USD to train each inmate they employ, as well as other incentives.  The subsidies create a windfall for these Chinese companies, and the artificially low labor costs create unfair competition in the supply chain in the form of cheaper goods.

- **Involuntary Transfer of Xinjiang Laborers to Chinese Factories:** There have been credible reports of mass forced labor transfers of Uyghurs and members of other ethnic minority groups from Xinjiang who are then subject to forced labor in certain industries inside and outside Xinjiang. Laborers are sometimes transferred directly from camps to factories, are forced to attend "patriotic education" and Mandarin studies, and are subjected to constant surveillance. Many of these workers are assigned minders and have limited freedom of movement. The factories produce goods that are inputs in a variety of industries including apparel and textiles, electronics, solar energy, and automotive.

- **Forced Labor in Prisons in Xinjiang:** There is evidence of forced prison labor in Xinjiang, including in the apparel and textile sector, and agricultural industries, including cotton, and in the mining of coal, uranium, and asbestos. Prisoners are forced to work under threat of penalties, such as solitary confinement. Working conditions are harsh with long hours, poor food quality, and little to no pay. See Annex 3 on the Xinjiang Cotton, Textile, and Garment Supply Chain.

- **Forced Labor in Agriculture in Xinjiang:** Recent research has shed light on the extensive use of forced labor in the agricultural sector, including cotton and tomatoes grown in Xinjiang. Xinjiang's cotton lint production provides for over 85 percent of China's total cotton production and 20 percent of global output, and many companies in the cotton industry have ties to the U.S.-sanctioned Xinjiang Production and Construction Corps (XPCC), which is also a major producer of cotton and tomatoes.

- **Forced Labor in the Cotton Supply Chain**: Recent research corroborates reports of forced labor involving Uyghur and other minority groups in cotton supply chains originating in Xinjiang, particularly in cotton production, processing, and export in the garment sector. Reports indicate that a large number of companies in China and in the Asia region produce and sell cotton products tainted with this forced labor for use in the final production of garments. See Annex 3 on the Xinjiang Cotton, Textile, and Garment Supply Chain.

- **Forced Labor in the Solar Supply Chain in Xinjiang:** The PRC dominates global solar supply chains, and mounting evidence indicates that solar products and inputs at nearly every step of the production process, from raw silicon material mining to final solar module assembly, are linked to known or probable forced labor programs. In 2020, PRC solar companies controlled 70 percent of the global supply for solar-grade polysilicon, and 45 percent was manufactured in Xinjiang. China also controls market shares of the downstream solar supply chain, including the production of wafers, solar cells, and solar panels. Some of the world's largest suppliers of solar panel materials and components reportedly have ties to U.S.-sanctioned XPCC. See Annex 4 on the Xinjiang Solar Supply Chain.

8

See Annex 2 for a list of industries in which the U.S. government is aware of reported instances of companies involved in activity that may constitute human rights abuses, specifically in connection with Xinjiang.

**b. Warning Signs of Forced Labor in the Operating Environment in Xinjiang**

ï **Lack of Transparency:** Firms operating in Xinjiang using shell companies to hide the origin of their goods or conceal their ownership of the companies, writing contracts with opaque terms, and conducting financial transactions in such a way that it is difficult to determine where the goods were produced, or by whom.

ï **Social Insurance Programs:** Companies operating in Xinjiang disclosing high revenue but having very few employees paying into the government's social security insurance program.

ï **Terminology:** Any mention of internment terminology (e.g., Education Training Centers (职业教育培训中心) or Legal Education Centers) coupled with poverty alleviation efforts (e.g. Xinjiang Aid, Mutual Assistance Programs), ethnic minority graduates, or involvement in reskilling vocational training, or re-education.

ï **Government Incentives:** Companies operating in Xinjiang receiving government development assistance as part of the government's poverty alleviation efforts or vocational training programs; companies involved in the mutual pairing assistance program or companies receiving subsidies for energy, transportation, and labor costs.

ï **Government Recruiters:** Companies operating in Xinjiang implementing nonstandard hiring practices and/or hiring workers through government recruiters.

ï **Any XPCC Affiliates:** XPCC-affiliated entities are part of the prison labor system and manufacture goods beyond cotton products.  In July 2020, the Department of the Treasury sanctioned the XPCC pursuant to its Global Magnitsky sanctions authority.[3] The XPCC, including the XPCC Public Security Bureau, is on the Department of Commerce's Entity List.  Exports, reexports, or transfers (in-country) of items subject to the EAR where the XPCC or XPCC Public Security Bureau are a party to the transaction (e.g., end-user, purchaser, intermediate or ultimate consignee) require a license from the U.S. Department of Commerce's BIS.  Additionally, U.S. CBP issued a WRO against XPCC cotton.

ï **Business Location and Affiliation:** Companies operating in Xinjiang located within the confines of the internment camps and prisons; near internment camps and prisons; or within the confines of or adjacent to industrial parks involved in the government's poverty alleviation efforts are at increased risk of forced labor.  New factories built near

internment camps and prisons are also suspect. Any businesses owned by or contracting with a prison enterprise are very likely engaged in forced labor.

ï **Goods Included on the U.S. Department of Labor's List of Goods Produced by Child Labor or Forced Labor:** The Department of Labor maintains a list of goods and their source countries which it has reason to believe are produced by child labor or forced labor in violation of international standards (the TVPRA List). To date, the Department of Labor has identified 18 goods produced by forced labor in China, including six goods on the TVPRA List that are produced by forced labor by members of Muslim minority groups, including Uyghurs ethnic Kazakhs, ethnic Kyrgyz, and members of other ethnic and Muslim minority groups, in Xinjiang. The six goods are gloves, hair products, polysilicon, textiles, thread/yarn, and tomato products. The Department of Labor continues its research into forced labor issues in China, including the use of ethnic and religious minorities forced to produce goods in Xinjiang and in other regions in China.

ï **Companies on the U.S. Department of Commerce's Entity List:** The Department of Commerce's Entity List identifies entities reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States. Since June 2020, the Department of Commerce has added multiple Chinese entities to the Entity List implicated in or participating in the practice of forced labor involving members of Muslim minority groups from Xinjiang. Exports, reexports, or transfers (in-country) of items subject to the EAR where such entities are a party to the transaction (e.g., end-user, purchaser, intermediate or ultimate consignee) require a license from the Department of Commerce's BIS. The list is available here: Commerce Entity List. For additional information about the Entity List, please see Annex 5 below.

ï **Companies and Products under Customs and Border Protection Withhold Release Orders:** WROs are issued based on information available that reasonably but not conclusively indicates that merchandise within the purview of 19 U.S. C. § 1307 is being or is likely to be imported into the United States. CBP has issued WROs against nine Chinese companies, XPCC cotton, and all Xinjiang cotton and tomatoes as well as products using Xinjiang cotton or tomatoes as inputs. A list of goods and entities subject to WROs is available here: WRO List.

ï **Entities on the U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons List:** The Department of the Treasury's OFAC's List of Specially Designated Nationals and Blocked Persons (SDN List) includes eight Chinese officials and two entities, including XPCC, that are subject to economic sanctions. All property and interests in property with respect to such sanctioned entities (and any entities 50 percent or more owned, directly or indirectly, individually or in the aggregate, by one or more blocked persons) are blocked, and U.S. persons are generally prohibited from conducting transactions or dealings with such blocked persons unless the activity is

10

exempt or authorized by OFAC.  OFAC's searchable online SDN list is available here: OFAC SDN List.

