# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

Changji Esquel Textile Co. Ltd., *et al.*,

        Plaintiffs,

  v.

Gina M. Raimondo, *et al.*,

        Defendants.

Civil Action No. 1:21-cv-1798 (RBW)

## DEFENDANTS' REDACTED STATEMENT OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION...................................................................................................... 1

BACKGROUND....................................................................................................... 4

I.      Statutory And Regulatory Background............................................................ 4

        A.      The Export Administration Regulations and the Entity List ................ 4

        B.      Statutory Authority for the Entity List.................................................. 7

II.     Factual Background......................................................................................... 9

III.    This Lawsuit ..................................................................................................11

STANDARD OF REVIEW .....................................................................................12

ARGUMENT ..........................................................................................................13

I.      The Plaintiffs Are Unlikely to Succeed on the Merits...................................13

        A.      The Defendants May Permissibly Maintain Lists of Foreign Persons Who
                Threaten Foreign Policy Interests through Human Rights Abuses. .....................14

                i.      Sections 4811(2)(D) and 4813(a)(16) Authorize Listings for
                        Human Rights Reasons. .........................................................15

                ii.     Section 4813(a)(2) Does Not Limit the Permissible Reasons for
                        Listings under Other Reform Act Authorities.........................17

                iii.    The History of the Reform Act Confirms that Human Rights
                        Concerns are a Permissible Purpose for Placement on the Entity
                        List..........................................................................................20

        B.      The Defendants Acted Consistent with their Regulatory Authority, and the
                Plaintiffs Cannot Assert an *Ultra Vires* Claim to the Contrary..........................22

II.     The Plaintiffs Have Not Established Certain and Imminent Irreparable Harm
        Justifying a Preliminary Injunction................................................................25

III.    The Balance of the Equities and Public Interest Strongly Disfavor Preliminary
        Relief ████████████████████████████████████ .........29

CONCLUSION........................................................................................................32

# TABLE OF AUTHORITIES

**CASES**

*AARP v. United States Equal Emp. Opportunity Comm'n,*
  226 F. Supp. 3d 7 (D.D.C. 2016) .................................................................29

*Adirondack Med. Ctr. v. Sebelius,*
  740 F.3d 692 (D.C. Cir. 2014) ....................................................................19

*Aid Ass'n for Lutherans v. United States Postal Serv.,*
  321 F.3d 1166 (D.C. Cir. 2003) ...................................................................23

*Air Transport Ass'n of Am., Inc. v. Exp.-Imp. Bank of the U.S.,*
  840 F. Supp. 2d 327 (D.D.C. 2012) .............................................................26

*Ajilon Prof'l Staffing, PLC v. Kubicki,*
  503 F. Supp. 2d 358 (D.D.C. 2007) .............................................................27

*Ark. Dairy Coop. Ass'n v. Dep't of Agric.,*
  573 F.3d 815 (D.C. Cir. 2009) ....................................................................25

*Aviles-Wynkoop v. Neal,*
  978 F. Supp. 2d 15 (D.D.C. 2013) ..............................................................26

*Avocados Plus Inc. v. Veneman,*
  370 F.3d 1243 (D.C. Cir. 2004) ...................................................................30

*Boumediene v. Bush,*
  553 U.S. 723 (2008) ...................................................................................31

*Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos,*
  344 F. Supp. 3d 158 (D.D.C. 2018) .............................................................26

*Cannon v. Univ. of Chicago,*
  441 U.S. 677 (1979) ...................................................................................22

*Chaplaincy of Full Gospel Churches v. England,*
  454 F.3d 290 (D.C. Cir. 2006) ...............................................................25, 27

*Cheney R.R. Co. v. Interstate Com. Comm'n,*
  902 F.2d 66 (D.C. Cir. 1990) ......................................................................18

*Chevron U.S.A. Inc. v. Echazabal,*
  536 U.S. 73 (2002) .....................................................................................18

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council,*
  467 U.S. 837 (1984) ...................................................................................17

*Clinchfield Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*,
   895 F.2d 773 (D.C. Cir. 1990) ...................................................................................20

*Coal. for Common Sense in Gov't Procurement v. United States*,
   576 F. Supp. 2d 162 (D.D.C. 2008) ...........................................................................26

*Cobell v. Norton*,
   391 F.3d 251 (D.C. Cir. 2004) ...................................................................................12

*Cornish v. Dudas*,
   540 F. Supp. 2d 61 (D.D.C. 2008) .............................................................................26

*Creekstone Farms Premium Beef, LLC v. Dep't of Agric.*,
   539 F.3d 492 (D.C. Cir. 2008) ...................................................................................19

*DCH Reg' Med. Ctr. V. Axar*,
   925 F.3d 503 (D.C. Cir. 2019) ...................................................................................14

*Eagle Tr. Fund v. United States Postal Serv.*,
   811 F. App'x 669 (D.C. Cir. 2020), *petition for cert. docketed*,
   No. 20-1026 (U.S. Jan. 28, 2021) ..........................................................................23, 24

*Econ. Rsch. Servs., Inc. v. Resolution Econ., LLC*,
   140 F. Supp. 3d 47 (D.D.C. 2015) ..........................................................................26, 27

*Elec. Priv. Info. Ctr. v. FTC*,
   844 F. Supp. 2d 98 (D.D.C. 2012), *aff'd*, 2012 WL 115566 (D.C. Cir. Mar. 5, 2012) ...........25

*Fed. Express Corp. v. United States Dep't of Commerce*,
   486 F. Supp. 3d 69 (D.D.C. 2020), *appeal filed*, No. 20-5337 (D.C. Cir. Nov. 16, 2020) .......21

*Fla. Health Sci. Ctr. Inc. v. Sec'y of Health & Human Servs.*,
   830 F.3d 515 (D.C. Cir. 2016) ...............................................................................14, 24

*Griffith v. Fed. Labor Rels. Auth.*,
   842 F.2d 487 (D.C. Cir. 1988) ...........................................................................14, 17, 24

*Halverson v. Slater*,
   129 F.3d 180 (D.C. Cir. 1997) ...................................................................................20

*Hartz Mountain Corp. v. Dotson*,
   727 F.2d 1308 (D.C. Cir. 1984) .................................................................................14

*Hettinga v. United States*,
   560 F.3d 498 (D.C. Cir. 2009) ...................................................................................29

*IMS, P.C. v. Alvarez*,
   129 F.3d 618 (D.C. Cir. 1997) ...................................................................................25

*King v. St. Vincent's Hosp.*,
    502 U.S. 215 (1991) .................................................................................................15

*Luokang Technology Corp. v. Department of Defense*
    __F. Supp. 3d __, 2021 WL 1820265 (D.D.C. May 5, 2021) ...................................27

*Maritel, Inc. v. Collins*,
    422 F. Supp. 2d 188 (D.D.C. 2006) .......................................................................24

*Mead Johnson Pharm. Grp. v. Bowen*,
    655 F. Supp. 53 (D.D.C. 1986), *aff'd*, 838 F.2d 1332 (D.C. Cir. 1988)..................28

*Mexichem Specialty Resins, Inc. v. EPA*,
    787 F.3d 544 (D.C. Cir. 2015) ...............................................................................25

*Micei Int'l v. Dep't of Commerce*,
    613 F.3d 1147 (D.C. Cir. 2010) .........................................................................7, 20

*Milena Ship Mgmt. Co. v. Newcomb*,
    804 F. Supp. 846 (E.D. La. 1992) ..........................................................................31

*Mittleman v. Postal Regul. Comm'n*,
    757 F.3d 300 (D.C. Cir. 2014) ...............................................................................23

*Mobile Commc'ns Corp. of Am. v. Fed. Comm'ns Comm'n*,
    77 F.3d 1399 (D.C. Cir. 1996) ...............................................................................19

*Newdow v. Bush*,
    355 F. Supp. 2d 265 (D.D.C. 2005) .......................................................................28

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ..........................................................................14, 24

*Open Top Sightseeing USA v. Mr. Sightseeing, LLC*,
    48 F. Supp. 3d 87 (D.D.C. 2014) ...........................................................................28

*Organogenesis, Inc. v. Sebelius*,
    41 F. Supp. 3d 14 (D.D.C. 2014) ...........................................................................14

*Pauley v. BethEnergy Mines, Inc.*,
    501 U.S. 680 (1991).................................................................................................18

*Postal Police Officers Ass'n v. United States Postal Serv.*,
    502 F. Supp. 3d 411 (D.D.C. 2020) .......................................................................23

