# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————

CHANGJI ESQUEL TEXTILE CO. LTD., *et al.*,

                Plaintiffs,

                v.

GINA M. RAIMONDO, SECRETARY OF COMMERCE, *et al.*,

                Defendants.

—————————————————————

Civ. Action No. 1:21-cv-01798-RBW

## PLAINTIFFS' REDACTED REPLY IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

ARGUMENT .....................................................................................................................3

I.     PLAINTIFFS ARE LIKELY TO SUCCEED IN SHOWING THAT
DEFENDANTS LACKED AUTHORITY TO PLACE CJE ON THE ENTITY
LIST. ........................................................................................................................3

     A.     Defendants Misrepresent The Applicable Legal Standard.......................................3

     B.     Defendants Acted *Ultra Vires* In Adding CJE To The Entity List Based On
Purported Human Rights Violations. .......................................................................7

          1.     *ECRA's Text, Structure, And Purpose Do Not Authorize The
Challenged Action.*......................................................................................7

          2.     *Defendants Cannot Demonstrate That Congress Authorized Or
Permitted Them To List Entities For Reasons Other Than The Ones
Congress Chose.*.........................................................................................11

          3.     *The History Of ECRA Supports Plaintiffs, Not Defendants.*.....................14

     C.     Defendants Acted *Ultra Vires* In Adding CJE To The Entity List Without
Any "Specific And Articulable Facts."....................................................................15

II.     PLAINTIFFS ARE SUFFERING SIGNIFICANT, IRREPARABLE HARM. .................18

III.     THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY
FAVOR AN INJUNCTION. ..................................................................................23

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

<u>CASES</u>:

*32 Cty. Sovereignty Comm. v. Department of State*,
    292 F.3d 797 (D.C. Cir. 2002) ................................................................................23

*Adamski v. McHugh*,
    304 F. Supp. 3d 227 (D.D.C. 2015) ......................................................................16

*Advocate Health Care Network v. Stapleton*,
    137 S. Ct. 1652 (2017) ..........................................................................................10

*Aid Ass'n for Lutherans v. United States Postal Serv.*,
    321 F.3d 1166 (D.C. Cir. 2003) ..............................................................................5

*American Fed'n of Lab. & Cong. of Indus. Orgs. v. Chao*,
    409 F.3d 377 (D.C. Cir. 2005) ................................................................................9

*American Hosp. Ass'n v. Azar*,
    964 F.3d 1230 (D.C. Cir. 2020) ..............................................................................5

*American Mining Cong. v. United States E.P.A.*,
    907 F.2d 1179 (D.C. Cir. 1990) ............................................................................23

*American Petroleum Inst. v. E.P.A.*,
    706 F.3d 474 (D.C. Cir. 2013) ................................................................................9

*American Petroleum Inst. v. United States E.P.A.*,
    52 F.3d 1113 (D.C. Cir. 1995) ..............................................................................11

*Azar v. Allina Health Servs.*,
    139 S. Ct. 1804 (2019) ..........................................................................................10

*Bell Atl. Tel. Cos. v. FCC*,
    131 F.3d 1044 (D.C. Cir. 1997) ..............................................................................6

*Bennett v. Spear*,
    520 U.S. 154 (1997) ..............................................................................................23

*California Human Dev. Corp. v. Brock*,
    762 F.2d 1044 (D.C. Cir. 1985) ............................................................................18

*Chaplaincy of Full Gospel Churches v. England*,
    454 F.3d 290 (D.C. Cir. 2006) ..............................................................................20

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
    467 U.S. 837 (1984) ................................................................................................5

*City of Kansas City v. Department of Hous. & Urb. Dev.*,
   923 F.2d 188 (D.C. Cir. 1991) ........................................................................6

*Colorado River Indian Tribes v. National Indian Gaming Comm'n*,
   466 F.3d 134 (D.C. Cir. 2006) .....................................................8, 9, 10, 11

*Columbia Falls Aluminum Co. v. EPA*,
   139 F.3d 914 (D.C. Cir. 1998) ......................................................................23

*Comite de Apoyo a Los Trabajadores Agricolas v. Perez*,
   774 F.3d 173 (3d Cir. 2014) ..........................................................................24

*D. Ginsberg & Sons, Inc. v. Popkin*,
   285 U.S. 204 (1932) .........................................................................................8

*Dart v. United States*,
   848 F.2d 217 (D.C. Cir. 1988) .................................................................4, 14

*DCH Reg'l Med. Ctr. v. Azar*,
   925 F.3d 503 (D.C. Cir. 2019) ...................................................................4, 5

*Dunn v. Commodity Futures Trading Comm'n*,
   519 U.S. 465 (1997) .........................................................................................6

*Eagle Tr. Fund v. United States Postal Serv.*,
   811 F. App'x 669 (D.C. Cir. 2020) ...............................................................16

*Ethyl Corp. v. EPA*,
   51 F.3d 1053 (D.C. Cir. 1995) ..................................................................9, 13

*Federal Express Corp. v. United States Dep't of Com.*,
   486 F. Supp. 3d 69 (D.D.C. 2020) ............................................................4, 8

*Florida Health Scis. Ctr. Inc. v. Secretary of Health & Human Servs.*,
   830 F.3d 515 (D.C. Cir. 2016) ........................................................................4

*Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) .......................................................................................25

*Garcia v. Acosta*,
   393 F. Supp. 3d 93 (D.D.C. 2019) ................................................................24

*Genus Med. Techs. LLC v. United States Food & Drug Admin.*,
   994 F.3d 631 (D.C. Cir. 2021) ........................................................................8

*Griffith v. Federal Labor Rels. Auth.*,
   842 F.2d 487 (D.C. Cir. 1988) ........................................................................4

*Halverson v. Slater*,
129 F.3d 180 (D.C. Cir. 1997) ........................................................................ *passim*

*Hartz Mountain Corp. v. Dotson*,
727 F.2d 1308 (D.C. Cir. 1984) ................................................................................4

*Independent Ins. Agents of Am., Inc. v. Hawke*,
211 F.3d 638 (D.C. Cir. 2000) .................................................................9, 13, 15

*League of Women Voters of the United States v. Newby*,
838 F.3d 1 (D.C. Cir. 2016) ...............................................................................3, 24

*Leedom v. Kyne*,
358 U.S. 184 (1958) ............................................................................................4, 16

*Lopez v. Federal Aviation Admin.*,
318 F.3d 242 (D.C. Cir. 2003) ........................................................................17, 18

*Lorillard v. Pons*,
434 U.S. 575 (1978) ..................................................................................................14

*Luokung Tech. Corp. v. Department of Def.*,
No. CV 21-583 (RC), 2021 WL 1820265 (D.D.C. May 5, 2021) ..............19, 21, 24

*Lyng v. Payne*,
476 U.S. 926 (1986) ....................................................................................................7

*MCI Telecommc'ns Corp. v. AT & T*,
512 U.S. 218 (1994) ....................................................................................................8

*Michigan v. E.P.A.*,
268 F.3d 1075 (D.C. Cir. 2001) ......................................................................11, 12

*Mittleman v. Postal Regul. Comm'n*,
757 F.3d 300 (D.C. Cir. 2014) ..............................................................................16

*Morales v. Trans World Airlines, Inc.*,
504 U.S. 374 (1992) ....................................................................................................8

*Murphy Expl. & Prod. Co. v. United States Dep't of Interior*,
252 F.3d 473 (D.C. Cir. 2001) ..............................................................................12

*National Env't Dev. Ass'n's Clean Air Project v. EPA*,
752 F.3d 999 (D.C. Cir. 2014) ..............................................................................17

*Natural Res. Def. Council, Inc. v. Reilly*,
976 F.2d 36 (D.C. Cir. 1992) ..................................................................................9