### IV. Human Rights Due Diligence

In line with internal risk assessments, businesses and individuals should undertake heightened due diligence to ensure compliance with U.S. law and to identify potential supply chain or other exposure to companies operating in Xinjiang, linked to Xinjiang (e.g., through the pairing program or Xinjiang supply chain inputs), or utilizing Uyghur and other Muslim minority laborers from Xinjiang.  In the event of identifying linkages to prohibited entities linked to Xinjiang, businesses and individuals must avoid unlawful activities.

Given the severity and extent of these abuses, including widespread, state-sponsored forced labor and intrusive surveillance taking place amid ongoing genocide and crimes against humanity in Xinjiang, businesses and individuals that do not exit supply chains, ventures, and/or investments connected to Xinjiang could run a high risk of violating U.S. law.  Potential legal risks include: violation of statutes criminalizing forced labor including knowingly benefitting from participation in a venture, while knowing or in reckless disregard of the fact that the venture has engaged in forced labor; sanctions violations if dealing with designated persons; export control violations; and violation of the prohibition of importations of goods produced in whole or in part with forced labor or convict labor.

The UN Guiding Principles, the OECD Guidelines, the International Labor Organization (ILO) publication, "Combating Forced Labour: A Handbook for Employers and Business," and the Office of the High Commissioner for Human Rights guide on "The Corporate Responsibility to Respect Human Rights," (OHCHR guide) provide guidance for heightened due diligence in high-risk and conflict-affected regions and factors to be considered in determining appropriate action, including whether and how to responsibly end relationships when a business lacks the leverage to prevent or mitigate adverse impacts and is unable to increase its leverage.

Businesses and individuals providing or receiving goods and services directly or indirectly to or from Chinese entities or engaging in ventures with Chinese entities are likely to face obstacles to conducting adequate due diligence to fully identify and avoid complicity in human rights abuses linked to Xinjiang.  Government controls, the lack of government and corporate transparency, the threat of detention of auditors and workers, and a police state atmosphere in Xinjiang impose significant obstacles to ensuring the reliability of audits on working conditions and respect for human rights, which has led audit companies to refuse to conduct audits in this region. Businesses and individuals should consider these difficulties, as well as any warning signs and the credible reports of the prevalence of forced labor and other human rights abuses in the region.

11

The use of multilateral targeted financial sanctions against corrupt actors and human rights violators has created a need for businesses to shift to a proactive corporate risk and due diligence strategy that takes into account both human rights and corruption issues.  Sanctions have proven to U.S. and global businesses that human rights violations and corruption directly impact them. The recent actions of the U.S. government and multilateral partners have shown that the cost of companies performing increased due diligence is less than that of economic and reputational impacts of economic sanctions.

### a.  Due Diligence Related to Banking, Financial Institutions, and other Investors

Entities with ties to the U.S. financial system should be aware that U.S. financial institutions[3] are required to comply with a range of anti-money laundering (AML),[4] countering the financing of terrorism (CFT), and countering proliferation financing (CPF) related requirements under the Bank Secrecy Act (BSA).[5]  These BSA obligations generally apply to a variety of financial institutions.[6]  In complying with these AML/CFT/CPF BSA requirements, financial institutions are expected to take a risk-based approach  to identify, assess, and mitigate the money laundering and terrorist financing risks to which they are exposed and take measures commensurate with those risks in order to mitigate them effectively.

Compliance with the BSA is essential to detecting, investigating, and deterring criminal activity, including human trafficking.  The BSA imposes a range of obligations across a wide sector of financial institutions, including establishing AML programs,[7] filing currency transaction reports,[8] and reporting suspicious activity[9] (including that related to human trafficking and including forced labor) to Treasury's Financial Crimes Enforcement Network (FinCEN).

As appropriate, U.S. financial institutions should assess their illicit finance risk; implement sanctions compliance and AML programs; and meet existing due diligence program

---

[3] *See* 31 CFR 1010.100(t).

[4] Money laundering is a crime when knowingly conducting or attempting to conduct a financial transaction with proceeds of a specified unlawful activity (SUA).  Sex trafficking, forced labor, and other crimes related to trafficking in persons are considered specified unlawful activity, among others, under the relevant money laundering statutes, including promotion money laundering, concealment money laundering, international money laundering [18 U.S.C. Section 1956(a) and 18 U.S.C. Section 1956(b)], and the spending statute [18 U.S.C. Section 1957].

[5] *See* 31 CFR Chapter X.

[6] Report to Congress on An Analysis of Anti-Money Laundering Efforts Related to Human Trafficking Section 7154(a) of the National Defense Authorization Act for Fiscal Year 2020 (Div. F., P.L. 116-92)

[7] *See* 31 U.S.C. § 5318(h)(4)(A) and 31 CFR 1010.201, See 31 CFR 1020.210(a) (banks with a Federal functional regulator, 31 CFR 1020.210(b) (banks without a Federal functional regulator); 31 CFR 1021.210 (casinos and card clubs); 31 CFR 1022.210 (money services businesses); 31 CFR 1023.210 (brokers or dealers in securities); 31 CFR 1024.210 (mutual funds); 31 CFR 1025.210 (insurance companies); 31 CFR 1026.210 (futures commission merchants and introducing brokers in commodities); 31 CFR 1027.210 (dealers in precious metals, precious stones, or jewels); 31 CFR 1028.210 (operators of credit card systems); 31 CFR 1029.210 (loan or finance companies); and 31 CFR 1030.210 (housing government sponsored enterprises).

[8] *See generally* 31 CFR 1010.310.

[9] *See generally* 31 CFR 1010.320, 1020.320, 1021.320, 1022.320, 1023.320, 1024.320, 1025.320, 1026.320, 1029.320, and 1030.320.

12

requirements relevant to their institution.  As part of their AML programs, U.S. financial institutions must provide training (and resources) for appropriate personnel to effectively execute those programs.  As with all their risks, financial institutions should assess their potential exposure to the risk of handling the proceeds of forced labor on behalf of their clients, and as appropriate, implement a mitigation process that aligns with that risk, consistent with their BSA requirements.[10]

As part of these BSA obligations, financial institutions are expected to identify customers and monitor customer activity for unusual or suspicious transactions or activity.  As such, U.S. financial institutions play a critical role in identifying transactions associated with human trafficking at the transactional or teller level.[11]  Consistent with their existing suspicious activity requirements, financial institutions should include in their suspicious activity reports (SARs) all relevant indicia of human trafficking identified in financial transactions or series of transactions or through other appropriate methods.  U.S. financial institutions also are expected to comply with law enforcement processes, such as subpoenas, seeking to identify traffickers' assets, which can be seized, forfeited, and used toward restitution.

If financial institutions lack sufficient controls, criminal actors can benefit from ready access to financial services to advance, and profit from, their enterprises.  Financial institutions may face civil enforcement penalties as well as potential criminal penalties if they willfully fail to comply with their BSA obligations,[12] including reporting of suspicious activity.

Financial institutions are also subject to criminal, sanctions, customs, and other laws and may be subject to criminal prosecution and civil, criminal or both types of enforcement actions depending on the specific facts and circumstances.  Entities doing business with or through a U.S. financial institution may wish to consider communicating with their counterparties, partners, subsidiaries, and affiliates to understand the application of these general compliance expectations in a manner consistent with internal risk assessments, industry standards, and applicable local requirements.