*Qualls v. Rumsfeld*,
    357 F. Supp. 2d 274 (D.D.C. 2005) .......................................................................13

*Singh v. Carter,*
  185 F. Supp. 3d 11 (D.D.C. 2016) ...............................................................13

*State v. United States Dep't of State,*
  996 F.3d 552 (9th Cir. 2021) ......................................................................13

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.,*
  940 F.2d 685 (D.C. Cir. 1991) ....................................................................20

*Trudeau v. Fed. Trade Comm'n,*
  456 F.3d 178 (D.C. Cir. 2006) ....................................................................20

*United Dominion Indus., Inc. v. United States,*
  532 U.S. 822 (2001).....................................................................................18

*United States v. Atl. Rsch. Corp.,*
  551 U.S. 128 (2007).....................................................................................15

*United States v. Vonn,*
  535 U.S. 55 (2002).......................................................................................18

*Winter v. Nat. Res. Def. Council, Inc.,*
  555 U.S. 7 (2008) ...................................................................................12, 13

*Wisc. Gas Co. v. Fed. Energy Regul. Comm'n,*
  758 F.2d 669 (D.C. Cir. 1985) ....................................................................26

*Xiamoi Corp. v. Department of Defense,*
  Civ. A. No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ..................27

**STATUTES**

50 U.S.C. §§ 4801 *et seq.*..................................................................................... 7

50 U.S.C. §§ 4801-4826 ...............................................................................7, 21

50 U.S.C. §§ 4811-4813 ....................................................................................30

50 U.S.C. § 4811 ......................................................................................*passim*

50 U.S.C. § 4812 ........................................................................... 4, 8, 9, 17

50 U.S.C. § 4813 ......................................................................................*passim*

50 U.S.C. § 4815 ........................................................................................... 4

50 U.S.C. § 4821 ...................................................................................13, 24

50 U.S.C. § 4826 ...............................................................................9, 21, 22

50 U.S.C. §§ 4841–4843 ............................................................................................ 8

50 U.S.C. §§ 4851–4852 ............................................................................................ 8

Act of June 30, 1942,
    56 Stat. 463 .......................................................................................................... 7

John S. McCain National Defense Authorization Act for Fiscal Year 2019,
    Pub. L. No. 115-232, 132 Stat. 1636 (2018) ................................................... 7, 21

**REGULATIONS**

15 C.F.R. parts 730-774 ............................................................................................ 4

15 C.F.R. § 734.3 ...................................................................................................... 4

15 C.F.R. §§ 734.13-734.16 ...................................................................................... 5

15 C.F.R. § 734.13 .................................................................................................... 4

15 C.F.R. § 734.14 .................................................................................................... 4

15 C.F.R. § 734.16 .................................................................................................... 4

15 C.F.R. § 744.11 ............................................................................................*passim*

15 C.F.R. § 744.16 ............................................................................................*passim*

15 C.F.R. Part 744, Supplement No. 4 ..............................................................1, 4, 5

15 C.F.R. Part 744, Supplement No. 5 ...................................................................1, 5

Addition of Person to the Entity List,
    79 Fed. Reg. 21,394 (Apr. 16, 2014) ..............................................................6, 31

Addition of Person to the Entity List,
    79 Fed. Reg. 24,558 (May 1, 2014) ..................................................................... 6

Addition of Person to the Entity List,
    79 Fed. Reg. 24,563 (May 1, 2014) ..................................................................... 6

Addition of Certain Persons to the Entity List,
    80 Fed. Reg. 47,402 (Aug. 7, 2015) ...................................................................30

Addition of Certain Entities to the Entity List,
    82 Fed. Reg. 722 (Jan. 4, 2021) ..........................................................................30

Addition of Certain Entities to the Entity List,
    84 Fed. Reg. 54,002 (Oct. 9, 2019) ..................................................................... 6

Addition of Certain Entities to the Entity List,
85 Fed. Reg. 34,503 (June 5, 2020) ......................................................................... 6

Addition of Certain Entities to the Entity List,
85 Fed. Reg. 44,159 (July 22, 2020) ...............................................................*passim*

Addition of Certain Entities to the Entity List,
86 Fed. Reg. 33,119 (June 24, 2021) ...................................................................... 6

Addition of Certain Entities to the Entity List; Correction of Existing Entry on the Entity List,
86 Fed. Reg. 35,389 (July 6, 2021) .......................................................................31

Addition of Certain Entities to the Entity List,
86 Fed. Reg. 36,496 (July 12, 2021) ....................................................................... 6

Entity List,
62 Fed. Reg. 4910 (Feb. 3, 1997) ......................................................................... 4

Exec. Order 13,222,
66 Fed. Reg. 44,025 (Aug. 17, 2001) ..................................................................... 7

**OTHER AUTHORITIES**

Conf. Rep. to Accompany H.R. 5515
H.R. Rep. No. 115-874 (2018) .............................................................................21

Sustein Law and Administration After *Chevron,*
90 Colum. L. Rev. 2071 (1990) ...........................................................................18

## INTRODUCTION

Congress provided the Executive Branch the authority to use export controls to protect national security and carry out foreign policy. As part of its responsibilities in this area, the Department of Commerce maintains the "Entity List," which includes foreign persons "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.16; Supp. No. 4 to 15 C.F.R. pt. 744. Absent a license from Commerce, it is unlawful to engage in certain transactions involving entities included on the list. *See* 15 C.F.R. § 744.11(a). The End-User Review Committee, an interagency committee chaired by Commerce, is responsible for adding or removing foreign persons from the Entity List. *See* 15 C.F.R. § 744.11 and Supp. No. 5 to 15 C.F.R. pt. 744.

More than a year ago in July 2020, the Committee added Changji Esquel Textile Co.[1] to the Entity List. The Committee determined that Changji was engaging in or enabling activities contrary to the United States' foreign policy interests—namely, that Changji was implicated in human rights abuses through the practice of forced labor involving members of Muslim minority groups in the Xinjiang Uyghur Autonomous Region of the People's Republic of China. Changji subsequently submitted a request for removal from the Entity List to the Committee's chair, as provided by relevant regulations. *See* 15 C.F.R. § 744.11; Supp. No. 5 to 15 C.F.R. pt. 744. ███

████████████████████████████████████████████████████████████

███████████████████████████████████

On July 31, 2021, the Committee completed its review of the request for removal and unanimously determined to conditionally approve the request. *See* Letter from Matthew S.

---

[1] Changji is a wholly-owned subsidiary of the Esquel Group, a Chinese textile manufacturing company.

1

Borman, Deputy Assistant Secretary for Export Administration, to Nnedinma C. Ifudu Nweke (July 31, 2021), ECF No. 19-2 (under seal). ███████████████████████████████

███████████████████████████████   ███████████████████████████████

███████████████████   *Id.*   ███████████████████████████████████████

███████████████████████████████████████████████████████████████████████

███████████████████

  But rather than wait for the conclusion of the administrative process it initiated, Changji filed this lawsuit and moved for a preliminary injunction challenging the Committee's July 2020 determination and addition of Changji to the Entity List. Changji argues that its addition to the Entity List was *ultra vires* because the Export Control Reform Act of 2018 does not allow listings for human rights violations, and even if it did, the company's addition to the Entity List did not accord with regulatory authority under the Export Administration Regulations.

  The Court should deny the plaintiffs' motion for a preliminary injunction. To start with, the plaintiffs have not established a likelihood of success on the merits. Although the plaintiffs assert that Changji's listing runs afoul of Commerce's statutory and regulatory authority, they cannot bring a claim under the Administrative Procedure Act ("APA"), as Congress expressly precluded such review. The plaintiffs therefore must press for *ultra vires* review, but they do not come close to meeting that extraordinarily narrow standard. The Committee has ample statutory authority to make determinations to list foreign persons in connection with human rights related concerns—having done so on numerous occasions—and the plaintiffs fail to show otherwise. Nor can the plaintiffs bring an *ultra vires* claim alleging that an agency did not follow its own regulations—and even if they could, their argument finds no basis in the regulatory text.