*Nyunt v. Chairman, Broad. Bd. of Governors*,
    589 F.3d 445 (D.C. Cir. 2009) ........................................................................... 4, 5

*Organogenesis Inc. v. Sebelius*,
    41 F. Supp. 3d 14 (D.D.C. 2014) ............................................................................ 4

*Panhandle E. Pipe Line Co. v. FERC*,
    613 F.2d 1120 (D.C. Cir. 1979) ............................................................................ 17

*Postal Police Officers Ass'n v. United States Postal Serv.*,
    502 F. Supp. 3d 411 (D.D.C. 2020) ...................................................................... 16

*Prime Time Int'l Co. v. Vilsack*,
    599 F.3d 678 (D.C. Cir. 2010) ............................................................................... 5

*Public Serv. Comm'n of State of N.Y. v. FERC*,
    866 F.2d 487 (D.C. Cir. 1989) ............................................................................. 10

*Qi-Zhuo v. Meissner*,
    70 F.3d 136 (D.C. Cir. 1995) ............................................................................... 13

*Qualls v. Rumsfeld*,
    357 F. Supp. 2d 274 (D.D.C. 2005) ........................................................................ 3

*R.I.L-R v. Johnson*,
    80 F. Supp. 3d 164 (D.D.C. 2015) ....................................................................... 24

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) ................................................................................. 8, 9, 10

*Railway Labor Execs.' Ass'n v. National Mediation Bd.*,
    29 F.3d 655 (D.C. Cir. 1994) ............................................................................... 12

*Shea v. Clinton*,
    850 F. Supp. 2d 153 (D.D.C. 2012) ........................................................................ 6

*Sierra Club v. E.P.A.*,
    719 F.2d 436 (D.C. Cir. 1983) ............................................................................. 11

*Texas & Pacific Ry. Co. v. Pottorff*,
    291 U.S. 245 (1934) ........................................................................................... 15

*United States v. Western Elec. Co.*,
    46 F.3d 1198 (D.C. Cir. 1995) ............................................................................... 3

*Uranga v. U.S. Citizenship & Immigr. Servs.*,
    No. CV 20-0521 (ABJ), 2020 WL 7230675 (D.D.C. Dec. 8, 2020) ........................ 22

*Utility Air Regul. Grp. v. EPA*,
    573 U.S. 302 (2014) .............................................................................................6

*Village of Barrington v. Surface Transp. Bd.*,
    636 F.3d 650 (D.C. Cir. 2011) ...........................................................................6

*Wisconsin Gas Co. v. FERC*,
    758 F.2d 669 (D.C. Cir. 1985) .........................................................................22

*Xiaomi Corp. v. Department of Def.*,
    No. 21-280 (RC), 2021 WL 950144 (D.D.C. Mar. 12, 2021) ...............19, 20, 21, 22

**STATUTES AND REGULATIONS:**

50 U.S.C.
    § 4811(2)(A) ...................................................................................... *passim*
    § 4811(2)(B) ..................................................................................................13
    § 4811(2)(C) ..................................................................................................13
    § 4811(2)(D) ..................................................................................................13
    § 4811(2)(E) ..................................................................................................13
    § 4811(2)(F) ..................................................................................................13
    § 4811(2)(G) ..................................................................................................13
    § 4812(b)(7) ....................................................................................................9
    § 4813(a)(2) ...................................................................................... *passim*
    § 4813(a)(2)(1) ..............................................................................................13
    § 4813(a)(11) ................................................................................................13
    § 4813(a)(16) .............................................................................................7, 12
    § 4815(a) ........................................................................................................9
    § 4815 ..........................................................................................................13
    § 4821(a) ........................................................................................................4
    § 4826(a) ......................................................................................................14
    § 5211(f) ......................................................................................................15

15 C.F.R.
    § 744.11(b) ...............................................................................................16, 18

**OTHER AUTHORITIES:**

85 Fed. Reg. 44,159 (Jul. 22, 2020) ...........................................................22, 23

BLACK'S LAW DICTIONARY (11th ed. 2019) ...........................................................3

Overholt, William (Harvard Kennedy School, Senior Research Fellow), Letter to
    the Editor, THE WIRE CHINA (Aug. 4, 2021) ...........................................................3

Republican Policy Committee, S.1260 – The United States Innovation And
    Competition Act (May 19, 2021) .......................................................................15

United States Innovation and Competition Act of 2021, S. 1260, 117th Cong.
§ 5211(a) ..............................................................................................................15

WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2948.1 .................................19

## INTRODUCTION

Plaintiffs never sought litigation; they have instead spent the past year urging the U.S. government to correct its erroneous and unlawful decision to add CJE to the Entity List, and thus to bring an end to the severe harms caused by the government's recklessness. In unanimously voting to conditionally remove CJE from the list, the government's End-User Review Committee has taken a first step towards addressing its mistake. But that action has not alleviated Plaintiffs' harm. ███████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████ In the meantime, Esquel already has lost over a quarter of its annual revenue and more than 7,500 valued employees; absent interim relief, the government's action threatens the viability of Esquel's U.S. business. ████████████████████████████████████████████████████████████████████████

██—Plaintiffs have no choice but to seek relief from this Court.

Plaintiffs are likely to succeed on the merits. In 2018, Congress passed a law authorizing Defendants to establish and maintain the Entity List "pursuant to" five high-profile areas of national security concern, such as terrorism and weapons of mass destruction. In adding CJE to the list based on a concededly *un*-enumerated reason, Defendants exceeded the authority Congress granted and transgressed the limits Congress imposed.

Defendants acknowledge that they did not add CJE to the Entity List "pursuant to" Congress's listed policy. Instead, they argue that catch-all language elsewhere in the statute empowered them to "maintain[] a list for other reasons," Opp. 16—*i.e.*, to second-guess Congress's choice. But that reading cannot be squared with the statute's text, structure, purpose, or history. Because Congress selected both its purposes *and* the means to effectuate them, Defendants cannot rely on general authority to trump Congress's specific choices. In fact, though

Defendants claim that their authority is "clear," Congress is currently debating whether to authorize them to add entities to the Entity List based on "serious human rights abuses"—*i.e.*, the very authority Defendants claim to already possess.

Defendants also acted *ultra vires* by adding CJE to the Entity List in the total absence of "specific and articulable facts," as their regulations require. Remarkably, Defendants offer no evidence to defend CJE's designation; they instead attempt to dodge judicial review altogether by claiming unreviewable authority. Defendants are wrong, but their refusal to defend CJE's designation decision confirms what the government's unanimous removal vote already implies: Defendants lack competent evidence that CJE ever engaged in forced labor practices.

Plaintiffs are suffering substantial, irreparable harm due to Defendants' unlawful actions. The devastating reputational injuries and crippling financial losses continue as the direct result of CJE's Entity List designation. Making matters worse, the government is detaining a substantial portion of Esquel shipments to U.S. customers, citing the same unsubstantiated forced-labor rationale. Defendants' halfhearted characterizations of Plaintiffs' harms as "short term" and "speculative" cannot be taken seriously in light of the declarations submitted—or recent precedent from this Court rejecting the same arguments in enjoining similarly unlawful designations.

The remaining factors also weigh in favor of injunctive relief. In contrast to the ongoing, devastating harms to Plaintiffs, Defendants will suffer no cognizable harm from an order directing them to comply with the law. And the public interest is exceptionally ill-served by allowing Defendants to perpetuate this unlawful action—especially where all record evidence indicates that

they "imposed sanctions on the world's most socially responsible company."[1]  This Court should enjoin Defendants' unlawful action in placing CJE on the Entity List.