Additionally, non-U.S. businesses seeking to engage in mergers, acquisitions, takeovers, or other certain non-controlling investments in U.S. businesses may want to assess any potential risks arising from their commercial activities or other relationships with companies directly and indirectly linked to human rights abuses in Xinjiang.

---

[10] Defense Authorization Act for Fiscal Year 2020 (Div. F., P.L. 116-92)

[11] *See* FinCEN Human Trafficking advisories: (FIN-2014-A008.pdf (fincen.gov) and (FinCEN Advisory, FIN-2020-A008).

[12] *See* 31 U.S.C. § 5321 and 31 USC 5322.

13

### b. Due Diligence Related to Surveillance

As appropriate, businesses and individuals should examine the end-users of their products, technology, research, collaborations, and services, to reduce the likelihood that their goods or services are being, or can be, used to build, maintain, or support the internment camps, the broader surveillance apparatus of the PRC government, companies that use or benefit from forced labor, or activities that enable human rights abuses, including but not limited to forced collection of biometric data, abusive genetic analysis schemes, and coercive transfer of members of ethnic minority groups.

Investors should consider undertaking responsible divestment in the event that funding or investment that has already occurred or is ongoing implicates these considerations.

Businesses and individuals exporting technology, products, and services with surveillance capabilities, including those pertaining to genetic collection and analysis, or businesses and individuals that are exporting inputs in or supporting the manufacture of surveillance products, are encouraged to undertake due diligence to prevent the misuse of their technology, products, and services to commit human rights abuses in Xinjiang in line with the *U.S. Department of State Guidance on Implementing the "UN Guiding Principles" for Transactions Linked to Foreign Government End-Users for Products or Services with Surveillance Capabilities*.  The Guidance provides practical and accessible human rights guidance to U.S. businesses to prevent their products or services from being misused by government end-users to commit human rights abuses.

### c. Due Diligence Related to Forced Labor

China's ongoing crimes against humanity and genocide in Xinjiang and the repressive and opaque environment in China presents extreme challenges to conducting human rights due diligence.  Businesses with supply chain links to entities operating in Xinjiang, linked to Xinjiang (e.g., through the pairing program or through Xinjiang supply chain inputs or through XPCC), or utilizing Uyghur or other Muslim minority laborers from Xinjiang, should be aware of the reputational, economic, and legal risks of involvement with entities and individuals engaged in human rights abuse in or linked to Xinjiang.  In and of themselves, third-party audits are not a sufficient due diligence program, and may not be a credible source of information for indicators of labor abuses in the region, for the following reasons:

- ï   Auditors have reportedly been detained, harassed, threatened, or stopped at the airport.
- ï   Auditors may be required to use a government translator who conveys misinformation or does not speak in workers' first language.
- ï   Auditor interviews with workers cannot be relied upon given pervasive surveillance, the threat of detainment, and evidence of workers' fear of sharing accurate information.

14

Several audit companies will not conduct audits of labor practices in this region in light of the challenges of obtaining objective assessments and threats to auditors.

If auditors or their families have been detained or otherwise threatened, businesses and individuals are encouraged to contact the U.S. government, including at U.S. embassies or consulates, for assistance.

Businesses and individuals may wish to collaborate with industry groups to share information, develop the capacity to research potential indicators of forced labor or labor abuses linked to Xinjiang in Chinese languages, and build relationships with Chinese suppliers and recipients of U.S. goods and services, to better understand their possible relationships to Xinjiang under PRC programs, including the mutual pairing assistance program.  While human rights due diligence best practices for businesses typically include conducting independent onsite inspections and working with suppliers and local law enforcement to remediate forced labor and other abusive labor practices, repressive conditions in the context of genocide and crimes against humanity make it extremely challenging for businesses to have the necessary access to their suppliers or customers inside of Xinjiang to conduct credible audits and support meaningful remediation. The U.S. Department of Labor's Comply Chain mobile app and web-based platform provides information on due diligence measures specific to forced labor and child labor in supply chains. The app provides an interactive platform to help companies assess risks and impacts and draw on lessons and good practices from over 50 real-life examples of due diligence in various sectors. Comply Chain is currently available in English, French, and Spanish.

The U.S. Department of State's Responsible Sourcing Tool includes an in-depth examination of 11 key sectors and 43 commodities at risk for human trafficking or trafficking-related practices, as well as 10 comprehensive risk-management tools.

The Human Trafficking Prosecution Unit of the Department of Justice's Civil Rights Division works with the Criminal Division, including its Money Laundering and Asset Recovery Section (MLARS) and Human Rights and Special Prosecutions Section, U.S. Attorneys' Offices, and federal law enforcement agencies to investigate and prosecute potential criminal cases involving forced labor and other human rights abuses.  MLARS also investigates financial institutions whose actions threaten the integrity of the individual institution or of the U.S. financial system.

The U.S. Department of Homeland Security Center for Countering Human Trafficking (CCHT), administered by U.S. Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), is a unified coordination center to holistically counter human trafficking and the importation of goods produced with forced labor.  This includes supporting worldwide criminal, civil, and administrative investigations of forced labor.  The HSI Human Rights Violators and War Crimes Center also supports investigations into global atrocities and perpetrators of human rights violations and war crimes.  Questions regarding federal criminal laws in this context may be addressed to info@ccht.dhs.gov.

15

### d. Due Diligence Related to Providing Construction Materials to Chinese Entities that May Be Operating in Xinjiang

Businesses and individuals providing construction materials to Chinese entities that may be operating in Xinjiang should consider undertaking due diligence in line with their internal risk assessment and industry practice.  The provision of goods used to construct internment facilities or factories located within internment camps, including concrete, steel, rebar, chain-link fencing, paving materials, and glass, may present risks.  Firms should undertake due diligence practices to prevent the possibility that internment camps are the ultimate direct beneficiaries of their business.  Similarly, the direct provision of services, including training programs for internment camp guards, could implicate U.S. enforcement activities or other authorities.
*See* Annex 6 for additional guidance resources.

### V. Relevant U.S. Agencies and Selected Authorities for Enforcement Actions and Sanctions

Individuals and entities should be aware of legal, financial, and reputational consequences of engaging with entities that have been involved in human rights abuses.

### a. U.S. Department of Commerce

The U.S. Department of Commerce's EAR restricts exports, reexports, and transfers (in-country) of U.S.-origin and some foreign items, including software and technology, to destinations and specific end uses of concern and to end-users acting contrary to U.S. national security or foreign policy interests.  EAR end-user controls referred to in this advisory are connected to the Entity List, which is found in Supplement No. 4 to Part 744 of the EAR, which identifies certain non-U.S. persons, such as businesses, research institutions, government and private organizations, individuals, and other types of legal persons.  The EAR imposes a license requirement for the export, reexport, and/or transfer (in-country) of items subject to the EAR where such entities are a party to the transaction (e.g. end-user, purchaser, intermediate or ultimate consignee), in addition to license requirements for destinations, end-uses, and other restricted end-users.

On October 6, 2020, the Department of Commerce clarified that it will consider human rights concerns when reviewing nearly all license applications under the EAR.  Accordingly, when making licensing decisions, the U.S. government will assess whether items may be used to engage in, or enable violations or abuses of, human rights including those involving censorship, surveillance, detention, or excessive use of force.