The remaining preliminary injunction factors likewise weigh against granting the extraordinary relief the plaintiffs request. Notwithstanding their claims to the contrary, the plaintiffs' allegations of economic hardship fail to satisfy the high standard for irreparable harm. Nor can they show that the balance of the equities and the public interest favor preliminary relief. As part of its administrative request for removal from the Entity List, ███████████ ████████████████████████████████████████████████████████ ████████████████ The public interest lies with the Government's continued commitment to its human rights policy denouncing forced labor of minority workers, its ability to take action against foreign persons that support or facilitate such forced labor, and its efforts to ensure U.S. goods and technology are not used to perpetuate human rights abuses. In this context, the plaintiffs should not be permitted to short-circuit the administrative process they started by seeking to litigate the Government's initial listing decision, ████████████████████ ████████████

## BACKGROUND

### I.   Statutory and Regulatory Background

### A.  The Export Administration Regulations and the Entity List

Under the Export Control Reform Act, the Executive Branch controls the "export, reexport, and in-country transfer of items" subject to United States jurisdiction, 50 U.S.C. § 4812(a)(1), in order to protect national security, "carry out the foreign policy of the United States, including the protection of human rights and the promotion of democracy," and pursue other similar objectives, *id*. § 4811(2). Congress assigned the primary responsibility for administering this export control system to the Department of Commerce, which maintains a licensing regime to ensure compliance with its controls. *See id*. § 4815. Commerce promulgated much of this licensing regime and other

export controls through the Export Administration Regulations, 15 C.F.R. parts 730-774, which as a general matter apply to "[a]ll items in the United States" and "[a]ll U.S. origin items," unless they are "exclusively controlled" by the export regimes of other federal agencies or otherwise do not fall under Commerce's jurisdiction. 15 C.F.R. § 734.3(a)-(b).

As part of its regulatory efforts, Commerce maintains the Entity List, *see* 15 C.F.R. Part 744, Supplement No. 4, which identifies foreign persons, including companies, "reasonably believed to be involved, or to pose a significant risk of being or becoming involved, in activities contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.16; *see also* Entity List, 62 Fed. Reg. 4,910 (Feb. 3, 1997) (establishing the Entity List). In general, it is unlawful to export,[2] re-export,[3] or make an in-country transfer[4] of items subject to the Export Administration Regulations to an entity on the Entity List, or to engage in such transactions if they involve such an entity, without a license from Commerce. *See* 15 C.F.R. pt. 744, Supplement No. 4; 15 C.F.R. § 744.11 ("License requirements, limitations on use of license exceptions and license application review policy will be imposed under this section by adding an entity to the Entity List . . ."); *see also* 15 C.F.R. §§ 734.13–734.16. An entry on the Entity List will specify the scope of the licensing requirement and licensing policy. The availability of license exceptions is extremely limited. *See* 15 C.F.R. § 744.11(a).

All decisions regarding additions to, removals from, or other modifications to the Entity List are made by the End-User Review Committee, an interagency committee chaired by the Department of Commerce and composed of representatives from the Departments of State,

---

[2] Defined as the shipment or transmission of an item out of the United States or the release of technology to a foreign person. *See* 15 C.F.R. § 734.13.
[3] Defined as the shipment or transmission of a U.S.-origin item from one foreign country to another or the release of U.S.-origin technology by a foreign person of one country to a foreign person of another country. *See* 15 C.F.R. § 734.14.
[4] Defined as a change in end use or end user of a U.S.-origin item within the same foreign country. *See* 15 C.F.R. § 734.16.

Defense, Energy and, where appropriate, the Treasury.  *See* 15 C.F.R § 744.16(d);  Addition of Certain Entities to the Entity List; Revision of Existing Entities on the Entity List, 85 Fed. Reg. 44,159 (July 22, 2020).  The Committee makes decisions to add an entry to the Entity List by majority vote and decisions to remove or modify an entry by unanimous vote.  *See* 15 C.F.R. pt. 744, Supplement No. 5.

The Export Administration Regulations provide that an entity may be added to the Entity List if "there is reasonable cause to believe, based on specific and articulable facts, that the entity has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States and those acting on behalf of such entities."  15 C.F.R. § 744.11(b).  That regulatory provision offers "[e]xamples" that provide "an illustrative list of activities that could be contrary to the national security or foreign policy interests of the United States," such as "[s]upporting persons engaged in acts of terror," and "[p]reventing accomplishment of an end use check conducted by or on behalf of" Commerce.  *Id.*

Since the Entity List's creation in 1997, the Committee has added foreign persons for a variety of national security and foreign policy reasons.  In recent years, it has repeatedly cited conduct implicating human rights abuses and violations as potential grounds for inclusion on the Entity List.  *See* Addition of Person to the Entity List, 79 Fed. Reg. 21,394, 21,394 (Apr. 16, 2014) ("Since its initial publication, grounds for inclusion on the Entity List have expanded to include activities sanctioned by the State Department and activities contrary to U.S. national security or foreign policy interests, including terrorism and export control violations involving abuse of human rights."); Addition of Person to the Entity List, 79 Fed. 24,558 (May 1, 2014) (same); Addition of Person to the Entity List, 79 Fed. 24,563 (May 1, 2014) (same). Since October 2019,

the Committee has added numerous entities implicated in human rights violations and abuses in the Xinjiang Uyghur Autonomous Region of China. *See* Addition of Certain Entities to the Entity List, 84 Fed. Reg. 54,002, 54,003 (Oct. 9, 2019) (these entities "have been implicated in human rights violations and abuses in the implementation of China's campaign of repression, mass arbitrary detention, and high-technology surveillance against Uyghurs, Kazakhs, and other members of the Muslim minority groups in the [Xinjiang Uyghur Autonomous Region]."); Addition of Certain Entities to the Entity List, 85 Fed. Reg. 34,503 (June 5, 2020) (same); Addition of Certain Entities to the Entity List, 85 Fed. Reg. 44,159 (July 22, 2020) (same); Addition of Certain Entities to the Entity List, 86 Fed. Reg. 33,119, 33,119 (June 24, 2021) (same); Addition of Certain Entities to the Entity List, 86 Fed. Reg. 36,496, 36,497 (July 12, 2021) (same).

Once added to the Entity List, an entity "may request that its listing be removed or modified" by submitting in writing the reasons for its request to the Chair of the Committee. 15 C.F.R. § 744.16(e).

### B. Statutory Authority for the Entity List

Since at least 1942, Congress has authorized the Executive to control the export of weapons, processing materials, technical data, and other sensitive items. *See* Act of June 30, 1942, ch. 461, 56 Stat. 463. In 2001, the statutory authority for most of the Commerce Department's export regulations—the Export Administration Act of 1979—expired and Congress did not re-authorize the legislation. *See Micei Int'l v. Dep't of Commerce*, 613 F.3d 1147, 1150 (D.C. Cir. 2010). To ensure there was no gap in the Commerce Department's authority to control exports, the President issued an executive order under the International Emergency Economic Powers Act and directed the Department to continue enforcing the export regulations "as if they

were 'in full force and effect.'" *Id.* (quoting Exec. Order 13222 § 2, 66 Fed. Reg. 44025, 44025 (Aug. 17, 2001)).

In 2018, Congress passed the Export Control Reform Act. *See* 50 U.S.C. §§ 4801 *et seq.*, John S. McCain National Defense Authorization Act for Fiscal Year 2019, Pub. L. No. 115-232, 132 Stat. 1636, 2208 (2018). Among other things, the Reform Act repeals nearly all of the long-lapsed Export Administration Act of 1979, and provides a new statutory authority for the Export Administration Regulations, including the maintenance of the Entity List. *See* Reform Act § 1766(a), 132 Stat. at 2232 (repealing nearly all of the Export Administration Act); *see generally* 50 U.S.C. §§ 4801–4826 (granting authorities to the President, Secretary of Commerce, and other officials to promulgate and administer export controls).

The Reform Act sets forth policies to be considered when implementing export controls. The Act provides that U.S. "national security and foreign policy . . . require that the export, reexport, and in-country transfer of items . . . be controlled" for several purposes. 50 U.S.C. § 4811(2). Among others, the statute expressly provides for export controls to effectuate "the foreign policy of the United States, including the protection of human rights and the promotion of democracy." *Id.* § 4811(2)(D).

"In order to carry out" the policies announced in section 4811—including the protection of human rights—the Act directs the President to control "the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States." *Id.* § 4812(a)(1). And in implementing that authority, it requires the President to "enforce the controls through means such as regulations" as well as "lists of foreign persons who threaten the national security or foreign policy of the United States." *Id.* § 4812(b)(7).