## ARGUMENT

## I.   PLAINTIFFS ARE LIKELY TO SUCCEED IN SHOWING THAT DEFENDANTS LACKED AUTHORITY TO PLACE CJE ON THE ENTITY LIST.

### A.   Defendants Misrepresent The Applicable Legal Standard.

Plaintiffs' burden is to show that they are likely to succeed on their claim that Defendants have acted *ultra vires*, *i.e.*, "beyond the scope of power allowed or granted by *** law." *ultra vires*, BLACK'S LAW DICTIONARY (11th ed. 2019).  In urging for a narrower standard, Defendants misrepresent applicable law in multiple respects.

*First*, Defendants contend that Plaintiffs "must meet an even higher standard" relative to the traditional preliminary-injunction factors because "the injunction sought would alter, rather than preserve, the status quo."  Opp. 12 (quoting *Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 279 (D.D.C. 2005)).  But Plaintiffs *are* seeking to preserve the status quo—namely, the one that existed before Defendants unlawfully placed CJE on the Entity List.  Regardless, the D.C. Circuit has squarely "rejected any distinction" between injunctions characterized either as mandatory or prohibitory.  *League of Women Voters of the United States v. Newby*, 838 F.3d 1, 7 (D.C. Cir. 2016) ("[T]he 'mandatory' injunction has not yet been devised that could not be stated in 'prohibitory' terms.") (quoting *United States v. Western Elec. Co.*, 46 F.3d 1198, 1206 (D.C. Cir. 1995)).  The Court should reject any reliance on this "essentially arbitrary criterion."  *Id.*

---

[1] William Overholt (Harvard Kennedy School, Senior Research Fellow), Letter to the Editor, THE WIRE CHINA (Aug. 4, 2021), *available at* https://www.thewirechina.com/2021/08/04/letter-to-the-editor-august-4-2021/.

*Second*, Defendants repeatedly insist that Plaintiffs' *ultra vires* claim faces an "exceptionally high bar" requiring a "patent" statutory violation.  Opp. 13; *see* 16-17, 19, 22, 24.  Although Defendants' statutory violation *is* "patent," Defendants are again wrong to suggest that a heightened standard applies.  Each of the cases they cite for this "'extreme' agency error" standard concerns the judicial "exception" established in *Leedom v. Kyne*, 358 U.S. 184 (1958), which permits a claim despite a statutory "bar" on "district-court review."  *DCH Reg'l Med. Ctr. v. Azar*, 925 F.3d 503, 508-510 (D.C. Cir. 2019).[2]  Requiring a "patent" violation in that context is understandable—judicial review in the face of an applicable prohibition should be limited.

But that is not this case.  As this Court has held (and Defendants do not dispute), "Congress cannot be 'understood [even] generally to have precluded [judicial] review'—let alone ultra vires review"—in ECRA.  *Federal Express Corp. v. United States Dep't of Com.*, 486 F. Supp. 3d 69, 79 (D.D.C. 2020) (alterations in original) (quoting *Griffith*, 842 F.2d at 492).  Although ECRA makes "functions exercised" under the Act not "subject to" the APA, 50 U.S.C. § 4821(a), it "does not repeal the review of *ultra vires* actions that was recognized long before" the APA, *Dart v. United States*, 848 F.2d 217, 221-226 (D.C. Cir. 1988) (interpreting similar language in predecessor statute).  Indeed, ECRA does not purport to bar even an *APA claim* challenging actions that do "not fall within the category of proper *** 'functions' made unreviewable."  *Id.* at 219.

Thus, as the D.C. Circuit recently noted in distinguishing Defendants' primary authority, there is a fundamental "distinction between [those] cases involving a '*Kyne* exception,'" where

---

[2] *See, e.g.*, *Florida Health Scis. Ctr. Inc. v. Secretary of Health & Human Servs.*, 830 F.3d 515, 519 (D.C. Cir. 2016) (discussing narrow standard of review where an "Act bars judicial review"); *Nyunt v. Chairman, Broad. Bd. of Governors*, 589 F.3d 445, 449 (D.C. Cir. 2009) ("[A] *Leedom v. Kyne* claim is essentially a Hail Mary pass[.]"); *Griffith v. Federal Labor Rels. Auth.*, 842 F.2d 487, 493 (D.C. Cir. 1988) ("The *Leedom v. Kyne* exception is intended to be of extremely limited scope."); *Hartz Mountain Corp. v. Dotson*, 727 F.2d 1308, 1312 (D.C. Cir. 1984) (same); *Organogenesis Inc. v. Sebelius*, 41 F. Supp. 3d 14, 23 (D.D.C. 2014) (same).

plaintiffs claim "their merits argument is so obviously correct that [the Court] should consider it despite an applicable bar on our review," and cases such as this one, in which "the agency's action fails to qualify as the kind of action for which review is barred." *American Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1238-1239 (D.C. Cir. 2020) (quoting *DCH Reg'l Med. Ctr.*, 925 F.3d at 509-510). Because Plaintiffs do not ask the Court "to remedy a 'statutory violation[ ] even when a statute precludes review,'" their *ultra vires* claim "does not implicate the *Kyne* framework" or its narrow scope of review. *Id.* at 1238 (alteration in original) (quoting *Nyunt*, 589 F.3d at 449).

Instead, the standard is the one that ordinarily applies to *ultra vires* claims, *i.e.*, whether the agency acted "outside of the scope of its statutory authority." *Aid Ass'n for Lutherans v. United States Postal Serv.*, 321 F.3d 1166, 1168 (D.C. Cir. 2003). Courts resolve that question by "employ[ing] 'traditional tools of statutory construction' to determine whether Congress has spoken directly to the issue." *Am. Hosp. Ass'n*, 964 F.3d at 1241 (quoting *Prime Time Int'l Co. v. Vilsack*, 599 F.3d 678, 683 (D.C. Cir. 2010)). If so, the agency receives no deference, for the Court "must give effect to the unambiguously expressed intent of Congress." *Id.* at 1240; *see, e.g.*, *Aid Ass'n for Lutherans*, 321 F.3d at 1177-1178 (upholding *ultra vires* claim because "when the statutory language is fairly construed using the normal tools of statutory construction," the statute "simply cannot bear the meaning that the [agency] seeks to give it").

*Third*, Defendants suggest that the Court must put a thumb on their side of the scale under *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). But the judiciary "is the final authority on issues of statutory construction." *Chevron*, 467 U.S. at 843 n.9. As noted, courts do not defer if Congress has spoken directly to the issue. *See id.* Before making that determination, moreover, courts "must first exhaust the traditional tools of statutory construction, *** includ[ing] examination of the statute's text, legislative history, and structure, as

well as its purpose." *Bell Atl. Tel. Cos. v. FCC*, 131 F.3d 1044, 1047 (D.C. Cir. 1997) (citations and internal quotation marks omitted); *see, e.g.*, *Dunn v. Commodity Futures Trading Comm'n*, 519 U.S. 465, 470-480 (1997) (using statutory construction tools to find statute unambiguous, even when more than one reading of the statutory text was possible).   Where, as here, Congress has "prescrib[ed] a precise course of conduct other than the one chosen by the agency" or "grant[ed] the agency a range of interpretive discretion that the agency has clearly exceeded," the Court's "task[]" is to interpret the statute "without showing the agency any special deference." *Village of Barrington v. Surface Transp. Bd.*, 636 F.3d 650, 659-660 (D.C. Cir. 2011).   Even where a statute is deemed ambiguous or silent, the agency's interpretation must still be reasonable in light of the statute as a whole.   *See, e.g.*, *Utility Air Regul. Grp. v. EPA*, 573 U.S. 302, 321 (2014) (rejecting agency's statutory interpretation as unreasonable under *Chevron* step two because it did not "account for both the specific context in which language is used and the broader context of the statute as a whole") (internal quotation marks and ellipses omitted).