The Department of Commerce enforces the EAR, including requirements associated with the Entity List, and persons who violate the EAR may be subject to civil and/or criminal penalties.

### b. U.S. Department of Homeland Security's Relevant Enforcement Agencies

16

The Department of Homeland Security's agencies enforce federal laws related to forced or indentured labor and convict labor through civil and criminal enforcement actions.

CBP is responsible for enforcing the federal statute in 19 U.S.C. § 1307 that prohibits the importation of merchandise mined, produced, or manufactured, wholly or in part, in any foreign country by forced labor, convict labor, and/or indentured labor including forced or indentured child labor.

Where evidence reasonably indicates that goods were produced with forced, indentured, or convict labor, CBP will issue a WRO and deny entry of those goods.  If the evidence shows the goods are in violation of 19 U.S.C. § 1307, a finding may be issued and the goods may be seized and forfeited.  CBP may issue civil penalties against the importer and other parties, as appropriate.

ICE's HSI may conduct criminal investigations of violations of federal laws, including those related to forced labor and prison labor, potentially resulting in incarceration, fines, and the seizure and forfeiture of imported goods.  HSI's investigations may lead to the criminal prosecution of individuals and corporations present in the United States for their role in benefitting from forced labor occurring anywhere in the world, regardless of whether forced labor led to U.S. importation of forced labor-made goods, or their role in U.S. importation of goods produced with forced labor or prison labor in violation of U.S. law.

Both CBP and ICE, as well as any agency within DHS with authority to determine if DHS acquisitions are compliant, such as the DHS Office of the Inspector General, may take administrative enforcement action against contractors or suppliers who violate Federal Acquisitions Regulations or DHS Acquisition Regulations related to forced labor.

### c.  Federal Acquisition Regulation, Combating Trafficking in Persons (FAR 52.222-50)

Pursuant to the Federal Acquisition Regulation, Combating Trafficking in Persons (FAR 52.222-50), contractors, contractor employees, sub-contractors, subcontractor employees, and their agents are prohibited from engaging in forced labor or sex trafficking as well as a range of trafficking-related activities.  If a contractor is found to be in violation of the FAR, the contracting agency can impose a range of remedies including, but not limited to, suspension and debarment.

### d.  The Trafficking Victims Protection Act's Crime of Forced Labor (18 U.S.C. § 1589)

The Trafficking Victims Protection Act (TVPA) criminalizes the act of knowingly benefitting, financially or by receiving anything of value, from participation in a venture, where the

17

defendant knew or recklessly disregarded the fact that the venture engaged in forced labor. The TVPA imposes criminal liability on defendants (individuals or entities) present in the United States, regardless of nationality or domicile, even when the forced labor occurs in another country. Forced labor is defined under U.S. criminal law as providing or obtaining labor or services by one or more enumerated means of force or coercion. Companies charged with criminal violations of the TVPA could face up to 500,000 USD in fines and executives or other company employees involved may face up to 20 years of imprisonment, and may be liable for restitution to the victims of forced labor. Entities engaged in or about to engage in forced labor violations are also subject to civil injunctions brought by the Attorney General. The TVPA also imposes civil liability through a private right of action if a preponderance of evidence shows that the entity benefitted from participating in a venture that it knew or recklessly disregarded was engaged in forced labor.

### e.  The Uyghur Human Rights Policy Act of 2020 (Public Law 116-145)

On June 17, 2020, the President signed into law the "Uyghur Human Rights Policy Act of 2020," which directs U. S. resources to address human rights violations and abuses of Uyghurs and members of other ethnic Turkic Muslim minority groups in the Xinjiang region in China. This statute, among other things, directs the President to impose sanctions on each foreign person the President determines is responsible for torture, cruel treatment, prolonged detention without charges, disappearances and other denials of life, liberty or security with respect to these persons in the Xinjiang region in China.

### f.  U.S. Department of the Treasury's Office of Foreign Assets Control

Among OFAC's various sanctions authorities, Executive Order (E.O.) 13818, which builds upon and implements the Global Magnitsky Human Rights Accountability Act, gives the Secretary of the Treasury, in consultation with the Secretary of State and the Attorney General, the authority to impose economic sanctions on certain persons who, among other things, are responsible for or complicit in, or have directly or indirectly engaged in serious human rights abuse; who are or have been a leader or official of an entity that has engaged in, or whose members have engaged in, serious human rights abuse relating to the leader or official's tenure; who have attempted to engage in serious human rights abuse; or who have materially assisted, sponsored, or provided financial, material, or technological support for, or goods or services to or in support of, those persons already sanctioned under E.O. 13818 (see E.O. 13818 for all designation criteria). Unless authorized by a general or specific license issued by OFAC or otherwise exempt, OFAC's regulations generally prohibit all transactions by U.S. persons or within (or transiting) the United States that involve any property or interests in property of designated or otherwise blocked persons. U.S. persons or others over which OFAC exercises jurisdiction can face significant monetary penalties in addition to other enforcement action for conduct in violation of OFAC's regulations. In addition, persons that engage in certain transactions with designated persons may themselves be exposed to designation. OFAC has sanctioned multiple entities and

18

individuals in connection with serious human rights abuse in Xinjiang.  For more details on OFAC's Global Magnitsky sanctions program, click here.

In addition, OFAC administers and enforces E.O. 13959, as amended, which gives the Secretary of the Treasury, in consultation with the Secretary of State and, as the Secretary of the Treasury deems appropriate, the Secretary of Defense, the authority to impose certain investment-related prohibitions with respect to persons that operate or have operated in the defense and related materiel sector or the surveillance technology sector of China's economy, and certain other related persons.  Specifically, U.S. persons are prohibited from purchasing or selling any publicly traded securities, or any publicly traded securities that are derivative of such securities or are designed to provide investment exposure to such securities, of entities identified in or pursuant to E.O. 13959, as amended.  These prohibitions take effect according to certain timelines as laid out in E.O. 13959, as amended.  To implement E.O. 13959, as amended, OFAC has published a list on its website containing the names of entities identified in or pursuant to E.O. 13959, as amended, titled the Non-SDN Chinese Military-Industrial Complex Companies List (the "NS-CMIC List").  For more details on OFAC's Chinese Military Companies sanctions program, click here.

### g.  The U.S. Department of the Treasury's Bank Secrecy Act (BSA) Regulations

The Currency and Foreign Transactions Reporting Act of 1970 (which legislative framework is commonly referred to as the "Bank Secrecy Act" or "BSA") requires U.S. financial institutions to assist USG agencies to detect and prevent money laundering.  Specifically, the act requires financial institutions to keep records of cash purchases of negotiable instruments; to file reports of cash transactions exceeding $10,000 (daily aggregate amount); and to report suspicious activity that might signify money laundering, tax evasion, or other criminal activities, including forced labor.  It was passed by the Congress of the United States in 1970.  The BSA is sometimes referred to as an "anti-money laundering" law ("AML") or jointly as "BSA/AML."  Several AML acts, including provisions in Title III of the USA PATRIOT Act of 2001, have been enacted up to the present to amend the BSA.  (See 31U.S.C. §§ 5311-5330 and 31 CFR Chapter X (formerly 31 CFR Part 103)).