In addition to vesting authority in the President, section 4813(a) of the Act states that the Secretary of Commerce, "[i]n carrying out [the Act[5] on behalf of the President," and in consultation with "the Secretary of State, the Secretary of Defense, the Secretary of Energy, and the heads of other Federal agencies as appropriate," shall "establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States pursuant to the policy set forth in section 4811(2)(A) of this title." *Id*. § 4813(a)(2). The policy announced in section 4811(2)(A) addresses controlling the release of items for use in weapons of mass destruction, conventional weapons, acts of terrorism, military programs, and activities aiming to cause significant interference with or disruption of critical infrastructure. *Id*. § 4811(2)(A).

Section 4813(a)'s grant of authority to the Secretary does not end there. Among other things, the section further directs the Secretary—again in carrying out the Act on behalf of the President and in consultation with others—to "undertake any other action as is necessary to carry out [the Act] that is not otherwise prohibited by law." 50 U.S.C. § 4813(a)(16). This provision thus gives the Secretary the power to effectuate the President's authority provided in section 4812, which includes exercising export control authority through lists of foreign persons who threaten U.S. foreign policy, *id*. § 4812(a)(1), (b)(7), including "the protection of human rights," *id*. § 4811(2)(D).

Finally, the Reform Act makes clear that all "delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action" that were issued under the prior Export Administration Act or the International Emergency Economic Powers Act, "shall continue

---

[5] Several provisions in the Reform Act refer to "this subchapter," but the pertinent subchapter is the entirety of the Reform Act, save for two short subchapters addressing "anti-boycott" controls, *see* 50 U.S.C. §§ 4841–43, and an undersecretary and two assistant secretary positions, §§ 4851–52, neither of which are relevant to this case. For ease of reading, the defendants have replaced "this subchapter" with "[the Act]" or "[the Reform Act]."

in effect according to their terms until modified, superseded, set aside or revoked under the authority" set forth in the Reform Act. *Id*. § 4826(a).

## II.     Factual Background

On July 22, 2020, the Committee placed Changji and ten other entities on the Entity List. 85 Fed. Reg. at 44,159.   According to the Amended Complaint, Changji operates a spinning mill facility in Xinjiang, China for the Esquel group of companies, a textile and apparel manufacturing business based in Hong Kong. Am. Compl. ¶¶ 2, 24 (ECF No. 8). Esquel Enterprises Limited, another plaintiff in this action, "is the operating arm of Esquel," *id*. ¶ 22, and Esquel Apparel Inc., the third plaintiff, is headquartered in New York and "provides primarily merchandising services to Esquel Enterprises, specifically in connection with Esquel Enterprise's U.S. customers." *Id*. ¶ 23.

As the Committee explained in placing Changji and the other entities on the Entity List, it "reviewed and applied § 744.11(b) (Criteria for revising the Entity List)," and "made the requisite determination" that they are "engaging in or enabling activities contrary to the foreign policy interests of the United States." 85 Fed. Reg. at 44,159.  The Committee determined that Changji and the other entities had been "implicated in human rights violations and abuses in the implementation of China's campaign of repression, mass arbitrary detention, forced labor and high-technology surveillance against Uyghurs, Kazakhs, and other members of Muslim minority groups in the Xinjiang Uyghur Autonomous Region" of China. *Id*. Specific to Changji, the Committee found that the company is "engaging in activities contrary to the foreign policy interests of the United States through the practice of forced labor involving members of Muslim minority groups" in Xinjiang. *Id*. It determined that Changji's conduct "raises sufficient concern that prior review of exports, reexports or transfers (in-country) of all items subject to the [Export

Administration Regulations] involving [Changji], and the possible imposition of license conditions or license denials on shipments to [Changji], will enhance [the Bureau of Industry and Security[6]]'s ability to prevent items subject to the [Export Administration Regulations] from being used in activities contrary to the foreign policy interests of the United States." *Id*. at 44,160.

On September 25, 2020, Esquel Holdings Inc., on behalf of its wholly-owned subsidiary Changji, submitted a request for Changji's removal from the Entity List. ██████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████ Subsequently, Changji submitted multiple supplements in support of its request, including responses to a set of questions posed by the Committee. On July 5, 2021, the Government notified Changji that it would inform it of the outcome of the Committee's review no later than August 1, 2021.

On July 31, 2021, the Committee decided to conditionally approve Changji's request for removal from the Entity List ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

---

[6] The Bureau of Industry and Security is a component of the Department of Commerce and one of the defendants here.

*See* Borman Letter (under seal).

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████

### III.    This Lawsuit

On July 6, 2021, Changji and its affiliated entities filed this lawsuit, challenging Changji's placement on the Entity List.  Compl. (ECF No. 1); *see also* Am. Compl.  The plaintiffs' Amended Complaint asserts three causes of action.  First, it argues that its listing was *ultra vires* because the Reform Act permits additions to the Entity List for only certain types of activities that do not include human rights abuses, and because the Government allegedly neither "possessed nor offered any 'specific and articulable facts'" for Changji's listing.  Am. Compl. ¶¶ 84-91 (Count I) (citing 15 C.F.R. § 744.11).  Second, the plaintiffs repackage these assertions to claim a violation of the APA, while further alleging that the defendants "failed to provide Plaintiffs with advance notice or a sufficient opportunity to be heard regarding the listing."  *Id.* ¶¶ 92-97 (Count II).  And third, the plaintiffs assert a violation of due process, arguing that they did not receive "constitutionally mandated due process prior to any deprivation of their constitutionally protected interest," including, "at a minimum, the right to notice of the basis for Defendants' decisions and an opportunity to be heard, including an opportunity to rebut whatever evidence on which the government relied."  *Id.* ¶¶ 98-104 (Count III).

After the plaintiffs filed their lawsuit, the Government reiterated that it expected the Committee to render a decision on Changji's request for removal by August 1, 2021.  Nevertheless, the plaintiffs on July 19, 2021 moved for a preliminary injunction, challenging the Committee's

July 2020 decision to add Changji to the Entity List. Pls.' Mem. in Supp. of Mot. for Prelim. Inj. ("Br.") (ECF No. 9). Their motion seeks preliminary relief only on the basis of their Amended Complaint's first claim—that the Committee's July 2020 decision to add Changji to the Entity List was allegedly *ultra vires*. *See* Br. at 13-20.

## STANDARD OF REVIEW

The preliminary injunctive relief the plaintiffs seek constitutes an "extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). As such, the plaintiffs must "by a clear showing, carr[y] the burden of persuasion," *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir. 2004), and "establish that [they are] likely to succeed on the merits, . . . likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [their] favor, and that an injunction is in the public interest," *Winter*, 555 U.S. at 20.[7] Further, where "the injunction sought would alter, rather than preserve, the status quo"—which the plaintiffs seek to do here by attempting to undo the implementation or enforcement of an Entity List designation made over a year ago—the movants must meet an even higher standard: they must demonstrate "a clear entitlement to relief" or that "extreme or very serious damage will result if the injunction does not issue." *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 279 (D.D.C. 2005).

## ARGUMENT

### I.    The Plaintiffs Are Unlikely to Succeed on the Merits.

The plaintiffs' motion for a preliminary injunction should be denied because they have not established a likelihood of success on the merits. To begin with, the plaintiffs' motion does not rely on their procedural due process claim, which is unsurprising in light of the plaintiffs taking

---

[7] In light of *Winter*, the "continued viability of" the "sliding scale" approach the D.C. Circuit has used in the past "is highly questionable." *Singh v. Carter*, 185 F. Supp. 3d 11, 16 (D.D.C. 2016. Regardless, the plaintiffs fail to carry their burden here.

full advantage of Commerce's regulations that specify a precise process for making requests for removal from the Entity List and evaluating such requests. *See* 15 C.F.R. § 744.16(e). Nor do the plaintiffs rely on their APA claim, and for good reason: the Reform Act expressly precludes APA challenges to all "functions" exercised under the Act, which indisputably includes additions to the Entity List. 50 U.S.C. § 4821(a); *see State v. United States Dep't of State*, 996 F.3d 552, 564 (9th Cir. 2021) ("Congress not only barred APA challenges to Commerce's Reform Act functions; it rendered them, in effect, judicially unreviewable."). Instead, eschewing any constitutional or statutory basis for relief, the plaintiffs rely solely on their claim for "*ultra vires*" review, arguing the defendants have acted "beyond" their delegated authority. Br. at 14, 18.