Here, no heightened deference to the government is appropriate.   The parties agree that the statute is not silent or ambiguous on the question of Defendants' authority.   *E.g.*, Opp. 16 ("there is not" ambiguity).   Nor did the government develop or discuss this expansive theory of Defendants' authority before now—and "the law is clear that agencies are not entitled to deference for interpretations offered by their counsel in legal briefs." *Shea v. Clinton*, 850 F. Supp. 2d 153, 161 (D.D.C. 2012); *see, e.g.*, *City of Kansas City v. Department of Hous. & Urb. Dev.*, 923 F.2d 188, 192 (D.C. Cir. 1991) ("In whatever context we defer to agencies, we do so with the understanding that the object of our deference is the result of agency decisionmaking, and not some *post hoc* rationale developed as part of a litigation strategy.").   The Court should thus decline the invitation to cede its role in interpreting unambiguous statutory text to the Executive Branch.

**B.**      **Defendants Acted *Ultra Vires* In Adding CJE To The Entity List Based On Purported Human Rights Violations.**

  *1.      ECRA's Text, Structure, And Purpose Do Not Authorize The Challenged Action.*

The parties agree that ECRA "section 4813(a)(2) requires the Secretary to maintain a list of foreign persons involved in the five areas of concern in section 4811(2)(A)." Opp. 17; *see* 50 U.S.C. § 4813(a)(2) (directing Commerce Secretary to "establish and maintain" Entity List "pursuant to the policy set forth in section 4811(2)(A)"). But Defendants concede that they did not list CJE "pursuant to the policy set forth in section 4811(2)(<u>A</u>)"; they acknowledge that they listed CJE based on a different policy—namely, one set forth in section 4811(2)(<u>D</u>). *See* Opp. 8 (emphasis added). Defendants thus acted beyond the authority granted by Congress. *See Lyng v. Payne*, 476 U.S. 926, 937 (1986) ("[A]n agency's power is no greater than that delegated to it by Congress.").

Defendants nevertheless contend that a separate catch-all provision, which permits the Secretary of Commerce to "undertake any other action as is necessary to carry out [the Act] that is not otherwise prohibited by law," 50 U.S.C. § 4813(a)(16), authorizes placing a foreign person on the Entity List to advance *any* foreign policy interest specified in ECRA. Defendants' argument cannot be squared with the statute's text, structure, or purpose.

As an initial matter, Section 4813(a)(16) does not grant the Secretary "authority to take *additional* actions," Opp. 18 (emphasis added), but rather "*other* action"—*i.e.*, action "other" than those already covered under the preceding fifteen subsections, 50 U.S.C. § 4813(a)(16) (emphasis added). Both Defendants and this Court have previously acknowledged that *section 4813(a)(2)* "confers on the Secretary of Commerce the authority to *** 'establish and maintain' *** the Entity List." Mem. of Points & Auth. in Supp. of Defs.' Mot. to Dismiss 6-7, *FedEx Corp. v. United States Dep't of Com.*, No. 1:19-cv-01840-JDB (D.D.C. Sept. 10, 2019), ECF No. 18 (quoting 50

U.S.C. § 4813(a)(2)); *see Federal Express Corp*, 486 F. Supp. 3d at 73.  Thus, even if section 4813(a)(16) permitted Defendants to create *other* lists, it does not permit them to add CJE to the "Entity List"—that "action" is already covered by section 4813(a)(2).

Even if section 4813(a)(16) could be read to encompass the action Defendants took, that reading would violate the "well established canon of statutory interpretation" that "the specific governs the general."  *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384 (1992)).  This canon has "full application *** to statutes such as the one here, in which a general authorization and a more limited, specific authorization exist side-by-side."  *Id.*  Under that structure, the "[g]eneral language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment."  *Id.* at 646 (alteration in original) (quoting *D. Ginsberg & Sons, Inc. v. Popkin*, 285 U.S. 204, 208 (1932)); *see, e.g.*, *Halverson v. Slater*, 129 F.3d 180, 188 (D.C. Cir. 1997) (holding that statute's "more specific (and limited) delegation authority, precludes the use of" general delegation authority, even though "it does not expressly prohibit" such use).  This "general-specific canon is particularly appropriate where, as here, the provisions at issue are 'interrelated and closely positioned' as 'parts of the same statutory scheme.'"  *Genus Med. Techs. LLC v. United States Food & Drug Admin.*, 994 F.3d 631, 638-639 (D.C. Cir. 2021) (quoting *RadLAX*, 566 U.S. at 645).

Although Defendants ignore this canon, it forecloses their contention that they are free to adopt measures inconsistent with Congress's choices.  "Agencies are *** 'bound, not only by the ultimate purposes Congress has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes.'"  *Colorado River Indian Tribes v. National Indian Gaming Comm'n*, 466 F.3d 134, 139-140 (D.C. Cir. 2006) (quoting *MCI Telecommc'ns Corp. v.*

*AT & T*, 512 U.S. 218, 231 n.4 (1994)); *see id.* at 140 (even though agency "is correct" about Congress's goals, "it is equally clear that Congress wanted to do this in a particular way").  That is why a "broad grant of regulatory authority" cannot "trump the specific provisions of" an enabling act, *Natural Res. Def. Council, Inc. v. Reilly*, 976 F.2d 36, 41 (D.C. Cir. 1992), and "a broad programmatic objective cannot trump specific instructions" from Congress, *American Petroleum Inst. v. E.P.A.*, 706 F.3d 474, 479 (D.C. Cir. 2013).  Any other result would render Congress's specific instructions "nugatory."  *American Fed'n of Lab. & Cong. of Indus. Orgs. v. Chao*, 409 F.3d 377, 384 (D.C. Cir. 2005).[3]

For similar reasons, Defendants' reading violates two related canons:  the *expressio unius* canon and the canon against surplusage.  *See Independent Ins. Agents of Am., Inc. v. Hawke*, 211 F.3d 638, 644 (D.C. Cir. 2000) (observing that "the canons of avoiding surplusage and expressio unius are at their zenith when they apply in tandem").  In authorizing Defendants to create a list of foreign persons involved in "acts of terror[]," "weapons of mass destruction," and similar concerns, 50 U.S.C. §§ 4811(2)(A), 4813(a)(2), Congress plainly "intended to exclude" others, *Halverson*, 129 F.3d at 185; *see, e.g.*, *Ethyl Corp. v. EPA*, 51 F.3d 1053, 1061 (D.C. Cir. 1995) (citing "familiar maxim of statutory construction" that the "mention of one thing implies exclusion of another thing" to hold that "Congress did not delegate to the Agency the authority to consider other factors" incorporated elsewhere in statute but not in provision at issue).  Proving the point, a nearby provision in ECRA requires the Secretary "to carry out the policy set forth in section *4811*" generally, 50 U.S.C. § 4815(a) (emphasis added), not just section *4811(2)(A)* specifically.  Thus,

---

[3] It is likewise immaterial that a separate provision confers distinct authority on the President. Opp. 16 (quoting 50 U.S.C. § 4812(b)(7)). Not only does the Secretary rely on her own Entity List authority (not the President's distinct authority), that "general" authority still must be read in light of the "specific" limitations in Section 4813(a)(2). *RadLAX*, 566 U.S. at 645.

had Congress truly intended Defendants to add entities to the Entity List based on *any* policy goals, it easily could have done so, without a superfluous "pursuant to" clause. *See Azar v. Allina Health Servs.*, 139 S. Ct. 1804, 1813 (2019) (noting "the doubtful proposition that Congress sought to accomplish in a 'surpassingly strange manner' what it could have accomplished in a much more straightforward way") (quoting *RadLAX*, 566 U.S. at 647); *Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("When legislators did not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative") (citation omitted).[4]