### h.  U.S. Department of Labor's List of Products Produced by Forced or Indentured Child Labor

The U.S. Department of Labor maintains a *List of Products Produced by Forced or Indentured Child Labor*, which is a list of products and their source countries which the Department of Labor has a reasonable basis to believe are produced by forced or indentured child labor.  Under U.S. government procurement regulations, pursuant to the Federal Acquisition Regulation (FAR 52.222-18 and 52.222-19), federal contractors who supply products on the Department of Labor's *List of Products Produced by Forced or Indentured Child Labor* must certify that they have made a good faith effort to determine whether forced or indentured child labor was used to produce the items supplied.  As of publication, there are four goods on the list for China as a

19

whole: bricks, cotton, electronics, and toys.  For more details on the Department of Labor's *List of Products Produced by Forced or Indentured Child Labor*, click here.

### i. Office of the United States Trade Representative's Trade Agenda to Combat Forced Labor

The Office of the United States Trade Representative (USTR) utilizes its trade tools to combat forced labor.  This includes pursuing a trade agenda that prohibits the importation of goods produced by forced labor, and working with allies and trade partners to promote a fair, rules-based international trading system where products made with forced labor do not enter the trading system.  For example, the United States-Mexico-Canada Agreement (USMCA) includes a ground-breaking forced labor provision that obligates each Party to "prohibit the importation of goods into its territory from other sources produced in whole or in part by forced or compulsory labor, including forced or compulsory child labor."  The United States, Mexico, and Canada collaborate and bolster each other's efforts to ensure the effective implementation of the Agreement's forced labor import prohibition.

20

## Annex 1: U.S. Government Actions[13]

### U.S. Customs and Border Protection (CBP)

### Withhold Release Orders (WROs)

- ï   CBP forced labor enforcement related to China since 1990 has yielded 44 WROs, accounting for 75 percent of the total WROs issued, and seven findings against Chinese goods produced with forced labor.
- ï   In fiscal year 2020, the agency issued 13 WROs; eight of these were issued against goods from China.  In fiscal year 2021, CBP issued to date four WROs against Chinese goods produced with forced labor.

### WROs Related to Forced Labor from Xinjiang

- ï   September 30, 2019:  Hetian Taida Apparel Co., Ltd.
- ï   May 1, 2020:  Hetian Haolin Hair Accessories Co. Ltd.
- ï   June 17, 2020:  Lop County Meixin Hair Product Co. Ltd.
- ï   September 14, 2020:  Lop County No. 4 Vocational Skills Education and Training Center; Lop County Hair Product Industrial Park; Yili Zhuowan Garment Manufacturing Co., Ltd. and Baoding LYSZD Trade and Business Co., Ltd; Xinjiang Junggar Cotton and Linen Co., Ltd.; Hefei Bitland Information Technology Co., Ltd.
- ï   November 30, 2020:  Cotton products from the Xinjiang Production and Construction Corps (XPCC)
- ï   January 13, 2021:  Cotton and tomato products from Xinjiang
- ï   June 23, 2021:  Silica products from Hoshine Silicon Industry Co., Ltd.

For the complete list of WROs see here.

For a list of various fact sheets see Annex 6 Resources List.

### U.S. Department of Commerce

### Entity List Additions Related to Human Rights Abuses in Xinjiang

- ï   October 9, 2019:  Xinjiang Uyghur Autonomous Region (XUAR) People's Government Public Security Bureau; Aksu District Public Security Bureau; Altay Municipality Public Security Bureau; Bayingolin Mongolian Autonomous Prefecture Public Security Bureau; Boertala Mongolian Autonomous Prefecture Public Security Bureau; Changji Hui Autonomous Prefecture Public Security Bureau; Hami Municipality Public Security Bureau; Hetian Prefecture Public Security Bureau; Kashgar Prefecture Public Security

---

[13] For up-to-date information related to U.S. government actions please use the hyperlinks provided throughout this document. U.S. government actions may be taken subsequent to the issuance of this Advisory.

21

Bureau; Kelamayi Municipality Public Security Bureau; Kezilesu Kyrgyz Autonomous Prefecture Public Security Bureau; Shihezi Municipality Public Security Bureau; Tacheng Prefecture Public Security Bureau; Tumushuke Municipal Public Security Bureau; Turfan Municipality Public Security Bureau; Urumqi Municipal Public Security Bureau; Wujiaqu Municipality Public Security Bureau; Xinjiang Police College; Xinjiang Production and Construction Corps (XPCC) Public Security Bureau; and Yili Kazakh Autonomous Prefecture Public Security Bureau; Dahua Technology; Hikvision (later changed to Hangzhou Hikvision Digital Technology Co., Ltd.); IFLYTEK; Megvii Technology; Sense Time (later changed to Beijing Sensetime Technology Development Co., Ltd.); Xiamen Meiya Pico Information Co. Ltd.; Yitu Technologies; and Yixin Science and Technology Co. Ltd.

ï    June 5, 2020:  Ministry of Public Security's Institute of Forensic Science of China; Aksu Huafu Textiles Co.; CloudWalk Technology; FiberHome Technologies Group and the subsidiary Nanjing FiberHome Starrysky Communication Development Co.; Netposa and the subsidiary SenseNets; Intellifusion; and IS'Vision.

ï    July 22, 2020:  Beijing Liuhe BGI; Changji Esquel Textile Co. Ltd.; Hefei Bitland Information Technology Co. Ltd.; Hefei Meiling Co. Ltd.; Hetian Haolin Hair Accessories Co. Ltd.; Hetian Taida Apparel Co., Ltd.; KTK Group; Nanchang O-Film Tech; Nanjing Synergy Textiles Co. Ltd.; Tanyuan Technology Co. Ltd.; and Xinjiang Silk Road BGI.

ï    June 24, 2021:  Hoshine Silicon Industry (Shanshan) Co., Ltd.; Xinjiang Daqo New Energy, Co. Ltd; Xinjiang East Hope Nonferrous Metals Co. Ltd.; Xinjiang GCL New Energy Material Technology, Co. Ltd; and Xinjiang Production and Construction Corps.

ï    July 12, 2021:  China Academy of Electronics and Information Technology; Xinjiang Lianhai Chuangzhi Information Technology Co., Ltd.; Leon Technology Co., Ltd.; Xinjiang Tangli Technology Co., Ltd.; Shenzhen Cobber Information Technology Co., Ltd.; Xinjiang Sailing Information Technology Co., Ltd.; Beijing Geling Shentong Information Technology Co., Ltd.; Tongfang R.I.A. Co., Ltd.; Shenzhen Hua'antai Intelligent Technology Co., Ltd.; Chengdu Xiwu Security System Alliance Co., Ltd.; Beijing Sinonet Science & Technology Co., Ltd.; Urumqi Tianyao Weiye Information Technology Service Co., Ltd.; Suzhou Keda Technology Co., Ltd.; and Xinjiang Beidou Tongchuang Information Technology Co., Ltd.

For additional Entity Listings see:  <u>Supplement No. 4 to Part 744 of the EAR</u>

## U.S. Department of the Treasury

ï    July 9, 2020:  Economic sanctions under E.O. 13818 on: Chen Quanguo, the Communist Party Secretary of XUAR; Zhu Hailun, a former Deputy Party Secretary of the XUAR; the Xinjiang Public Security Bureau (XPSB); Wang Mingshan, Director and Communist Party Secretary of the XPSB; and Huo Liujun, former Party Secretary of the XPSB.