*Ultra vires* review is "extraordinarily narrow," *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984), covering only "extreme agency error," *DCH Reg'l Med. Ctr. V. Axar*, 925 F.3d 503, 509 (D.C. Cir. 2019) (citation omitted). It is not enough that an agency merely misinterpret a law or misapply facts. *Griffith v. Fed. Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988). Rather, it must "patently misconstrue[] a statute, disregard[] a specific and unambiguous statutory directive, or violate[] a specific command of a statute." *Organogenesis, Inc. v. Sebelius*, 41 F. Supp. 3d 14, 23 (D.D.C. 2014) (citation omitted); *see Fla. Health Sci. Ctr. Inc. v. Sec'y of Health & Human Servs.*, 830 F.3d 515, 522 (D.C. Cir. 2016) ("To challenge agency action on the ground that it is *ultra vires*, [the plaintiff] must show a patent violation of agency authority. . . . A violation is 'patent' if it is '[o]bvious' or 'apparent.'") (citations omitted). *Ultra vires* review is thus "essentially a Hail Mary pass – and in court as in football, the attempt rarely succeeds." *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) (Kavanaugh, J.). Here, the plaintiffs fail to meet this exceptionally high bar.

**A. The Defendants May Permissibly Maintain Lists of Foreign Persons Who Threaten Foreign Policy Interests through Human Rights Abuses.**

The plaintiffs challenge the Committee's July 2020 decision to add Changji to the Entity List for "engaging in activities contrary to the foreign policy interests of the United States," including Changji's implication in "human rights violations and abuses" through the practice of "forced labor involving members of Muslim minority groups in the [Xinjiang Uyghur Autonomous Region]" of China. 85 Fed. Reg. at 44,159.

According to the plaintiffs, Changji's listing was not authorized under the Reform Act because human rights abuses purportedly are not a permissible reason to make additions to the Entity List. In the plaintiffs' view, placements on the Entity List are proper only if the relevant entity is involved in one of the five types of activities listed in 50 U.S.C. § 4811(2)(A), specifically:

    (i)   the proliferation of weapons of mass destruction or of conventional weapons;

    (ii)  the acquisition of destabilizing numbers or types of conventional weapons;

    (iii) acts of terrorism;

    (iv) military programs that could pose a threat to the security of the United States or its allies; or

    (v)  activities undertaken specifically to cause significant interference with or disruption of critical infrastructure.

*Id*. The plaintiffs reach this conclusion by focusing on section 4813(a)(2), which states that the Secretary of Commerce, in consultation with other agencies, "shall . . . establish and maintain a list of foreign persons and end-uses that are determined to be a threat to the national security and foreign policy of the United States pursuant to the policy set forth in section 4811(2)(A) of this title." The plaintiffs assert this provision not only *requires* the maintenance of a list of foreign persons involved in section 4811(2)(A)'s five types of activities, but by negative inference

*prohibits* maintaining any list of foreign persons who threaten national security or foreign policy in other ways. As explained below, this construction suffers a number of flaws, each independently fatal.

### i. Sections 4811(2)(D) and 4813(a)(16) Authorize Listings for Human Rights Reasons.

To start, the plaintiffs' reading of the Reform Act ignores the basic precept that "[s]tatutes must be read as a whole." *United States v. Atl. Rsch. Corp.*, 551 U.S. 128, 135 (2007) (quoting *King v. St. Vincent's Hosp.*, 502 U.S. 215, 221 (1991)). Namely, it fails to consider other provisions of the statute that authorize the defendants to list foreign persons for conduct that is contrary to the national security and foreign policy of the United States beyond those detailed in section 4811(2)(A). Specifically, the plaintiffs disregard section 4813(a)(16), which states that the Secretary of Commerce "shall . . . undertake any other action as is necessary to carry out [the Act] that is not otherwise prohibited by law," as well as section 4811(2)(D), which explains that export controls under the Reform Act should further, among other things, "the foreign policy of the United States, including *the protection of human rights* and the promotion of democracy." *Id.* § 4811(2)(D) (emphasis added).

Changji's placement on the Entity List for human rights violations falls squarely within the plain meaning of section 4813(a)(16). Changji's addition to the Entity List is an action "other" than the actions already required in that section, and the defendants have determined that maintaining a list of foreign persons who have been implicated in human rights abuses and violations is "necessary" to carry out the Reform Act, including its policy of using export controls for "the protection of human rights," 50 U.S.C. § 4811(2)(D); *see* 85 Fed. Reg. at 44,159 (listing Changji and others because the defendants "determined" they acted contrary to U.S. foreign policy interests by engaging in conduct that implicated human rights abuses and violations).

15

Critically, this straightforward reading of the statute does not render superfluous section 4813(a)(2)'s requirement to maintain a list "pursuant to the policy set forth in section 4811(2)(A) of this title." Just the opposite, subsections (a)(2) and (a)(16) of section 4813 sit comfortably together because they address different requirements. Subsection (a)(2) requires, without precondition, that the Secretary establish and maintain a list of foreign persons to address threats to the national security and foreign policy of the United States for the five reasons detailed in section 4811(2)(A). Subsection (a)(16), on the other hand, directs the Secretary to undertake other actions (such as listing foreign persons for other reasons), as necessary to carry out the Reform Act, including its policy of protecting human rights. Thus, while the Secretary *must* establish and maintain the list described in subsection (a)(2), the Secretary is not required to take other actions (including maintaining a list for other reasons) *unless* doing so becomes necessary to carry out the statute. This plain reading correctly accounts for both subsections without turning either into surplusage.

Reinforcing this conclusion, section 4812(b)(7)—which the plaintiffs similarly ignore—directs the President to further *all* of the Reform Act's statutory purposes by enforcing export controls through, among other things, "lists of foreign persons who threaten the national security or foreign policy of the United States." The Secretary of Commerce, in turn, carries out the Reform Act "on behalf of the President." *Id.* § 4813(a). Tellingly, the plaintiffs fail to explain why Congress would authorize the President to list foreign persons for all of the Act's statutory purposes (including the protection of human rights), but bar the Secretary of Commerce, who carries out the Reform Act on behalf of the President, from doing the same.

And even if there were some ambiguity in the statute (there is not), the defendants' interpretation is at least reasonable and merits deference. *See Chevron, U.S.A., Inc. v. Nat. Res.*

*Def. Council*, 467 U.S. 837 (1984).   Just as fundamental, their reading is not so patently and obviously wrong as to satisfy the extraordinarily high standard for *ultra vires* review.   *See Griffith*, 842 F.2d at 494 (holding  no *ultra vires* review where agency's interpretation was "not the only possible construction of the statutory language, [but] surely a colorable one").

### ii.   Section 4813(a)(2) Does Not Limit the Permissible Reasons for Listings under Other Reform Act Authorities.

The plaintiffs' interpretation suffers the additional problem of improperly reading into section 4813(a)(2) a limitation not found in the text of that provision.   According to the plaintiffs, because section 4813(a)(2) requires the Secretary to maintain a list of foreign persons involved in the five areas of concern in section 4811(2)(A), "Defendants *cannot* list an entity based on the entity's alleged involvement in some other, non-specified area." Br. at 15.   But that conclusion does not follow from the relevant text.   Nowhere does section 4813(a)(2)—or any other Reform Act provision—state that lists may be maintained only for the reasons reflected in § 4811(2)(A).   To the contrary, section 4813(a)(2) states only that the Secretary *must* maintain lists of foreign persons involved in section 4811(2)(A) activities—not that the Secretary is *prohibited* from maintaining lists of other foreign persons in connection with activities that are not specified in section 4811(2)(A).

To get around this plain reading, the plaintiffs' fall back on the *expressio unius*, or negative-implication, canon. Br. at 16.   But courts routinely reject that canon where the context suggests it does not apply.   *See, e.g. Chevron U.S.A. Inc. v. Echazabal*, 536 U.S. 73, 80 (2002) (rejecting argument based on the negative-inference canon); *United States v. Vonn*, 535 U.S. 55, 65 (2002) (same); *United Dominion Indus., Inc. v. United States*, 532 U.S. 822, 836 (2001) (same). Moreover, as the Supreme Court has rightly recognized, the canon is "questionable [] in light of the dubious reliability of inferring specific intent from silence." *Pauley v. BethEnergy Mines, Inc.*,

17

501 U.S. 680, 703 (1991) (quoting Sunstein, Law and Administration After *Chevron,* 90 Colum. L. Rev. 2071, 2109, n.182 (1990)).