Contrary to Defendants' suggestion (Opp. 18), it makes no difference that they are authorized to take other action "necessary" to carry out ECRA. The D.C. Circuit again and again has rejected that very argument. For instance, although Congress broadly authorized FERC to make rules "as it may find necessary or appropriate to carry out the provisions of the [Natural Gas Act]," the agency was not free to "overrid[e] the balance achieved" in the rest of the statute, as its general authority "cannot enlarge the choice of permissible procedures beyond those that may fairly be implied from the substantive sections and the functions there defined." *Public Serv. Comm'n of State of N.Y. v. FERC*, 866 F.2d 487, 490-492 (D.C. Cir. 1989) (citations omitted). Similarly, in authorizing the National Indian Gaming Commission to "audit all papers, books, and records respecting gross revenues of class II gaming conducted on Indian lands and any other matters necessary to carry out the duties of the Commission under this chapter," Congress did not implicitly give the Commission "audit authority" over *class III* gaming facilities. *Colorado River Indian Tribes*, 466 F.3d at 137-138. And although Congress authorized the EPA "to promulgate such regulations as are necessary to carry out its functions under the Act," such "general

---

[4] In fact, Congress is currently considering a measure that would grant the Secretary the exact power it already claims to have. *See* p. 15, *infra*.

rulemaking authority" provided no "justification for adding new factors to a list of statutorily specified ones." *American Petroleum Inst. v. United States E.P.A.*, 52 F.3d 1113, 1117, 1119-1120 (D.C. Cir. 1995) ("*API*"); *see Michigan v. E.P.A.*, 268 F.3d 1075, 1084 (D.C. Cir. 2001) ("EPA cannot rely on its general authority to make rules necessary to carry out its functions when a specific statutory directive defines the relevant functions of EPA in a particular area.") (quoting *API*, 52 F.3d at 1119); *Sierra Club v. E.P.A.*, 719 F.2d 436, 455 (D.C. Cir. 1983) (rejecting "EPA's reliance on its general authority" where relevant functions were already defined by "specific statutory directive").

These cases (and many others) directly refute Defendants' attempt to rely on section 4813(a)(16) in isolation "in order to expand its authority beyond the aims and limits of the section as a whole." *API*, 52 F.3d at 1119-1120. In section 4813(a)(2), Congress directed Defendants to list entities involved in certain enumerated activities—terrorism, weapons proliferation, and similar practices—but not others. Congress thus selected the "means it has deemed appropriate, and prescribed," to effectuate its Entity List policies. *Colorado River Indian Tribes*, 466 F.3d at 139-140. Defendants cannot ignore that choice.

        2.    *Defendants Cannot Demonstrate That Congress Authorized Or Permitted Them To List Entities For Reasons Other Than The Ones Congress Chose.*

None of Defendants' further arguments can salvage their action taken in excess of their authority and contrary to ECRA.

*First*, Defendants argue that while section 4813(a)(2) requires the agency to add entities to the Entity List "pursuant to" certain goals, it never explicitly prohibits them from doing so "pursuant to" *other* goals. But even where agencies enjoy broad rulemaking authority, courts "will not presume a delegation of power based solely on the fact that there is not an express withholding of such power." *Michigan*, 268 F.3d at 1082 (quoting *API*, 52 F.3d at 1120). Were it otherwise,

"agencies would enjoy virtually limitless hegemony, a result plainly out of keeping with *Chevron* and quite likely with the Constitution as well." *Id.*

For similar reasons, Congress did not leave the scope of Defendants' power "unresolved[]"—or give Defendants an implicit gap to fill—simply because ECRA does not expressly state "that the Secretary is *prohibited* from maintaining lists of other foreign persons in connection with activities that are not specified in section 4811(2)(A)." Opp. at 17-18. The suggestion "that *Chevron* step two is implicated any time a statute does not expressly *negate* the existence of a claimed administrative power (*i.e.*, when the statute is not written in 'thou shalt not' terms), is both flatly unfaithful to the principles of administrative law *** and refuted by precedent." *Halverson*, 129 F.3d at 187 (citation omitted); *see Railway Labor Execs.' Ass'n v. National Mediation Bd.*, 29 F.3d 655, 670 (D.C. Cir. 1994) ("categorically reject[ing]" argument that agency "possesses *plenary* authority to act within a given area simply because Congress has endowed it with *some* authority to act in that area").

*Second*, Defendants claim to "account[] for both subsections without turning either into surplusage," because subsection (a)(2) "requires" a listing "pursuant to the policy set forth in section 4811(2)(A)," whereas subsection (a)(16) permits the Secretary to choose additional policies if "necessary to carry out the Reform Act." Opp. 16. But Defendants cannot deny that, under their reading, their authority and actions would be no different had Congress simply excised the "pursuant to" clause of section 4813(a)(2). Indeed, if Defendants are correct that the requirement to "undertake any *other* action" really encompasses the right to undertake "any" action, 50 U.S.C. § 4813(a)(16) (emphasis added), then every limitation in subsections 4811(a)(1) to (a)(15) becomes superfluous. *See Murphy Expl. & Prod. Co. v. United States Dep't of Interior*, 252 F.3d 473, 481 (D.C. Cir. 2001) ("[Agency's] reading *** contradicts the 'endlessly reiterated

principle of statutory construction *** that all words in a statute are to be assigned meaning.'") (second ellipsis in original) (quoting *Qi-Zhuo v. Meissner*, 70 F.3d 136, 139 (D.C. Cir. 1995)).

*Third*, Defendants argue that the *expressio unius* canon is inapplicable where, as here, a case "involves the scope of an agency's statutory authority."  Opp. 18.  But, as the cases cited above indicate, the D.C. Circuit has rejected the argument that "the *expressio unius* maxim cannot preclude an otherwise reasonable agency interpretation."  *Independent Ins. Agents*, 211 F.3d at 644; *see, e.g.*, *Halverson*, 129 F.3d at 185; *Ethyl Corp.*, 51 F.3d at 1061.  Instead, whether that canon (or the general/specific canon, or the canon against surplusage) applies depends on "statutory context"—and *expressio unius* remains a "useful aid" where, as here, a specific "grant of authority[] does really necessarily, or at least reasonably, imply preclusion of alternatives." *Independent Ins. Agents*, 211 F.3d at 644.

*Finally*, Defendants imply (*e.g.*, Opp. 18-19) that Congress would not have had any reason to circumscribe their authority in this manner.  Not so.  Although ECRA's general purposes are wide-ranging, *see* 50 U.S.C. § 4811(2)(A)-(G), the Entity List authorized by section 4813(a)(2) represents just one of the Secretary's responsibilities under ECRA—which also includes such varied tasks as establishing a list of controlled *items* (in addition to persons and end uses), *id.* § 4813(a)(2)(1), "monitor[ing] shipments and other means of transfer," *id.* § 4813(a)(11), and establishing "licensing" procedures, *id.* § 4815.  It is thus entirely reasonable for Congress to have wanted the Secretary to focus her Entity List designations exclusively on those entities that posed the most serious threats to the "foreign policy and national security" of the United States, such as those entities involved with "weapons of mass destruction" and "terrorism."   By contrast, Defendants offer no plausible reason why Congress, in directing Defendants to establish a list based on specific policies, was implicitly inviting Defendants to list entities based on *any* policy.

13

3.     *The History Of ECRA Supports Plaintiffs, Not Defendants.*

Defendants also contend that "the history of [ECRA] also demonstrates why human rights concerns are a statutorily authorized reason for placing foreign persons on the Entity List." Opp. 20.  Tellingly, Defendants rely primarily on practice "*[p]rior to* [ECRA's] 2018 enactment." *Id.* (emphasis added).  That history cuts against Defendants' reading.