22

- ï July 31, 2020:  Economic sanctions under E.O. 13818 on: Xinjiang Production and Construction Corps (XPCC); Sun Jinlong, a former Political Commissar of the XPCC; and, Peng Jiarui, the Deputy Party Secretary and Commander of the XPCC.
- ï March 22, 2021:  Economic sanctions under E.O. 13818 on: Wang Junzheng, the Secretary of the Party Committee of the XPCC; and Chen Mingguo, Director of the XPSB.

## U.S. Department of State

- ï October 8, 2019:  Imposed visa restrictions on PRC government and CCP officials believed to be responsible for, or complicit in, the detention or abuse of Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other Muslim minority groups in Xinjiang.
- ï July 9, 2020:  Imposed visa restrictions on PRC government and CCP officials believed to be responsible for, or complicit in, the detention or abuse of Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other Muslim minority groups in Xinjiang.
- ï September 30, 2020: Issued guidance on implementing the *UN Guiding Principles* for transactions linked to foreign government end-users of products on services with surveillance capabilities.
- ï June 25, 2020:  The Secretary of State released the 2020 Trafficking in Persons Report, rating China with the lowest ranking (tier 3) in part due to a government policy or pattern of widespread forced labor, including through the continued mass arbitrary detention of more than one million Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and other Muslims in Xinjiang.  Accordingly, on November 6, 2020, the President determined that certain assistance for the Government of China for FY2021 would be fully restricted, pursuant to Sec. 110 of the Trafficking Victims Protection Act (22 U.S.C. 7107).
- ï January 19, 2021:  The Secretary of State determined that since at least March 2017, the PRC is committing genocide and crimes against humanity against Uyghurs, who are predominantly Muslim, and members of other ethnic and religious minority groups in Xinjiang.

## U.S. Department of Labor

- ï September 2020:  The U.S. Department of Labor included five goods produced by forced labor by Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other Muslim minority groups - gloves, hair products, textiles, thread/yard, and tomato products - to the List of Goods Produced by Child Labor or Forced Labor under the Trafficking Victims Protection Reauthorization Act.
- ï September 2020:  The Department of Labor launched a webpage "Against Their Will: The Situation in Xinjiang" dedicated to compiling information related to state-sponsored forced labor in Xinjiang, noting the vast scale of abuse.

23

ï    June 2021:  Due to evidence of the production of polysilicon for solar panels by forced labor, the Department of Labor added polysilicon for China as an update to the *List of Goods Produced by Child Labor or Forced Labor*.  The addition of polysilicon represents the now sixth good produced by forced labor by Uyghurs, ethnic Kazakhs, ethnic Kyrgyz, and members of other Muslim minority groups in China.  A total of 18 goods are noted by the Department of Labor as produced by forced labor in China, including some by forced child labor.

24

**Annex 2:  Illustrative List of Industries in Xinjiang in which Public Reporting has indicated Labor Abuses may be Taking Place**

Elements of the following industries have been identified as using forced labor in Xinjiang.  This list is illustrative and non-exhaustive and does not confirm that all goods produced in these industries in Xinjiang involve forced labor.  Businesses and individuals should consider this list as an additional risk factor for the heightened human rights due diligence discussed in this advisory.

| **Industry** |
| --- |
| Agriculture (including such products as raw cotton, hami melons, korla pears, tomato products, and garlic) |
| Cell Phones |
| Cleaning Supplies |
| Construction |
| Cotton, Cotton Yarn, Cotton Fabric, Ginning, Spinning Mills, and Cotton Products |
| Electronics Assembly |
| Extractives (including coal, copper, hydrocarbons, oil, uranium, and zinc) |
| Fake hair and human hair wigs, hair accessories |
| Food processing factories |
| Footwear |
| Gloves |
| Hospitality Services |
| Metallurgical grade silicon |
| Noodles |
| Printing Products |
| Renewable Energy (polysilicon, ingots, wafers, crystalline silicon solar cells, crystalline silicon solar photovoltaic modules) |
| Stevia |
| Sugar |
| Textiles (including such products as apparel, bedding, carpets, wool, viscose) |
| Toys |

**Annex 3:  Cotton, Textile, and Garment Supply Chains**

Xinjiang's cotton lint production provides for over 85 percent of China's total cotton production and 20 percent of global output.  After the cotton is ginned and classed in Xinjiang, most cotton bales are transported to China's eastern provinces to be further processed into yarn.

Imports to the U.S. of cotton and cotton products produced in Xinjiang are subject to U.S. Customs and Border Protection's (CBP) Withhold Release Order (WRO) issued in January 2021 due to evidence of forced labor in Xinjiang cotton production.  The Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* includes cotton and garments produced in China, in addition, textiles and thread/yarn were added in September 2020 given evidence of their production by forced labor connected to Xinjiang in particular.  In addition, cotton yarn and fabric and downstream products (garments, towels, bedsheets) made elsewhere in China may be subject to detention under the WRO, as most Xinjiang cotton lint is processed outside the region.  However, the Xinjiang region is not a major producer of yarn, fabric, and products relative to the eastern provinces in China.

Roughly one-fifth of Xinjiang cotton remains within the autonomous region for yarn production.  In addition, China is the world's largest cotton lint and cotton yarn importer.  Cotton grown in Xinjiang accounts for roughly 60 percent of cotton yarn available to produce cotton fabric in China.

China is the world's largest cotton fabric exporter, with exports accounting for over 20 percent of cotton fabric production.  Cotton products produced using Chinese fabric (likely containing Xinjiang cotton lint) outside of Xinjiang, either in China or other countries may also be subject to CBP's WRO.

Cotton lint is not the only cotton product.  Cottonseed is also within the scope of the WRO.  Cottonseed in Xinjiang is processed in several intermediate products such as cottonseed oil and meal and cotton linters pulp (CLP).  These intermediate products are used both within and outside of Xinjiang to produce a wide range of products such as cosmetics, paper, and viscose fiber.

Xinjiang's production of textiles (yarn and fabric) is smaller relative to many of China's eastern provinces.  Xinjiang's 2020 yarn production (chemical fibers, cotton, cotton blended with other fibers) was approximately 1.9 million tons, providing for less than 10 percent of China's total yarn production.  Total fabric production (chemical fibers, cotton, cotton blended with other fibers) in 2020 was around 500 million meters, less than 5 percent of the country's total output.

Companies in China, including in Xinjiang, also import cotton directly from the United States and other countries.  The Department of Commerce's Bureau of Industry and Security has added multiple Chinese commercial companies involved in the cotton, textile, or garment supply chain to the Entity List for engaging in activities contrary to the foreign policy interests of the United

26

States through the practice of forced labor involving members of Muslim minority groups in Xinjiang.  See Annex 1 for U.S. government actions.

**Annex 4:  Solar Supply Chain**

As of 2020, China controlled an estimated 70 percent of the global supply for solar-grade polysilicon and China also dominated manufacturing in other downstream solar photovoltaic (PV) components including ingots, wafers, and cells that are assembled into solar modules. Around 95 percent of solar PV modules rely on solar-grade polysilicon.  In 2020, five of the top six solar-grade polysilicon companies, by capacity, were headquartered in China, with 45 percent of the world's supply of solar-grade polysilicon coming from four producers with operations in Xinjiang.