The negative-implication canon does not apply here. For starters, this case involves the scope of an agency's statutory authority—a context in which Congress routinely leaves questions unresolved as a way to delegate authority to the agency. The negative-implication canon presumes the opposite: that Congress provides limitations and prohibitions through silence. Accordingly, section 4813(a)(2)'s silence on whether the defendants may list foreign persons for alternative reasons suggests not a limitation on authority, but instead congressional intent to leave the question to the Secretary's discretion. *See Cheney R.R. Co. v. Interstate Com. Comm'n*, 902 F.2d 66, 69 (D.C. Cir. 1990) (negative-implication canon is "an especially feeble helper in an administrative setting, where Congress is presumed to have left to reasonable agency discretion questions that it has not directly resolved."); *Mobile Comm'ns Corp. of Am. v. Fed. Comm'ns Comm'n*, 77 F.3d 1399, 1404–05 (D.C. Cir. 1996) ("The [negative implication] maxim has little force in the administrative setting, where we defer to an agency's interpretation of a statute unless Congress has directly spoken to the precise question at issue.") (citations omitted).

Further, the plaintiffs' proposed limitation does not make sense in light of the statutory scheme as a whole. As explained, section 4813(a)(16) grants the Secretary broad authority to take additional actions necessary to carry out the Reform Act. The D.C. Circuit has repeatedly recognized that Congress is unlikely to include silent limitations alongside such broad grants of authority. *See Creekstone Farms Premium Beef, LLC v. Dep't of Agric.*, 539 F.3d 492, 500 (D.C. Cir. 2008) (holding that when a statute "contains broad language authorizing the agency to promulgate regulations necessary to 'carry out' the statute," the negative-implication canon "has minimal, if any, application"); *Adirondack Med. Ctr. v. Sebelius*, 740 F.3d 692, 697 (D.C. Cir.

2014) ("[W]hen countervailed by a broad grant of authority contained within the same statutory scheme, the [negative-implication] canon is a poor indicator of Congress' intent."). In addition, other language in the Reform Act demonstrates that where Congress intends to limit the particular objectives the defendants may further through export controls, it does so expressly, not by implication. Section 4811(11), for example, states that the authority under the Reform Act "may be exercised *only in furtherance of* all of the objectives set forth in paragraphs (1) through (10)" of that section. *Id.* (emphasis added). Yet Congress chose not to include such language in section 4813(a)(2). These considerations simply underscore why the negative-implication canon cannot apply here.

At any rate, even if the canon were applicable (and it is not), the plaintiffs still could not succeed on their *ultra vires* claim. By definition, the negative-implication canon can apply only where statutory language is otherwise silent on a question. The whole point of the canon is to give meaning to that statutory silence. But an agency's reading that misunderstands the implications of statutory silence, even if incorrect, cannot be considered patently and unambiguously wrong. If the statute were devoid of ambiguity to begin with, the canon would not be necessary. *Cf. Clinchfield Coal Co. v. Fed. Mine Safety & Health Rev. Comm'n*, 895 F.2d 773, 779 (D.C. Cir. 1990) (negative-implication canon insufficient to establish unambiguous intent under *Chevron*); *Trudeau v. Fed. Trade Comm'n*, 456 F.3d 178, 190 (D.C. Cir. 2006) (*ultra vires* review "represents a more difficult course . . . than would review under the APA"). The plaintiffs contend the D.C. Circuit's application of the canon in *Halverson v. Slater*, 129 F.3d 180 (D.C. Cir. 1997), is analogous to this case, but *Halverson* did not involve a claim for *ultra vires* review, much less two statutory provisions that are easily read together. Accordingly, the negative-implication canon "is simply too thin a reed to support the conclusion that Congress has clearly resolved this issue,"

19

*Texas Rural Legal Aid, Inc. v. Legal Servs. Corp.*, 940 F.2d 685, 694 (D.C. Cir. 1991), and the plaintiffs thus cannot satisfy *ultra vires* review.

### iii.   The History of the Reform Act Confirms that Human Rights Concerns are a Permissible Purpose for Placement on the Entity List.

Aside from its text and structure, the history of the Reform Act also demonstrates why human rights concerns are a statutorily authorized reason for placing foreign persons on the Entity List. As noted, prior to the passage of the Reform Act in 2018, the defendants' authority to regulate exports was grounded in the Export Administration Act of 1979, or, when that act lapsed, in executive orders under the International Emergency Economic Powers Act. *See Micei Int'l*, 613 F.3d at 1150. The purpose of the Reform Act was to repeal the then-lapsed Export Administration Act and provide a long-term statutory basis for the Commerce Department's export control scheme. *See* Reform Act § 1766(a), 132 Stat. at 2232; *see generally* 50 U.S.C. §§ 4801–4826. Congress, accordingly, did not write on a blank slate. It modeled much of the Reform Act on Commerce's then-existing regulations. *See, e.g.*, *Fed. Express Corp. v. Dep't of Commerce*, 486 F. Supp. 3d 69, 81 (D.D.C. 2020) (noting that portions of Commerce's regulations and the Reform Act are "almost identical"), *appeal filed*, No. 20-5337 (D.C. Cir. Nov. 16, 2020). And it expressly directed that those regulations, as well as all export-related "delegations, rules, . . . orders, determinations, licenses, or other forms of administrative action" would "continue in effect" until otherwise modified or revoked under the Reform Act. 50 U.S.C. § 4826(a). The legislative history confirms the Reform Act was intended to "preserve" those administrative actions "until changed or revoked under the new authority." Conf. Rep. to Accompany H.R. 5515, H.R. Rep. No. 115-874, 1079 (2018).

Prior to the Reform Act's 2018 enactment, the defendants added a number of foreign persons to the Entity List for reasons *other than* engaging in the five activities now listed in

section 4811(2)(A), such as activities contrary to U.S. embargoes and activities in support of foreign governments' efforts to undermine democratic institutions. *See, e.g.*, Addition of Certain Persons to the Entity List, 80 Fed. Reg. 47402 (Aug. 7, 2015) ("This final rule clarifies the introductory text of the Entity List to specify that the embargoes and other special controls part of the [Export Administration Regulations] is also used to add entities to the Entity List."); Addition of Certain Entities to the Entity List, 82 Fed. Reg. 722, 723 (Jan. 4, 2017) (adding entities for "tampering, altering, or causing the misappropriation of information with the purpose or effect of interfering or undermining election process or institutions" in contravention of Commerce authorities and Executive Order 13694); Addition of Certain Persons to the Entity List, 79 Fed. Reg. 21,394, 21,395 (Apr. 16, 2014) (adding two entities because assets were misappropriated in the Russian occupation of Crimea in contravention of Commerce authorities and Executive Order 13660."); Addition of Certain Entities to the Entity List; Correction of Existing Entry on the Entity List, 86 Fed. Reg. 35,389 (July 6, 2021) (adding entities that provide support to a ministry responsible for a military coup in Burma). These listings were made pursuant to the criteria in 15 C.F.R. § 744.11(b), which likewise predates the Reform Act and includes an illustrative list of potential bases for listing that does not mirror the reasons in section 4811(2)(A). *See, e.g.*, 15 C.F.R. § 744.11(b)(4)-(5) ("[p]reventing accomplishment of an end use check" or "[e]ngaging in conduct that poses a risk of violating the [Export Administration Regulations]"). In addition, as early as 2014 the Commerce Department stated in several administrative orders that it viewed human rights abuses as a permissible basis for placing foreign persons on the Entity List. *See supra* at 5–6.

Congress in 2018 was presumably aware of these prior administrative actions and interpretations, including the defendants' reading of 15 C.F.R. § 744.11(b) as permitting additions

to the Entity List for reasons beyond the five activities now listed in section 4811(2)(A), as well as their expressed position that human rights concerns are an appropriate basis for making additions to the Entity List. *Cf. Cannon v. Univ. of Chicago*, 441 U.S. 677, 697–98 (1979) (presuming that Congress was "aware of the prior interpretation of" a similar statute "and that that interpretation reflects [its] intent with respect to" the later-enacted statute). Yet Congress nonetheless preserved the defendants' regulations and administrative actions in the Reform Act, expressly stating those actions would "continue in effect" under the new statute. 50 U.S.C. § 4826(a). This provides clear evidence that Congress did not intend to narrow the bases on which foreign persons could be added to the Entity List. Indeed, it would make little sense for Congress to preserve the defendants' regulations and administrative actions in one section of the Act while simultaneously removing the statutory basis for those regulations and orders in another. For this reason as well, the plaintiffs' reading of section 4813(a)(2) is incorrect and should be rejected.

In sum, the plaintiffs advance a reading of the Reform Act that is contrary to the text, incorrect in context, internally inconsistent, and at odds with the relevant history. It should thus be rejected. But even if the plaintiffs' interpretation somehow were the best reading of the statute, they still would not come close to demonstrating the kind of obvious misinterpretation by the defendants necessary to satisfy *ultra vires* review.