When enacting new laws, "Congress is presumed to be aware of an administrative or judicial interpretation of" existing ones. *Dart*, 848 F.2d at 229 (quoting *Lorillard v. Pons*, 434 U.S. 575, 580 (1978)).  Defendants thus agree that ECRA was passed against the backdrop of their "reading of 15 C.F.R. § 744.11(b) as permitting additions to the Entity List for reasons beyond the five activities now listed in section 4811(2)(A)." Opp. 21-22.  Yet, in "consciously cho[osing]" to restrict the Entity List to those five enumerated foreign-policy concerns, Congress was aware of—and must have *intended to change*—the agency's existing practice.  *See Dart*, 848 F.2d at 229 (noting "assumption that if a change occurs in legislative language a change was intended in legislative result") (ellipsis omitted).  That Defendants have apparently chosen to simply disregard the "change *** in legislative language" hardly supports their reading of the statute.

Defendants also contend that Congress "preserved [their] regulations and administrative actions in the Reform Act, expressly stating those actions would 'continue in effect' under the new statute." Opp. 22 (quoting 50 U.S.C. § 4826(a)).  But that "[t]ransition[al] provision" provides that already-existing "delegations, rules, regulations, orders, determinations, licenses, or other forms of administrative action *** shall continue in effect according to their terms *until modified, superseded, set aside, or revoked*[.]" 50 U.S.C. § 4826(a) (emphasis added).  Section 4813(a)(2) effects such a "modifi[cation]" by limiting the use of the Entity List to the five specific foreign-policy concerns listed on a going-forward basis.

14

In fact, Congress's recent activities confirm that the agency's Entity List authority is cabined to the five areas of concern set forth in Section 4811(2)(A). Earlier this year, the Senate passed a bill that would amend ECRA to grant Defendants the power they already claim—*i.e.*, to "use export controls to the extent necessary to further the protection of internationally recognized human rights." United States Innovation and Competition Act of 2021, S. 1260, 117th Cong. § 5211(a)[5]; *see, e.g.*, Republican Policy Committee, S.1260 – The United States Innovation And Competition Act (May 19, 2021) (bill "establishes authority for end use controls related to human rights abuses").[6] If enacted, the law would amend 50 U.S.C. § 4811(a)(2) by taking the existing five enumerated areas of concern (terrorism, weapons proliferation, etc.), and then adding a *sixth* issue: "serious human rights abuses." *Id.* § 5211(f) (amending 50 U.S.C. § 4811(2)(A) by "adding at the end the following: '(vi) serious human rights abuses'"). Obviously, if Defendants already had the "clear" (Opp. 22) authority to place an entity on the Entity List for human rights abuses, "there would *** be[] no need to later alter" section 4811(2)(A) to grant that power. *Independent Ins. Agents of Am., Inc.*, 211 F.3d at 645 (discussing *Texas & Pacific Ry. Co. v. Pottorff*, 291 U.S. 245, 257-259 (1934)); *see Halverson*, 129 F.3d at 185 ("Congress cannot be presumed to do a futile thing."). Defendants acted *ultra vires* in claiming authority they do not possess.

### C.   Defendants Acted *Ultra Vires* In Adding CJE To The Entity List Without Any "Specific And Articulable Facts."

Even if ECRA could otherwise be construed to permit a listing based on forced-labor concerns, Defendants exceeded their authority by adding CJE to the Entity List without any "specific and articulable facts" supporting their conclusion that CJE engages in acts "contrary to

---

[5]      *Available      at*      https://www.congress.gov/bill/117th-congress/senate-bill/1260/text?r=9&s=1.

[6]   *Available   at*   https://www.rpc.senate.gov/legislative-notices/s1260_the-united-states-innovation-and-competition-act.

the national security or foreign policy interests of the United States." 15 C.F.R. § 744.11(b). That glaring omission is unlawful, but also understandable: no facts support Defendant's incorrect decision. Pls.' Mem. 18-20. On the contrary, numerous third-party audits repeatedly have affirmed that Esquel does not use (and has never used) forced labor. *Id.* at 8-10, 18-20.

Confronted with that failure—and even after the End-User Review Committee unanimously voted to conditionally remove CJE from the Entity List—Defendants *still* decline to share whatever evidence they purportedly relied on. Although Defendants contend that they gave a "factual basis" for the listing in the original Federal Register notice—namely, "the practice of forced labor involving members of Muslim minority groups" in Xinjiang—they do not even attempt to argue that this facially *general* and *vague* explanation qualifies as *specific* and *articulable* facts. Opp. 23.

Rather than defend the listing on the merits, Defendants argue that "an alleged violation of a regulation could [not] serve as the basis for an *ultra vires* claim." Opp. 22-23. But each of the cases on which Defendants rely for this "exacting standard" (*id.* at 25) concerns the *Kyne* preclusion-of-review exception discussed above. *See, e.g.*, *Mittleman v. Postal Regul. Comm'n*, 757 F.3d 300, 307 (D.C. Cir. 2014) (citing *Kyne*, 358 U.S. 184); *Eagle Tr. Fund v. United States Postal Serv.*, 811 F. App'x 669, 670 (D.C. Cir. 2020) (per curiam); *Postal Police Officers Ass'n v. United States Postal Serv.*, 502 F. Supp. 3d 411, 418-419 (D.D.C. 2020). As already explained, that framework is not relevant to Plaintiffs' claim. *See* pp. 4-5, *supra*; *cf. Adamski v. McHugh*, 304 F. Supp. 3d 227, 236-237 (D.D.C. 2015) (noting that "different uses of the term 'ultra vires' have given rise to considerable confusion," including about the fact that "ultra vires claims come in both a statutory and a non-statutory variety").

Thus, Defendants offer no reason why an agency's actions in violation of its own regulations are not equally *ultra vires*, *i.e.*, in excess of their authority.  Indeed, "[i]t is 'axiomatic' *** that an agency is bound by its own regulations" and thus "does not have authority to 'play fast and loose with [them].'" *National Env't Dev. Ass'n's Clean Air Project v. EPA*, 752 F.3d 999, 1009 (D.C. Cir. 2014) (quoting *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979)); *see also Lopez v. Federal Aviation Admin.*, 318 F.3d 242, 247 (D.C. Cir. 2003) ("A court's duty to enforce an agency regulation, while most evident when compliance with the regulation is mandated by the Constitution or federal law, embraces as well agency regulations that are not so required.") (alteration, internal quotation marks, and internal citation omitted).

Next, Defendants argue that the regulatory provision at issue merely provides the "[c]riteria for revising the Entity List" and "does not mandate that the Committee make those facts, or any other facts, public."  Opp. 23-24.  But the requirement to "base" a listing on specific and articulable facts is plainly "aimed at protecting [regulated entities] from [Defendants'] otherwise unlimited discretion"; it is not a mere procedural rule "primarily intended to provide information to the agency."  *Lopez*, 318 F.3d at 247-248; *see id.* at 247 ("[T]his court has been careful to distinguish between procedural rules benefitting the agency and procedural rules benefitting the party otherwise left unprotected by agency rules[.]") (internal citations omitted).  Defendants "are bound to follow" that regulation, and the Court has a "duty" to enforce it.  *Id.* at 247.