Creating a solar panel involves the transformation of raw silicon material to solar-grade polysilicon, ingots, wafers, cells, and final assembly into solar modules.  Quartz is mined then crushed and heated to create metallurgical grade silicon (MGS).  The MGS is refined into polysilicon, which is then further processed and melted into ingots.  Since Xinjiang polysilicon is blended with polysilicon made in other regions of China, separating and tracing the amount and exact origin of any polysilicon from China can be difficult.  At each stage in the solar supply chain, there is evidence of enterprises with links to the labor transfer programs that engage in coercive labor practices and to the Xinjiang Production and Construction Corps (XPCC).

The XPCC, which has been sanctioned by the U.S. government in connection with serious human rights abuse, is closely connected with polysilicon production in Xinjiang.  As of June 2021, the U.S. Department of Labor's *List of Goods Produced by Child Labor or Forced Labor* includes polysilicon produced in China, given evidence of the production of polysilicon for solar panels by forced labor connected to Xinjiang in particular.  Additionally, the XPCC and XPCC Public Security Bureau have been implicated in human rights abuses and violations in Xinjiang and are on the Department of Commerce's Entity List.  The XPCC operates many of the industrial parks where polysilicon manufacturers are located and provides them with various benefits (e.g., reduced rent and utilities, support with logistics, warehousing, and the transportation of finished goods).  The solar industry has been granted tax and financial incentives for expanding in Xinjiang, such as free office space from the XPCC.

Alongside this expansion, the solar industry companies have participated in forced labor. Between 2016 and 2018, many polysilicon manufacturers used a government-sponsored corporate incentive to employ "surplus labor transfers."  Reporting indicates that within these companies there are indicators of forced labor, including restricting workers from quitting, traveling or participating in religious services, paying less than minimum wage, applying harsh or unsafe work conditions, and threatening detention.  Subsidized electricity, electricity from coal-fired power plants, low environmental standards, and domestic initiatives – including subsidized labor and rents – allow factories in Xinjiang to produce polysilicon and other solar components at a lower price compared to other regions in China.  Central and provincial initiatives designate the solar PV industry as a strategic sector for investment to support and develop Xinjiang's market.  Local government programs provide land and low-interest loans to companies that relocate to the province, buttressed by lines of credit from state-owned banks.

28

The pervasiveness of forced labor programs in Xinjiang and co-mingling of solar-grade polysilicon supplies by downstream manufacturers raise concerns throughout the entire solar supply chain, and it is likely that absent more robust supply chain safeguards, reliable, enhanced auditing procedures, and continued midstream supply chain chokepoints that the majority of global solar products may continue to have a connection to forced labor and the XPCC.

The Department of Commerce's Bureau of Industry and Security has added multiple Chinese commercial companies that manufacture inputs in the solar supply chain to the Entity List for participating in the practice of, accepting, or utilizing forced labor in Xinjiang. The Department of Homeland Security's Customs and Border Protection has issued a Withhold Release Order against the silica-based products made by a Chinese commercial company and its subsidiaries based on information reasonably indicating that it uses forced labor to manufacture silica-based products. See Annex 1 for U.S. government actions.

**Annex 5:  Entity List Resources**

The Entity List specifies the license requirements and license review policy that it imposes on each listed person.  Those license requirements are independent of, and in addition to, license requirements imposed elsewhere in the Export Administration Regulations (EAR).  For example, if you want to export, reexport, or transfer (in-country) an "EAR99" item to a listed entity and the license requirement for that person specified in the "License Requirement" column of the Entity List states "All Items Subject to the EAR," you must obtain a license from the U.S. Department of Commerce's Bureau of Industry and Security (BIS) before exporting, reexporting or transferring (in-country) the item, even if the "EAR99" item could otherwise be exported to the country of destination without a license from BIS.

For additional information on the Entity List, please see Sections 744.11 and 744.16 of the EAR. For questions or concerns related to the EAR and its requirements, please contact BIS's Office of Exporter Services at 202-482-4811 or the BIS website at www.bis.doc.gov.  Information on a potential violation of U.S. export control regulations should be provided to BIS's Enforcement Hotline at 1-800-424-2980 or https://www.bis.doc.gov/index.php/component/rsform/form/14?task=forms.edit.  For more information on submitting a BIS license application, please see https://www.bis.doc.gov/index.php/licensing.

For additional information on controls on the export, reexport, or (transfer in-country) of the dual-use and military-related items under the Department of Commerce's jurisdiction, please see the resources available on BIS's website (www.bis.doc.gov), including the Export Administration Regulations (https://www.bis.doc.gov/index.php/regulations/export-administration-regulations-ear) and BIS' Online Training Room.

The U.S. Department of Commerce also provides the Consolidated Screening List tool (https://www.trade.gov/consolidated-screening-list), a searchable list of parties for which the United States Government maintains restrictions on certain exports, reexports or transfers of items.  The tool consolidates multiple export screening lists of the U.S. Department of Commerce, U.S. Department of State, and U.S. Department of the Treasury.

**Annex 6:  Relevant Reports and Guidance**

| Information Source | Description |
|---|---|
| **U.S. Government Resources** ||
| Department of State China Human Rights Reports | The Department of State's annual Country Reports on Human Rights Practices cover internationally recognized individual, civil, political, and worker rights, as set forth in the Universal Declaration of Human Rights and other international documents.  The reports can include specific information on foreign government agencies, including Chinese government agencies. |
| Department of State China Trafficking in Persons Report | The Department of State's annual Trafficking in Persons Report assesses 188 governments, including China's, on their efforts to meet the Trafficking Victims Protection Act's minimum standards for the elimination of trafficking in persons, and assigns each of them a tier ranking based on that assessment.  Each narrative in the report provides content specific to human trafficking, including forced labor, in each country. |
| Department of State China International Religious Freedom Report | The Department of State's annual Report on International Religious Freedom details the status of religious freedom in about 200 countries and territories, including China, and contains a section focused on Xinjiang. |
| Department of Labor List of Goods Produced by Child Labor or Forced Labor Report | The Department of Labor maintains a list of goods and their source countries, including China, which it has reason to believe are produced by child labor or forced labor in violation of international standards, as required under the Trafficking Victims Protection Reauthorization Act of 2005 and subsequent reauthorizations.  Artificial flowers, Christmas decorations, coal, fish, footwear, garments, gloves, hair products,  nails, polysilicon, thread/yarn, and tomato products are included for forced labor of adults; and bricks, cotton, electronics, fireworks, textiles, and toys are included for both forced labor of adults and child labor.  Gloves, hair products, polysilicon, textiles, thread/yarn, and tomato products were added due to evidence that they were produced by the forced labor of Uyghurs, ethnic Kazakhs, ethnic Kyrgyz and other Muslim minorities specifically. |