### B. The Defendants Acted Consistent with their Regulatory Authority, and the Plaintiffs Cannot Assert an *Ultra Vires* Claim to the Contrary.

The plaintiffs also press their *ultra vires* claim by arguing that the defendants "neither possessed nor offered any 'specific and articulable facts'" when they added Changji to the Entity List, as purportedly required by 15 C.F.R. § 744.11(b). *See* Br. at 14, 18-20 (citation omitted). But non-statutory review is "available only to determine whether the agency has acted 'ultra vires'—that is, whether it has 'exceeded its *statutory* authority.'" *Mittleman v. Postal Regul.*

*Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (emphasis added) (quoting *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1173 (D.C. Cir. 2003)). The plaintiffs' argument fails to allege the violation of any statute. Instead, the plaintiffs rely on a purported violation of a regulation promulgated by Commerce, yet "none of [the D.C. Circuit's] decisions have placed an agency's failure to follow its own regulations in the 'ultra vires' category." *Eagle Tr. Fund v. United States Postal Serv.*, 811 F. App'x 669, 670 (D.C. Cir. 2020) (per curiam), *petition for cert. docketed*, No. 20-1026 (U.S. Jan. 28, 2021); *see Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 422 (D.D.C. 2020) ("[A] conflict between the Bowers Memo and postal regulations would not, by itself, mean that USPS acted in excess of its statutory authority, which is the sole basis for relief on an *ultra vires* claim.") (citation omitted). The plaintiffs' argument falls outside the narrow parameters for *ultra vires* review and therefore fails at the outset.

Even if an alleged violation of a regulation could serve as the basis for an *ultra vires* claim, the plaintiffs' remain unable to meet its demanding standard. Notwithstanding the plaintiffs' suggestions to the contrary, 15 C.F.R. § 744.11(b) does not require disclosing to a listed entity the specific facts underlying that entity's designation. Rather, that regulatory provision provides the "[c]riteria for revising the Entity List," and explains that the Committee may vote to add to the list "[e]ntities for which there is reasonable cause to believe, based on specific and articulable facts, that the entity has been involved, is involved, or poses a significant risk of being or becoming involved in activities that are contrary to the national security or foreign policy interests of the United States." 15 C.F.R. § 744.11(b). Setting aside that the Committee *did* articulate the factual basis for Changji's listing, *see* 85 Fed. Reg. at 44,159 (citing "the practice of forced labor involving members of Muslim minority groups" in Xinjiang)—the regulation does not mandate the

Committee make those facts, or any other facts, public. It requires only that the Committee's decision be "based" on specific and articulable facts, not that those facts be disclosed. 15 C.F.R. § 744.11(b). Thus, the plaintiffs' assertions do not reflect *any* violation of the regulation, much less one that is patent. *See Fla. Health Sci. Ctr.*, 830 F.3d at 522; *cf. Griffith*, 842 F.2d at 494.

Equally wide of the mark is the plaintiffs' attempt to obtain *ultra vires* review by arguing that the defendants lacked specific and articulable facts in the first place. That assertion of insufficient evidence is precisely the sort of "[g]arden-variety errors of law or fact [that] are not enough" to sustain an *ultra vires* claim. *Griffith*, 842 F.2d at 493; *see also Nyunt*, 589 F.3d at 449 (explaining that agency's error must be "so extreme that one may view it as jurisdictional or nearly so") (citation omitted). Far from a cognizable *ultra vires* claim, the plaintiffs' argument amounts to an APA challenge asserting the agency acted arbitrarily and capriciously in lacking a basis for Changji's designation. But again, the Reform Act expressly precludes such APA challenges, 50 U.S.C. § 4821(a), and the plaintiffs cannot nullify that provision by recasting an APA claim under a different label. *See Eagle Tr. Fund*, 811 F. App'x at 670 (holding that claim alleging lack of reasoned decision making "is a heartland arbitrary-and-capricious challenge under the APA, not a claim that the [agency] exceeded its statutory authority").

The plaintiffs' efforts to introduce evidence that they believe clears Changji's name, *see* Br. at 18-19, does not alter the equation. Even when, unlike here, a plaintiff can bring an APA claim challenging a final agency action, it must do so based on the information considered by the agency in making the challenged determination, not a new record created by a plaintiff in litigation. *See Maritel, Inc. v. Collins*, 422 F. Supp. 2d 188, 196 (D.D.C. 2006) ("To ensure fair review of an agency action, therefore, the court 'should have before it neither more nor less information than did the agency when it made its decision.'") (quoting *IMS, P.C. v. Alvarez*, 129 F.3d 618, 623

24

(D.C. Cir. 1997)).  Nor should the plaintiffs be heard to complain otherwise—to the extent they want the Committee to consider this sort of evidence, they may present it in a request for removal pursuant to 15 C.F.R. § 744.16(e), as they have already done.  The plaintiffs' attempt to present such evidence in the context of litigation is not proper and should be rejected.

In sum, regardless of how the plaintiffs formulate their *ultra vires* claim, they have not met its exacting standard and thus have not shown a likelihood of success on the merits.

## II.  The Plaintiffs Have Not Established Certain and Imminent Irreparable Harm Justifying a Preliminary Injunction.

As shown above, the plaintiffs cannot demonstrate a likelihood of success on the merits, and thus the Court need not consider the irreparable harm factor.  *Elec. Priv. Info. Ctr. v. FTC*, 844 F. Supp. 2d 98, 101 (D.D.C. 2012) (where no likelihood of success on the merits, courts "need not proceed to review the other three preliminary injunction factors") (quoting *Ark. Dairy Coop. Ass'n v. Dep't of Agric.*, 573 F.3d 815, 832 (D.C. Cir. 2009)), *aff'd*, 2012 WL 115566 (D.C. Cir. Mar. 5, 2012).  Yet even if the Court were inclined to proceed further, there is little doubt the plaintiffs fail to satisfy the "high standard for irreparable injury" necessary to obtain preliminary injunctive relief.  *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006).

To obtain such relief, the plaintiffs must establish injury that is "'both certain and great,' 'actual and not theoretical,' 'beyond remediation,' and 'of such *imminence* that there is a clear and present need for equitable relief to prevent irreparable harm.'"  *Mexichem Specialty Resins, Inc. v. EPA*, 787 F.3d 544, 555 (D.C. Cir. 2015) (citing *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).  The plaintiffs "cannot simply make 'broad conclusory statements' about the existence of harm.  Rather, [they] must 'submit[ ] . . . competent evidence into the record . . . that would permit the Court to assess whether [they], in fact, face[] irreparable harm . . . .'"  *Aviles-Wynkoop v. Neal*, 978 F. Supp. 2d 15, 21 (D.D.C. 2013) (quoting *Cornish v. Dudas*, 540 F. Supp. 2d 61, 65 (D.D.C.

25

2008)).  The plaintiffs have failed their burden to put forth sufficient evidence to satisfy this high standard.

As an initial matter, the plaintiffs do not allege a type of harm that is legally sufficient to obtain preliminary relief.  The gravamen of the plaintiffs' alleged irreparable harm is economic loss—damage to its reputation, lost business, and the closure of two of Changji's factories.  *See Air Transport Ass'n. of Am., Inc. v. Exp.-Imp. Bank of the U.S.*, 840 F. Supp. 2d 327, 335 (D.D.C. 2012) ("The loss of business opportunities, market share, and customer goodwill are typically considered to be economic harms," (collecting cases)).  But economic harm is only considered irreparable "where the loss threatens the very existence of the movant's business."  *Wis. Gas Co. v. Fed. Energy Regul. Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985).  "The universe of harms that meets this litmus test is narrow indeed."  *Econ. Rsch. Servs., Inc. v. Resolution Econ., LLC*, 140 F. Supp. 3d 47, 53 (D.D.C. 2015).  "[E]ven where the United States is the defendant, 'a plaintiff must establish that the economic harm is so severe as to cause extreme hardship to the business.'"  *Cal. Ass'n of Priv. Postsecondary Schs. v. DeVos*, 344 F. Supp. 3d 158, 171 (D.D.C. 2018) (quoting *Coal. For Common Sense in Gov't Procurement v. United States*, 576 F. Supp. 2d 162, 168 (D.D.C. 2008)).