Defendants also contend that Plaintiffs' claim "amounts to an APA challenge asserting the agency acted arbitrarily and capriciously in lacking a basis for [CJE's] designation," rather than "a cognizable *ultra vires* claim."  Opp. 24.  But Plaintiffs pleaded their *ultra vires* claim (the only one at issue in this motion) in a separate count from their APA claim.  *See* First Am. Compl. 26-27.  And the D.C. Circuit has reviewed claims that an agency "failed to conform to agency

regulations" even when the Court "lack[ed] jurisdiction to review [a separate] contention challenging the [agency] decision on substantive grounds as being arbitrary and capricious and an abuse of process." *Lopez*, 318 F.3d at 245-248; *see, e.g.*, *California Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1048-1051 (D.C. Cir. 1985) (analyzing separately claim that "DOL violated its own regulations" and claim that "DOL's actions were arbitrary, capricious, and an abuse of discretion" under the APA). To say Defendants acted without "specific and articulable facts"—and there is no indication that they possessed any—is just to say that Defendants acted beyond their authority.

Finally, Defendants suggest that Plaintiffs' overwhelming affirmative evidence of clean audits, corporate sustainability, and ethical business practices is immaterial because the Court must review Defendants' action "based on the information considered by the agency in making the challenged determination, not a new record created by a plaintiff in litigation." Opp. 24. That is an ironic defense, considering that Defendants (a) have yet to provide the "information considered by the agency" in making the challenged determination, (b) did not seek any information from Plaintiffs before making that determination, and (c) have refused even to produce the administrative record, which Plaintiffs first requested immediately upon filing this suit in July.

Regardless, the upshot of Defendants' failure to produce the record is that this Court has no basis to conclude that they possessed *any* "specific and articulable" facts to support the challenged action, as their regulation requires. 15 C.F.R. § 744.11(b). Accordingly, Plaintiffs will likely succeed on this ground as well.

## II.    PLAINTIFFS ARE SUFFERING SIGNIFICANT, IRREPARABLE HARM.

The government's position that Esquel has not shown irreparable harm relies largely on the same arguments that it asserted, lost, and declined to appeal in *Xiaomi Corporation v. Department of Defense* and *Luokung Technology Corporation v. Department of Defense*. As in those cases, the government's arguments fail to rebut Esquel's demonstration of debilitating and irreparable harm.

The declarations of Esquel Chairman and CEO Marjorie Yang demonstrate that, absent preliminary relief, the company's unrecoverable losses will continue to mount, and its prospect of reopening its shuttered factories or rehiring its employees will continue to dim.

Defendants first argue that "the plaintiffs do not allege a type of harm that is legally sufficient to obtain preliminary relief."  Opp. 26.  Yet that completely ignores the substantial *reputational* harm that alone suffices.  "[B]ecause '[i]njury to reputation or goodwill is not easily measurable in monetary terms' it is typically 'viewed as irreparable.'"  *Xiaomi Corp. v. Department of Def.*, No. 21-280 (RC), 2021 WL 950144, *9 (D.D.C. Mar. 12, 2021) (quoting WRIGHT & MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL § 2948.1); *see also Luokung Tech. Corp. v. Department of Def.*, No. CV 21-583 (RC), 2021 WL 1820265, at *14 (D.D.C. May 5, 2021) (finding long-term reputational harm sufficient to constitute irreparable harm).  Ms. Yang explained that the U.S. government's labeling of CJE as a human rights violator—not to mention a threat to the "national security or foreign policy of the United States"—severely injures Plaintiffs, as customers reduce or cut off business, suppliers end their relationships, banks revoke or limit financing, universities and industry actors distance themselves, and competitors pick up lost business.  Yang Decl. ¶¶ 25-40 (ECF No. 9-1).  Indeed, the government cannot deny that placement on the Entity List is stigmatizing, having published an advisory warning about the "significant reputational, economic, and legal risks of involvement with entities" that have been added to the Entity List—*including CJE specifically*.  State Department, Xinjiang Supply Chain Business Advisory at 2, 22, Ex. 1 to Suppl. Yang Decl. (ECF No. 16); Suppl. Yang Decl. ¶ 9.

Esquel's extensive (and essentially undisputed) reputational harm by itself thus satisfies the irreparable harm requirement.  *See Luokung Tech. Corp.*, 2021 WL 1820265, at *14; *Xiaomi*, 2021 WL 950144 at *9.  Defendants respond (at 26) that reputational harm is just economic loss.

*But see Xiaomi*, 2021 WL 950144 at *10 (noting case law on whether damage to a business's reputation is an economic loss is "far from definitive").  Even if that were true, reputational harm that is combined with serious, unrecoverable financial injury easily qualifies as irreparable harm sufficient to warrant injunctive relief.  *See id.*

Without disputing Esquel's serious financial injuries directly, Defendants argue that Plaintiffs' financial harms are insufficient because they do not threaten Esquel's entire existence. Opp. 26-27.  But that argument cannot be squared with *Xiaomi* or the many cases *Xiaomi* relied on:  "Contrary to [the government's] assertions, there is no dispute that given the unrecoverable nature of the monetary harms suffered by [the plaintiff] it need not demonstrate that its economic injury is so severe it threatens [the plaintiff's] 'very existence.'"  *Xiaomi*, 2021 WL 950144 at *10 n.10 (citing cases).  Sovereign immunity plainly renders Esquel's massive losses "irreparable." *See id.* at *10.[7]

Defendants half-heartedly attempt to downplay the magnitude of Plaintiffs' harms, mischaracterizing them merely as "short term losses of production orders" and "speculative loss of market share," and suggest that Esquel failed to demonstrate the scale of the loss relative to Esquel's size and strength.  Opp. 26-27.  But contrary to Defendants' contention, Ms. Yang explicitly stated that Esquel lost *over one quarter of its annual revenue*—hundreds of millions of dollars—in the year following CJE's listing.  Yang Decl. ¶ 30.  Further, the company has been forced to close two factories and lay off thousands of employees, and has lost suppliers and access

---

[7] Defendants' reliance on *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297-298 (D.C. Cir. 2006), for the proposition that "[t]he possibility that adequate compensatory or corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm," Opp. 26-27, is perplexing.  Unless the government is willing to waive its sovereign immunity from damages, the only relief that is available in the ordinary course of litigation is an injunction ordering Defendants to remove CJE from the Entity List.  Such an order "at a later date" does nothing to relieve the harms Plaintiffs are suffering now.

to credit.  *Id.* ¶¶ 25-45; Suppl. Yang Decl. ¶¶ 5-11, 14-15; Second Suppl. Yang Decl. ¶¶ 12-16 (ECF

No. 27).  As in *Xiaomi* and *Luokung*, where the Court rejected the government's comparable

argument, Esquel's injuries are "severe" and "unrecoverable."  *Xiaomi*, 2021 WL 950144, at *12;

*Luokung*, 2021 WL 1820265, at *12.  If anything, Esquel's harms are even greater because its lost

market share will be especially difficult to recover, if recoverable at all, given the long fashion-

product development cycle.  *See* Yang Decl. ¶ 33.  In fact, Esquel now faces the serious risk of

permanently losing *all* U.S. business and U.S. customers.  Second Suppl. Yang Decl. ¶ 16.

As in *Xiaomi*, Esquel's losses are also "posed to accelerate if preliminary relief is denied."

*Xiaomi*, 2021 WL 950144 at *11.  Since Esquel filed its motion and the supporting declaration

from Ms. Yang, the company's harms are only increasing, as set forth in Ms. Yang's two

supplemental declarations.  Esquel's growing difficulties fulfilling orders as a result of the listing

jeopardize the company's ability to retain customers.  Suppl. Yang Decl. ¶¶ 5-15; Second Suppl.

Yang Decl. ¶¶ 6, 9, 12-16.  Loss of more customers will further erode market share, steepen

financial losses, and impede the re-hiring of employees.  *See* Yang Decl. ¶¶ 29-33.