31

| Department of Labor List of Products Produced by Forced or Indentured Child Labor Report | The Department of Labor maintains a list of products and their source countries, including China, which it has a reasonable basis to believe are produced by forced or indentured child labor, pursuant to Executive Order 13126.  This List is intended to ensure that U.S. federal agencies and contracted parties do not procure goods made by forced or indentured child labor.  The List currently includes bricks, cotton, electronics, and toys from China as goods made with forced or indentured child labor. |
|---|---|
| Department of Labor website "Against Their Will: The Situation in Xinjiang" | The Department of Labor's website dedicated to compiling information related to state-sponsored forced labor in Xinjiang. |
| Comply Chain: Business Tools for Labor Compliance in Global Supply Chains | The Department of Labor's mobile app and web-based platform provides information on due diligence measures specific to forced labor and child labor in supply chains, offering an interactive resource to help companies assess risks and impacts and draw on lessons and good practices from over 50 real-life examples of due diligence in various sectors.  Comply Chain is available in English, French, and Spanish. |
| Congressional-Executive Commission on China: Annual Report | The Congressional-Executive Commission on China (CECC) report published in January 2021 highlights multiple concerning human rights issues, including the mass, arbitrary internment of Uyghurs and other Muslim ethnic minorities. |
| Responsible Sourcing Tool | The Responsible Sourcing Tool, developed by the State Department and Verité, assists U.S. federal contractors, procurement officials, and companies to better identify, prevent, and address the risks of human trafficking in their global supply chains. |
| Xinjiang Uyghur Autonomous Region WRO Frequently Asked Questions | The Department of Homeland Security's U.S. Customs and Border Protection (CBP) provides frequently asked questions on the Xinjiang Uyghur Autonomous Region Withhold Release Order (WRO). |
| Forced Labor Importer Due Diligence Fact Sheet | CBP's fact sheet sets out resources to assist companies with strengthening their policies and procedures to mitigate the risk of child and forced labor in their global supply chains. |
| Withhold Release Orders and Findings | WROs can be found on CBP's website.  CBP does not generally publicize specific detentions, re-exportations, exclusions, or seizures of the subject merchandise that may have resulted from the WROs or findings. |
| Fact Sheet: Forced Labor Procedures | CBP's fact sheet provides information on resources related to forced labor enforcement authorities and enforcement action. |

| Forced Labor Detained Shipments Fact Sheet | CBP's fact sheet provides information for companies on the procedures for when goods suspected to be produced with forced labor are detained. |
|---|---|
| Fact Sheet: The Moiety Statute | CBP provides information on the possibility of an award of compensation to informers. |
| ICE Forced Labor Program Fact Sheet | The Department of Homeland Security's Immigration and Customs Enforcement Homeland Security Investigation's fact sheet provides information on the Forced Labor Program that coordinates criminal investigations into allegations of forced labor (including forced child labor) resulting in the manufacturing or production of goods overseas imported into the United States. |
| U.S Department of State Guidance on Implementing the "UN Guiding Principles" for Transactions Linked to Foreign Government End-Users for Products or Services with Surveillance Capabilities | The Department of State's first-of-its-kind tool intended to provide practical and accessible human rights guidance to U.S. businesses seeking to prevent their products or services with surveillance capabilities from being misused by government end-users to commit human rights abuses. |

33

**Annex 7: Other Countries' Measures**

The U.S. Departments of State, the Treasury, Commerce, Homeland Security, Labor, and the Office of the U.S. Trade Representative are committed to working with and supporting partner nations in combating human rights abuses in Xinjiang and elsewhere.[14]  The United States-Mexico-Canada Agreement (USMCA), which entered into force on July 1, 2020, includes a section in Article 23.6 requiring all three countries to prohibit the importation of goods produced wholly or in part with forced or compulsory labor.  Also, the US, UK, Australia, Canada, and New Zealand subscribe to the 2018 Principles to Guide Government Action to Combat Human Trafficking in Global Supply Chains.[15]

Below is information on other countries' regulatory provisions on forced labor in supply chains.

| Country | Measure | Link |
|---|---|---|
| Australia | Australia's Modern Slavery Act 2018 requires some entities to report on the risks of modern slavery in their operations and supply chains and actions to address those risks.  The legislation allows for other entities based or operating in Australia to report voluntarily. | Modern Slavery Act 2018 |
| Canada | Global Affairs Canada and the Canadian Trade Commissioner Service issued an advisory to bring attention to human rights violations in China affecting Uyghurs and other ethnic minorities from the Xinjiang Uyghur Autonomous Region (XUAR) to help Canadian firms and stakeholders understand the legal and reputational risks posed to companies whose supply chains engage with entities possibly implicated in forced labor. | Global Affairs Canada advisory on doing business with Xinjiang-related entities |
| Canada | Canada's *Customs Tariff Act* and the Schedule to the Customs Tariff were amended to include a prohibition on the importation of goods produced wholly or in part by forced labor, and not just prison labor as was already prohibited.  Customs Notice 20-23 includes a tip line to report allegations of violations of this prohibition to the  Canada Border Services Agency's Border Information Service.  The Government of Canada expects companies to take every step | Integrity Declaration on Doing Business with Xinjiang Entities<br><br>Customs Notice 20-23 - Import Prohibition on Goods Produced Wholly |

---

[14] For example, see a statement by the U.S. Department of State on the commitment to working multilaterally to promote accountability for the atrocities in Xinjiang: https://www.state.gov/promoting-accountability-for-human-rights-abuse-with-our-partners/
[15] https://www.state.gov/wp-content/uploads/2019/03/286369.pdf

| | possible to ensure that their supply chains conform to Canadian law with respect to the prohibition on the import of forced labor. | or In Part by Forced Labour |
|---|---|---|
| European Union | The European Union passed Regulation (EU) 2017/821 of the European Parliament and of the Council on supply chain due diligence obligations for EU importers of tin, tantalum, tungsten, their ores, and gold originating from conflict-affected and high-risk areas. | Conflict Minerals Regulation |
| European Union | The European Union passed a corporate sustainability reporting measure that requires large companies to publish regular reports on the social and environmental impacts of their activities. | Non-Financial Reporting Directive |
| European Union EEAS | The Commission and the European External Action Service (EEAS) provides Guidance on due diligence to help EU companies to address the risk of forced labor in their operations and supply chains, in line with international standards.  The Guidance explains the practical aspects of due diligence and provides an overview of EU and international instruments on responsible business conduct that are relevant for combatting forced labor. | EEAS Guidance on Due Diligence to Address the Risk of Forced Labor |
| France | France's Law No. 2017-399 of March 27, 2017 designates that some companies establish and effectively implement a vigilance plan that identifies risks and prevents serious violations of human rights and fundamental freedoms, human health and safety, and the environment. | Corporate Duty of Vigilance |
| Germany | Germany's Due Diligence in Supply Chains Law, in force from 2023, legally obliges some companies to implement human rights due diligence practices including: monitoring Tier-1 suppliers for human rights risks, creating and publishing a plan to identify human rights risks in supply chains, and establishing a grievance mechanism. | *Not yet available* |
| New Zealand | New Zealand's laws prohibit slavery, trafficking in persons and forced labor.  New Zealand's trade policy recognizes the need to respect and incorporate the observance of fundamental labor rights into trade agreements. | Foreign Affairs and Trade Combatting Modern Slavery |
| Norway | On June 10, 2021, Norway passed the Transparency Act to oblige companies to | International Development Ministry |

| | conduct due diligence for human rights issues throughout all business relationships in their value chain.  Norway also adopted a strategy to combat modern slavery on July 1, 2021 to leverage development assistance globally. | Strategy to combat modern slavery |
|---|---|---|
| United Kingdom | The United Kingdom's Modern Slavery Act 2015 issued provisions about slavery, servitude, and forced or compulsory labor, and about human trafficking, including provisions for the protection of victims. | Modern Slavery Act 2015 |

36