Yet the plaintiffs fail to demonstrate that, as a matter of certainty, their alleged economic loss *will* lead to the demise of their companies without preliminary injunctive relief.  First of all, the plaintiffs make no showing as to the scale of the loss in comparison to the size and strength of the organization.   Nor do the plaintiffs go so far as to establish that their businesses cannot be sustained until a decision is reached on the merits or, to put it differently, that the very existence of their businesses depends on immediate relief.  *Cf. Chaplaincy of Full Gospel Churches*, 454 F.3d at 297–98 ("The possibility that adequate compensatory or other corrective relief will be

26

available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.") (internal quotation mark and citation omitted).

Indeed, the plaintiffs' principal reliance on *Xiamoi Corp. v. Department of Defense*, Civ. A. No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021), and *Luokong Technology Corp. v. Department of Defense*, __ F. Supp. 3d __, 2021 WL 1820265 (D.D.C. May 5, 2021), only underscores what is missing here. That is, the record here does not demonstrate the kind of "enormity" of financial loss found in *Xiamoi*, 2021 WL 950144, at \*10-11 (where Plaintiffs demonstrated, among other things, "an enormous loss of approximately $10 billion in market capitalization"), and the "imminent harm" in *Luokong*, that, "[i]f anything," was "even more severe," 2021 WL 1820265, at \*12-13 (where plaintiff demonstrated, among other things, the certain loss of any public market for trading its securities and access to capital markets to fund the enterprise). Here, the plaintiffs merely point to what amounts to short term losses of production orders, speculative loss of market share, and having to take steps to mitigate losses. Br. at 21-26. Consequently, the Court cannot find that the economic loss asserted meets the existential threshold necessary to consider imposing a preliminary injunction. *See, e.g., Econ. Rsch. Servs.*, 140 F. Supp. 3d at 53 ("Given the size and prominence of ERS's parent corporation, and the apparent strength of its own infrastructure, this Court has no reason to believe that ERS's alleged losses threaten the company's very existence."); *Ajilon Prof'l Staffing, PLC v. Kubicki*, 503 F. Supp. 2d 358, 362 & n.6 (D.D.C. 2007) (declining to find irreparable harm where the plaintiff, itself a sizeable corporation, was a subsidiary of one of the "world's largest human resource solution providers").

At the same time, the plaintiffs' claimed harms stem almost entirely from independent decisions of third parties not before the Court. For example, the plaintiffs assert that they will be

unable to obtain items from certain suppliers and *may* lose customers.  Br. at 20-23.  But Changji's addition to the Entity List does not itself preclude suppliers or customers from dealing with the company.  Rather, it requires that suppliers, customers, or other persons obtain a license from Commerce before exporting, reexporting or transferring (in-country) items subject to the Export Administration Regulations when Changji is a party to the transaction.  Whether a third party seeks a license to make U.S. products or other Commerce-regulated items available to Changji, and whether third parties remain Changji customers, is beyond this Court's direct control, and it is possible such claimed harm may not be redressed should this Court grant the extraordinary relief the plaintiffs request.  The plaintiffs remain free to continue their business, and their speculation about what third parties may or may not do in response to an injunction does not demonstrate the type of certain or actual harm necessary for preliminary relief.  *See Mead Johnson Pharm. Grp. v. Bowen*, 655 F. Supp. 53, 53-56 (D.D.C. 1986) (rejecting as "pure speculation" a pharmaceutical company's claim in support of its preliminary injunction motion that it would suffer loss of sales if a competing generic drug were approved and marketed), *aff'd*, 838 F.2d 1332 (D.C. .Cir. 1988).

Finally, the plaintiffs' lengthy delay in seeking a preliminary injunction "stands in stark contrast to the high bar the plaintiffs must clear to show irreparable harm."  *Open Top Sightseeing USA v. Mr. Sightseeing, LLC*, 48 F. Supp. 3d 87, 90 (D.D.C. 2014).  "Courts have found that '[a]n unexcused delay in seeking extraordinary injunctive relief may be grounds for denial because such delay implies a lack of urgency and irreparable harm.'"  *Id.* (quoting *Newdow v. Bush*, 355 F. Supp. 2d 265, 292 (D.D.C. 2005)).  The Committee added Changji to the Entity List on July 22, 2020, and the plaintiffs did not file this action for nearly another *year*, until July 6, 2021.  That substantial delay highlights the speculative nature of the plaintiffs' alleged irreparable harm.  *See, e.g., AARP v. United States Equal Emp. Opportunity Comm'n*, 226 F. Supp. 3d 7, 22 (D.D.C. 2016) (finding

no irreparable harm where the final rules at issue "were promulgated in May 2016, yet [the plaintiff] waited until the end of October to file this suit"). And it underscores that preliminary relief is not necessary here before a full decision on the merits.

### III.  The Balance of the Equities and Public Interest Strongly Disfavor Preliminary Relief ██████████████████████████████████████████████

The balance of equities and public interest also sharply favor the Government. After placement on the Entity List, Changji submitted a request for removal to the Committee pursuant to 15 C.F.R. § 744.16(e), and in that request, ████████████████████████████████



████████████████████████████████ Upon review of the company's submissions, the Committee decided to remove the company from the Entity List subject to conditions, ███████████████

Given this change in posture, the Court should reject the plaintiffs' motion to enjoin the original listing decision while the administrative process regarding Changji's removal is ongoing. It does not further the public interest for the plaintiffs to leapfrog that process by litigating an earlier decision, ███████████████████████████████████████████

"Parties have long been required to exhaust administrative remedies before seeking relief from federal courts." *Hettinga v. United States*, 560 F.3d 498, 502-03 (D.C. Cir. 2009). Requiring the plaintiffs to complete the administrative process here would serve the public interest as well as the functions of exhaustion: It would allow the Government to promote its interest in preventing human rights abuses by further assessing Changji's requested removal from the Entity List. *See*

*Avocados Plus Inc. v. Veneman*, 370 F.3d 1243, 1247 (D.C. Cir. 2004) ("Non-jurisdictional exhaustion serves three functions: giving agencies the opportunity to correct their own errors, affording parties and courts the benefits of agencies' expertise, [and] compiling a record adequate for judicial review[.]") (internal quotation marks and citations omitted).

Preliminary relief is also contrary to the public interest because it would interfere with a formal foreign affairs function of the Executive Branch. The Executive relies on a series of tools to effectuate the national security and foreign policy of the United States, including to protect human rights, and the maintenance of the Entity List is one such tool in this effort. 50 U.S.C. §§ 4811-4813; 15 C.F.R. § 744.16. For years, the defendants have made additions to the Entity List to address a diverse range of actions that are contrary to national security and foreign policy interests, including for reasons other than the five the plaintiffs contend are the only permissible bases for making Entity List additions. *See supra* 20–21. And recently, the defendants have listed a number of foreign persons—including Changji—specifically in connection with conduct implicating human rights violations and abuses. *See supra* at 5–6.

Potentially calling into question some number of these additions to the Entity List without even full consideration on the merits would contravene the public's strong interest in a robust, comprehensive, and varied approach to national security and foreign policy, including through implementing export controls to address human rights concerns. *See Milena Ship Mgmt. Co. v. Newcomb*, 804 F. Supp. 846, 854 (E.D. La. 1992) (holding that injunction "unblocking the plaintiffs' vessels and bank accounts before a full hearing on the merits of OFAC's blocking decisions would risk impermissible interference with Executive and Congressional decisions"). Indeed, the plaintiffs would be hard-pressed to argue that the public interest lies with the financial prosperity of a corporation, rather than the country's continued commitment to human rights policy

denouncing, and taking action to address, the forced labor of religious and ethnic minorities abroad. Worse, the plaintiffs ask this Court to curtail the Executive Branch's foreign affairs and national security authority by way of injunctive relief—a request that turns the longstanding scope of deferential judicial review of agency action in this area on its head. *See Boumediene v. Bush*, 553 U.S. 723, 796 (2008) ("[P]roper deference must be accorded to the political branches" in national security matters).

Given that this case implicates significant issues of foreign policy and national security, and given that the Government has conditionally decided to remove the plaintiffs from the Entity List ███████████████████████ the public interest and balance of the equities weigh heavily against preliminary relief.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction.

Dated: September 2, 2021

BRIAN M. BOYNTON
Acting Assistant Attorney General

BRIGHAM J. BOWEN
Assistant Branch Director

/s/ *Kevin Snell*
KEVIN SNELL
ALEXIS J. ECHOLS
MATTHEW SKURNIK
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, NW
Washington, D.C. 20005
(202) 305-0924
kevin.snell@usdoj.gov

*Counsel for Defendants*