As for Defendants' argument that Esquel's harms are too speculative, Opp. 27-28, the

Court yet again rejected the same argument in *Xiaomi*, where loss of customers had already begun

and additional losses were imminent.  *Xiaomi*, 2021 WL 950144 at *11.  Defendants do not dispute

that Esquel already has lost significant customers because of the listing, with departing customers

pointing to the listing as the reason; nor do they rebut Ms. Yang's explanation that those past

departures signal future departures absent a preliminary injunction.  *See* Yang Decl. ¶¶ 29, 32;

Suppl. Yang Decl. ¶¶ 5, 7-11; Second Suppl. Yang Decl. ¶¶ 12-16.  Indeed, it is uncontested that

the Entity List functions like a "blacklist" and that, while licenses are theoretically possible, the

government's license review policy presumes denial. Pls.' Mem. 12 (citing articles describing CJE

as having been "blacklisted"); *id.* at 20 (citing 85 Fed. Reg. 44,159, 44,160 (July 22, 2020)); *see also Xiaomi*, 2021 WL 950144 at *9 (recognizing severity of reputational damage that designation can inflict). Plaintiffs have thus demonstrated irreparable harm by showing that the severe harms stemming from lost customers that they suffered in the past are likely to continue (and worsen) in the future as long as CJE remains on the Entity List. *See Uranga v. U.S. Citizenship & Immigr. Servs.*, No. CV 20-0521 (ABJ), 2020 WL 7230675, at *5 (D.D.C. Dec. 8, 2020) (recognizing irreparable harm may be shown by "demonstrat[ing] that the harm has occurred in the past and is likely to occur again") (citing *Wisconsin Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)).

Finally, what Defendants mischaracterize (at 28) as "lengthy delay" by Plaintiffs actually reflects the government's dilatory response to CJE's year-long effort to rectify Defendants' reckless and unlawful action. In September 2020, Esquel submitted to the Commerce Department a comprehensive explanation of why the listing was a mistake, and followed up multiple times with supplemental information in an effort to draw the government's attention to the error so that it could be quickly corrected. *See* Opp. 10. Yet it was not until Esquel threatened to file a lawsuit that the government first offered any meaningful response—and even then, it was merely a promise to issue a decision approximately a month later. Moreover, the government's delay has continued even after Esquel filed this action: ███████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████████████████████████████████ Decl. of N. Ifudu ¶ 8 (ECF No. 26). The government's continued delay in rectifying its error has translated into extreme, irreparable, and increasing harm, and has left Plaintiffs with no realistic alternative to seeking preliminary relief from this Court.

## III.    THE BALANCE OF EQUITIES AND THE PUBLIC INTEREST STRONGLY FAVOR AN INJUNCTION.

The balance of equities and the public interest strongly favor injunctive relief.  Defendants provide zero support for the proposition that Esquel committed human rights violations.  By unanimously agreeing to conditionally remove CJE from the Entity List ████████████████████ ████████████████████████████████████████████████████████████████ ████████████████

Without actually raising exhaustion or finality as a defense, Defendants suggest that the public interest supports denying relief because the "administrative process regarding [CJE's] removal is ongoing."  Opp. 29.  But the action Plaintiffs complain about is Defendants' *initial* placement of CJE on the Entity List—an action that is unquestionably final.  *See Bennett v. Spear*, 520 U.S. 154, 178 (1997); 85 Fed. Reg. at 44,159 (publishing "final rule" that "implement[ed] the decision of the ERC" by "amend[ing] the Export Administration Regulations (EAR)").  Absent judicial intervention, removing CJE from the Entity List would require amending the EAR through a new rule published in the Federal Register.  *See Columbia Falls Aluminum Co. v. EPA*, 139 F.3d 914, 919 (D.C. Cir. 1998) ("Once a rule is final, an agency can amend it only through a new rulemaking.").  Plaintiffs' request to the Committee to remove CJE from the Entity List thus constituted a "petition[] for new rulemaking" that does not alter the finality of CJE's initial listing. *American Mining Cong. v. United States E.P.A.*, 907 F.2d 1179, 1185 (D.C. Cir. 1990); *see, e.g.*, *32 Cty. Sovereignty Comm. v. Department of State*, 292 F.3d 797, 799 (D.C. Cir. 2002) (construing similar petition to remove entity from list of "foreign terrorist organization[s]" as "request for a new rulemaking" that "did not render the [original] designation 'nonfinal'").

Defendants make the galling assertion that Plaintiffs already got "precisely the relief" they requested.  Opp. 29.  But Plaintiffs asked to be *removed from the Entity List*—████████████████

23



"The possibility of some future [agency action] that may or may not lead to a change in the rules does not ameliorate the harm that [Defendants'] current use of those rules is causing plaintiffs now." *Garcia v. Acosta*, 393 F. Supp. 3d 93, 107 (D.D.C. 2019) (alterations and ellipsis omitted) (quoting *Comite de Apoyo a Los Trabajadores Agricolas v. Perez*, 774 F.3d 173, 184 (3d Cir. 2014)).

Defendants also argue that injunctive relief should be denied "because it would interfere with a formal foreign affairs function of the Executive Branch." Opp. 30. But "[t]here is generally no public interest in the perpetuation of unlawful agency action." *League of Women Voters of the United States*, 838 F.3d at 12 (citing cases). Defendants may not act *ultra vires* even in pursuit of a "formal foreign affairs function." Whatever the public interest in adding entities to the Entity List for reasons that Defendants (though not Congress) believe is good policy, it is not an interest cognizable in this proceeding. *See Luokung*, 2021 WL 1820265, at *15 ("[T]he government 'cannot suffer harm from an injunction that merely ends an unlawful practice or reads a statute as required.'") (quoting *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015)).

24

Finally, Defendants invoke their interest in the protection of human rights—an interest that Esquel shares.  As noted, however, Defendants provide *no evidence whatsoever* for placing CJE on the Entity List.  Nor do they rebut Plaintiffs' extensive evidence showing that Esquel has committed no human rights violations and unequivocally condemns the odious practices of which CJE has been falsely accused.  And Defendants ignore Esquel's substantial evidence regarding its consistent promotion of corporate social responsibility goals, including related to human rights and labor rights, for which Esquel has received multiple awards from customers and international non-governmental organizations.  Because Defendants' reckless listing has forced Esquel to fire thousands of employees, removing CJE from the Entity List (and saving Esquel's U.S. business) would permit Esquel to again provide high-quality, well-paying employment in historically underdeveloped parts of the world—including employment to Uighurs and other ethnic minorities. Yang Decl. ¶¶ 9-15, 44.  For that reason, *granting* injunctive relief will promote human rights in a much more tangible way than maintaining Defendants' unlawful action.

In all events, "no matter how 'important, conspicuous, and controversial' the issue, *** an administrative agency's power to regulate in the public interest must always be grounded in a valid grant of authority from Congress." *Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 161 (2000).  As noted, Congress is currently considering a bill that would grant Defendants the precise authority they now claim is "clear."  Opp. 22.  Until they have such authority, it is squarely in the public interest for Defendants to obey existing law.

## CONCLUSION

For the reasons explained above, in Plaintiffs' memorandum of points and authorities, and in the declarations Plaintiffs submitted, Plaintiffs respectfully urge this Court to grant their motion and to preliminarily enjoin as soon as possible CJE's inclusion on the Entity List.

Respectfully submitted,

Dated:  September 13, 2021

 s/ James E. Tysse
James E. Tysse
  D.C. Bar No. 978722
Caroline L. Wolverton
  D.C. Bar No. 496433
Lide E. Paterno
  D.C. Bar No. 166601
Akin Gump Strauss Hauer & Feld LLP
2001 K Street N.W.
Washington, D.C. 20006
Telephone: (202) 887-4000
jtysse@akingump.com

*Counsel to Plaintiffs Changji Esquel Textile Co. Ltd.,
Esquel Enterprises Limited, and Esquel Apparel Inc.*